## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS

| | |
|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, on behalf of itself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HANGER, INC., VINIT ASAR, GEORGE MCHENRY,<br><br>Defendants. | Civ. A. No.  1:14-cv-01026<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED<br><br>**ECF CASE** |

Plaintiff City of Pontiac General Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of: (a) regulatory filings made by Hanger, Inc. ("Hanger" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases and media reports issued by and disseminated by the Company; (c) analyst reports concerning Hanger; and (d) other public information regarding the Company.

## INTRODUCTION

1.     This securities class action is brought on behalf of all persons or entities that:  (1) purchased Hanger's publicly traded securities between August 1, 2013 through August 7, 2014, inclusive (the "Class Period") and were damaged thereby.

1

2.      The claims asserted herein are alleged against the Company and certain its executive officers (collectively, "Defendants"), and arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

3.      Hanger, headquartered in Austin, Texas, is a leading provider of orthotic and prosthetic ("O&P") patient care services and is a major distributor of O&P devices in the United States.  Hanger operates in two segments: Patient Care and Products & Services.  Through its Patient Care segment, Hanger is the largest owner and operator of O&P patient care clinics in the U.S.  It manages an O&P provider network of approximately 1,150 clinics that coordinates all aspects of O&P patient care for insurance companies and operates in over 740 O&P patient care clinics in 45 states and the District of Columbia.  Through its Products and Services segment, Hanger is one of the largest distributors of O&P products in the U.S.

4.      Because of its role in the health care industry, Hanger's continued growth and success depends in large part on its ability to navigate the changing regulatory landscape and successfully receive reimbursements for services it provides from government funded insurance, namely Medicare and Medicaid, and private insurance companies.  In the years following the passage of the Patient Protection and Affordable Care Act ("ACA") in 2010, Medicare increased the number of audits that it conducted of reimbursement claims that were submitted for O&P services, with the goal of eliminating overpayment of claims and targeting fraud in the market.  These audits were conducted pursuant to the Recovery Audit Contractor program and are referred to as RAC audits.

5.      The Class Period begins on August 1, 2013, the first trading day after Hanger reported its second quarter fiscal year 2013 results.  On the Company's earnings conference call, Hanger's President and CEO, Defendant Vinit K. Asar, represented that the increase in Medicare

audits would largely pose a challenge for smaller O&P providers rather than for Hanger, and minimized the audits' impact on Hanger's business, stating that Hanger also expected to receive relief from the RAC audits in the coming year given further regulatory changes. According to Asar, Hanger also continued "to be successful in [its] appeals on these audits and are in the range of a 90% success rate with final adjudication in our favor."

6.     Defendants also assured investors that the Company took a cautious approach to accounting for its reserves for accounts receivable and bad debt. Specifically, on the August 1 earnings conference call, Hanger's Chief Financial Officer, Defendant George McHenry, spoke to analyst's concerns that the Company adequately reserved for bad debt given the increase in RAC audits. McHenry stated that the Company "had put additional reserves on the books" and "some new processes in place" to ensure the reserves were adequate. The Company further reported that its same-store sales continued to rise, representing strong overall growth in the Company, and that excluding outstanding RAC audits, its days sales outstanding ("DSOs"), a critical metric showing the days it takes a company to collect its account receivable, had actually decreased from the fourth quarter of 2012.

7.     These statements, and similar statements issued throughout the Class Period, were materially false and misleading. In truth, the Company was under tremendous pressure from the RAC audits, and knew, but misrepresented or concealed from investors, that its same-store sales growth was overstated and misleading, and that its reserves for bad debt and accounts receivables were inadequate.

8.     Then, on August 5, 2014, after the close of the market, the Company announced that it was delaying the release of its second quarter fiscal year 2014 earnings. On August 7, 2014, the Company stunned the market, reporting that earnings per share had plummeted 23.1%

from $0.52 per share to $0.40 per share from the same quarter in 2013, and that its estimate of earnings per share for fiscal year 2014 had dropped from $2.01 to $2.11 to $1.60 to $1.70. Defendants attributed this sharp decline to the severe pressure placed on the Company due to the increase in RAC audits of its reimbursement claims.  Defendants further announced that the Company's accounts receivable over 120 days had dramatically increased by $14 million year-over-year due to the impact of increased RAC audits; that the Company's operating costs had increased $8 million for the year, $4.2 million of which was attributable to an increase in bad debt; and that the Company's same-stores sales growth had contracted by 1.5%, similarly attributable to a slow-down in authorization and payments.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act, 15 U.S.C § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and (d). Hanger maintains its executive offices in this District and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

11.     Plaintiff City of Pontiac General Employees' Retirement System is a public pension fund that managed over $490 million in total assets on behalf of over 1,100 beneficiaries as of December 31, 2013.  Plaintiff purchased shares of Hanger stock on the New York Stock

Exchange during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

12.     Defendant Hanger Inc., a Delaware corporation headquartered in Austin, Texas, purports to be the world's top provider of orthotic and prosthetic services and products.  Hanger maintains its principal executive offices at 10910 Domain Drive, Suite 300, Austin, Texas 78758.  The Company's common stock trades on the New York Stock Exchange, which is an efficient market, under ticker symbol "HGR."   As of November 10, 2014, there were approximately 35.29 million shares of Hanger stock outstanding.

13.     Defendant Vinit K. Asar is, and was at all relevant times, the President and Chief Executive Officer of Hanger.

14.     Defendant George McHenry is, and was at all relevant time, the Chief Financial Officer of Hanger.

15.     Defendants Asar and McHenry are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with Hanger, possessed the power and authority to control the contents of Hanger's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts and omissions specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions which were being made were then materially false and/or misleading

5

## **BACKGROUND**

16.     Hanger is the leading provider of O&P patient care services and a major distributor of O&P devices in the United States.  The Company's Patient Care segment is the largest in the country, managing an O&P provider network of approximately 1,150 clinics, which coordinates all aspects of O&P patient care for insurance companies and operates in over 740 O&P patient care clinics in 45 states and Washington, D.C.

17.     The O&P industry in the United States is highly fragmented.  The majority of the companies only have a single facility with annual revenues of less than one million dollars. None of Hanger's competitors account for more than 2% of the country's total estimated O&P patient care clinic revenues.  Hanger is the dominant player in the O&P industry, capturing approximately 20% of the $4.3 billion spent each year for O&P products and services.

18.     Because of the nature of its operations within the healthcare industry, Hanger's success is strongly tied to receiving approval from insurers for reimbursements of patients' various O&P devices and therapeutic treatments.  Hanger's principal sources of reimbursements are Medicare, Medicaid, the U.S. Department of Veterans Affairs, and commercial private insurance companies.  In 2013, 2012, and 2011, government reimbursements accounted for approximately 40%, 40.4% and 40% of Hanger's net sales, respectively.

19.     In the years following the passage of the ACA, the O&P industry experienced increased scrutiny from Medicare and Medicaid, from which patients sought reimbursements for services rendered.  Specifically, a report issued by the U.S. Department of Health & Human Services Office of Inspector General in August 2011 titled "Questionable Billing by Suppliers of Lower Limb Prostheses" (the "OIG Report") presented new challenges for the O&P industry.

20.     The report found that though the number of patients with amputations was not dramatically growing, the amount that Medicare had spent per patient for prostheses had grown dramatically in recent years.  The report had three main findings for Medicare O&P services in 2009: (i) Medicare inappropriately paid $43 million in claims for lower-limb prostheses that did not meet certain requirements; (ii) Medicare paid an additional $61 million for beneficiaries with no claims from the referring physicians; and (iii) 267 suppliers of lower limb prostheses had questionable billing.  The OIG Report concluded that the questionable payments were the result of suppliers incorrectly billing for a prostheses for both the right and left limbs using two claims instead of one.  Billing in this way allowed suppliers to appear to only be billing for one limb when in fact they were billing for two.  The OIG Report concluded that these issues could be prevented with greater oversight and with a requirement that the referring physician document a face-to-face encounter with the patient to ensure that the prostheses was medically necessary.

21.     In response to the OIG Report, the Centers for Medicare & Medicaid Services ("CMS"), issued a letter in August 2011 to all Medicare providers, mandating a new standard for documenting the need for prosthetics.   Under the new requirements, a patient would need documentation from a physician detailing whether the prosthesis was medically necessary, whereas previously, documentation from the O&P clinical provider had been sufficient to justify the need.  In the aftermath of the OIG Report and issuance of the letter, CMS undertook an effort to more closely monitor the O&P market, increasing the number of audits of O&P claims.

22.     RAC audits are conducted randomly and are performed by contractors working for the government.  The contractors examine a claim, and if they choose to challenge it, either because medical necessity is questionable or for some other reason, then the O&P provider is required to immediately refund the value of what they were paid by CMS.  When this happens,

the claim goes back on to the provider's accounts receivable at the original date of service.  In order to appeal the audit, the provider must follow a three-tiered appeals process, with the first two levels being with the contractor who challenged the claim, and the third level being with an administrative law judge.  When a claim is won, the money goes back to the provider, and if it is lost, the provider writes-off the amount of the receivable.

23.     As the major provider of O&P care and devices in the country, Hanger reassured the market that it was uniquely positioned to withstand increased RAC audits.

## DEFENDANTS DEFRAUD INVESTORS

24.     The Class Period starts on August 1, 2013, the first trading day after Hanger reported its second quarter fiscal year 2013 results.  On August 1, Hanger held an earnings conference call with analysts during which Defendant Asar touted the Company's same-store growth of 3.9% and its "proven ability to produce consistent same-store growth of 3% to 5%, in an industry growing at approximately 2%, [which] demonstrates the strength of our business model and supports our long-term goals for growth."  Defendant McHenry further explained that "bad debt expense was 3.2% in the quarter, compared to 3% in 2012," however when adjusted for the impact of the RAC audits, "it would be reduced to 2.9%"

25.     Defendant Asar further commented on the increase of RAC audits in the O&P industry, downplaying the impact they would have on Hanger.  He stated that the Company had been "hearing stories that the financial position of some of these independent O&P providers has been severely and adversely impacted as a result of the increase in RAC audits" and that the audits were a "challenge, more so perhaps for the independent O&P providers than us…We continue to be successful in our appeals on these audits and are in the range of a 90% success rate with final adjudication in our favor."

26.      These statements assured investors that the Company did not face significant effects from increased RAC audits, that its growth was in line with expectations and that it adequately reserved for potential losses related to RAC audits.  Notably, analysts even viewed the increase in audits as a growth opportunity for Hanger to acquire its smaller competitors that were being "squeezed" by the audits.  Indeed, according to Noble Financial Capital Markets, it was expected that "RAC audits [would] have less of an impact [on Hanger] in the second half" of the year.  Analysts from Suntrust Robinson Humphrey similarly stated that RAC audit pressure is "unquestionably hitting the Mom & Pops harder than HGR."  Likewise, Stephens Inc. found management's statements concerning the steps Hanger took to alleviate the impact of RAC audits on its business reassuring, stating that "[m]anagement has implemented processes to make sure it is more timely [appealing audits] going forward, which should mitigate this issue."

27.      The statements and omissions set forth in ¶¶24-25 were materially false and misleading.  In truth, Defendants knew or recklessly disregarded the impact that the RAC audits would have on the Company, and knew or recklessly disregarded that the Company's loss provisions were not adequate and that it was not adequately accounting for the effect of increased RAC audits.  Defendants also knew or recklessly disregarded that the Company's same-store growth was not sustainable.

28.      On October 30, 2013, the Company held its earnings conference call for the third quarter of fiscal year 2013.  Defendants sought to mollify any concerns regarding the RAC audits' effect on the Company's performance and accounts receivable, emphasizing that the Company was still winning its appeals of Medicare audits "90% of the time."  Regarding the Company's performance, Defendant McHenry described same-store growth of 3.8% and as for

9

accounts receivable, McHenry stated that if one eliminated Medicare audits from the calculation of DSOs, the Company's DSOs had actually improved by 3 days compared to the end of 2012.

29.     On the same call, Defendant Asar explained that the RAC audits were more of a problem for Hanger's smaller competitors than for Hanger.  He further stated that Hanger was growing and that the patient volume at Hanger's clinic remained "status quo in the sense that we still are taking market share we believe on a national level from our competitors."

30.     Further, in the Form 8-K filed with the SEC reporting the Company's earnings for the third quarter of fiscal year 2013, Defendants assured the market that Hanger was not afflicted by the RAC audits.  Indeed, Defendant Asar stated that "the number of RAC and other Medicare audits stabilized in the quarter, as did our overall Medicare audit success rate."  Further, in response to questions from analysts, who continued to view the increasing RAC audits as a positive acquisition opportunity for the Company, Defendant Asar confirmed that "we are more in dialog than we have been in before with interested potential sellers."

31.     On the call, Defendants also informed analysts that the Company had made an adjustment to its classification of bad debt items, which had no impact on profitability or cash flow.  Analysts saw this as a positive resolution to an outstanding SEC investigation into Hanger's classification of bad debt.  For example, Stephens Inc. reported that "[g]iven that this pending investigation is a large overhang on the stock, we'd expect investors to breathe easier which should push shares higher over the next several months."[1]

32.     The statements and omissions set forth in ¶¶28-31 were materially false and misleading.  Defendants knew or recklessly disregarded that the Company's performance was

---

[1] The Company reported on May 6, 2014 that the SEC had concluded its investigation and was not taking any action.

greatly affected by the increased RAC audits and failed to disclose that the backlog in resolving audits was putting extreme strain on the Company.

33.     On February 13, 2014, Hanger held its fourth quarter fiscal year 2014 earnings conference call.  While it again reported increased delays in the RAC audit appeals process, Defendant Asar described the business as "strong," noting that Hanger had "successfully" navigated "a fair amount of headwinds" in 2013 and that the number of Medicare audits had begun to decline.  Defendant McHenry added that Hanger's success rate on appeals of Medicare audits remained steady at 90% and assured investors that the Company had conservatively increased its reserves for bad debts.  Defendants also continued to describe the RAC audits as having a "significant adverse impact on the independent O&P providers," rather than on Hanger.

34.     Analysts were encouraged by Hanger's results.  Indeed, Stephens Inc. reported that while the EPS guidance had been lowered, because it was attributable to an investment in back-office systems, "which should lead to operational efficiencies," it predicted that the investment would also lead to "cost savings late 2014."  Suntrust Robinson Humphrey similarly cited Hanger's earnings with approval, noting that "cash flow remains solid despite ongoing Medicare payment delays" and that Hanger had provided upwards guidance of 7-8% guidance for cash flow from operating activities.

35.     Defendants' statements and omissions set forth in ¶33 were materially false and misleading.  Defendants knew or recklessly disregarded that Defendants would be unable to prevent further losses that the Company was incurring as a result of increased pressure from RAC audits, that Hanger's reserves for accounts receivable and bad debt were inadequate, and that the Company's growth was not as strong as represented to investors.

36.     On May 6, 2014, Hanger reported earnings for its first quarter of fiscal year 2014 on an earnings conference call.  The Company announced EPS growth of 12%, an overall increase of 7.1% in sales, and a slight decline in sales at its distribution centers, largely due to extreme weather conditions that had affected patients' ability to get to the clinics.  Defendants continued to downplay the significance of the RAC audits on the Company's performance.  Specifically, Defendant McHenry reported that DSOs were now 64, one day better than the fourth quarter of 2013, and that while accounts receivable related to RAC audits had seen an increase, the Company's success rate on its appeals remained steady.  Further, while Hanger had seen a general slowdown in payments for its services, there had not been a significant impact on its reserves calculations, and in any event, Defendant McHenry reassured investors that they were watching this "very closely."

37.     Despite also reporting an increase in prepayment audits from private commercial insurance companies and Medicare, Defendant Asar assured investors that the Company's documentation supporting its receivables was sufficient to withstand an audit, and would help the Company to weather the changing regulatory landscape.  Indeed, he stated that "if we do get audited, whether it's a prepay or a RAC, we are going to appeal it because we have the confidence in our own paperwork."

38.     Analysts continued to view the Company positively.  Indeed, Jefferies noted that despite the earnings miss attributable to poor weather conditions, Hanger's "fundamentals are intact" and stated that there was "comfort in knowing that the company's consistent organic growth trajectory (+3% to 5% SSS [same-store sales] remains intact." Noble Financial Capital Markets similarly labeled the quarter "an anomaly" and reported that it expected "the company to bounce back to a more fundamental performance as the year progresses."   Defendants'

statements and omissions set forth in ¶¶36-37 were materially false and misleading.  Defendants knew or recklessly disregarded that the Company's reserves were inadequate and misrepresented the continued effect that Medicare audits were having on its growth.

## THE TRUTH ABOUT HANGER IS REVEALED

39.     On August 5, 2014, after the close of the market, Hanger announced that it was delaying the release of its earnings for the second quarter of fiscal year 2014.  Upon this news, the Company's stock price dropped almost 6% from $31.75 on August 5 to close at $29.87 on August 6.

40.     Then, on August 8, 2014, Hanger announced its earnings results for the second quarter of 2014, stunning the market with a report that its earnings per share had dropped 23.1% from $0.52 per share to $0.40 per share from the same quarter in 2013, and that its estimate of earnings per share for fiscal year 2014 had dropped from a range of $2.01 to $2.11 per share down to just $1.60 to $1.70 per share.  The Company also reported negative growth of 1.5% in same-store sales, attributing the decline to a slow-down in patient flow and payments, which required an increase to the Company's accounts receivable reserves.  Further, the Company's accounts receivable over 120 days dramatically increased by $14 million year-over-year due to the increase in RAC audits, and the Company's operating costs had increased $8 million for the year, $4.2 million of which was attributable to an increase in bad debt.

41.     Most significantly, on August 8, Defendants were forced to reveal the true scope of the Medicare audits on the Company's business.  Indeed, Defendant McHenry stated that the Company's DSOs had jumped, increasing to 72 days compared to 65 days at year-end and 59 days from the previous year.  He attributed the dramatic increase to the effect of Medicare audits.  McHenry likewise reported that the Company's success rate with appeals of RCA audits had

dropped to 88%, also noting that although the Company's system currently showed $19 million in RCA audits and Medicare prepayment audits, the Company expected the actual amount to be "considerably larger" given that the Company had $29.3 million in outstanding Medicare receivables over 120 days.  Defendant Asar attempted to downplay the Company's dismal results, stating that the Company was "best positioned not only to weather the environment today, but also emerge as a stronger provider of O&P services as the dust on all of this settles." These reassurances were completely ineffective.

42.     Analysts were stunned by this news.  For example, Noble Finance Capital Markets reduced Hanger's rating to "Hold," citing the Company's "very disappointing second quarter results" and the fact that management's outlook "for the remainder of the year does not really include a path that will drive positive sales comps in the near future; cost-cutting, while helpful, will not overcome negative sales comps."  Stephens Inc. likewise reported that Hanger's "[s]ales slowdown is alarming," pointing to the "lengthening pre-approval process from commercial insurers…likely driven by payers taking a cue from Medicare."  Suntrust Robinson Humphrey similarly downgraded Hanger's rating to "Neutral" due to its "low earnings visibility, decelerating same-market growth and ongoing authorization/collection challenges."  On this news, the price of Hanger stock plummeted 25% from $29.87 per share on August 7 to close at $22.48 per share on August 8 on heavy trading volume.

## LOSS CAUSATION

43.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Hanger's common stock and operated as a fraud or deceit on the Class.  Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed

to the market on August 7, 2014, the price of Hanger's common stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Hanger's common stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, i.e., damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired the publicly traded securities of Hanger during the Class Period.  Excluded from the Class are Defendants and their families, directors, and officers of Hanger and their families and affiliates.

45.    The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of November 10, 2014, there were approximately 35.29 million shares of Hanger stock outstanding, owned by hundreds or thousands of investors.

46.    There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

A.    Whether Defendants violated the Exchange Act;

B.    Whether Defendants omitted and/or misrepresented material facts;

C.    Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

D.    Whether the Individual Defendants are personally liable for the alleged misrepresentations and omissions described herein;

15

E.      Whether the price of Hanger securities was artificially inflated;

F.      Whether Defendants' conduct caused the members of the Class to sustain damages; and

G.      The extent of damage sustained by Class members and the appropriate measure of damages.

47.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

48.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

49.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

50.     Hanger's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

51.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Hanger who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants

16

expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## **PRESUMPTION OF RELIANCE**

52.     At all relevant times, the market for Hanger's securities was an efficient market for the following reasons, among others:

A.     Hanger's stock met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

B.     As a regulated issuer, Hanger filed periodic public reports with the SEC and NYSE;

C.     Hanger regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

D.     Hanger was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).   Each of these reports was publicly available and entered the public marketplace.

53.     As a result of the foregoing, the market for Hanger securities promptly digested current information regarding Hanger from all publicly available sources and reflected such information in the price of Hanger securities.   Under these circumstances, all purchasers of Hanger securities during the Class Period suffered similar injury through their purchase of Hanger securities at artificially inflated prices and the presumption of reliance applies.

54.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the true of effect of the RAC audits on Hanger's business—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Medicare and Medicaid accounts to Hanger's business, as set forth above, that requirement is satisfied here.

## COUNT I

**For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants**

55.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

56.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Hanger securities at artificially inflated prices.

57.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to

maintain artificially high market prices for Hanger securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

58.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

59.     During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.     Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Hanger's true condition from the investing public and to support the artificially inflated prices of the Company's securities.

61.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Hanger securities.  Plaintiff and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Hanger securities had been artificially inflated by Defendants' fraudulent course of conduct.

62.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's securities during the Class Period.

63.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

**For Violation of Section 20(a) of the Exchange Act Against the Individual Defendants**

64.     Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

65.     The Individual Defendants acted as controlling persons of Hanger within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Hanger, the Individual Defendants had the power and ability to control the actions of Hanger and its employees.  By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

20

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## JURY DEMAND

66.      Plaintiff demands a trial by jury.

DATED: November 12, 2014

/s/ Gerald T. Drought
**MARTIN & DROUGHT, P.C.**
Gerald T. Drought
State Bar No. 06134800
Federal Bar No. 8942
Bank of America Plaza, 25th Floor
300 Convent Street
San Antonio, Texas 78205
Telephone: (210) 227-7591
Facsimile: (210) 227-7924
gdrought@mdtlaw.com

*Local Counsel for Plaintiff City of Pontiac*
*General Employees' Retirement System*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**
Gerald H. Silk
Avi Josefson
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
jerry@blbglaw.com
avi@blbglaw.com

*Counsel for Plaintiff City of Pontiac General*
*Employees' Retirement System and Proposed*
*Lead Counsel for the Class*

## CERTIFICATION PURSUANT TO
## THE FEDERAL SECURITIES LAWS

I, Charlie J. Harrison III, on behalf of City of Pontiac General Employees' Retirement System ("Pontiac General"), hereby certify, as to the claims asserted under the federal securities laws, that:

1. I am the Chairman of Pontiac General.  I have reviewed a complaint filed in this matter.

2. Pontiac General did not purchase the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3. Pontiac General is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4. Pontiac General's transactions in the Hanger, Inc. securities that are the subject of this action are set forth in the chart attached hereto.

5. Pontiac General has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *City of Pontiac General Employees' Retirement System v. Wal-Mart Stores, Inc.,*
   Case No. 12-cv-5162 (W.D. Ark.)
   *Willis v. Big Lots, Inc.,* Case No. 12-cv-604 (S.D. Ohio)
   *Patel v. L-3 Communications Holdings Inc.,* Case No. 14-cv-6038 (S.D.N.Y)

6. Pontiac General has served as a representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

   *City of Pontiac General Employees' Retirement System v. Genworth Financial, Inc.*
   Case No. 14-cv-682 (E.D. Va.)

7. Pontiac General has sought to serve as a lead plaintiff and representative party on behalf of a class in the following actions under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motions for lead plaintiff or was not appointed lead plaintiff:

   *Greenberg v. The Cooper Companies, Inc.,* Case No. 11-cv-5697 (N.D. Cal.)
   *Sapssov v. Health Management Associates, Inc.,* Case No. 12-cv-46 (M.D. Fla.)
   *Fifield v. Green Mountain Coffee Roasters, Inc.,* Case No. 12-cv-91 (D. Vt.)
   *Mulligan v. Impax Laboratories, Inc.,* Case No. 13-cv-1037 (N.D. Cal.)

8. Pontiac General is currently seeking to serve as a lead plaintiff and representative party on behalf of a class in the following action filed under the federal securities laws during the three years preceding the date of this Certification:

*City of Pontiac General Employees' Retirement System v. Dell Inc.*,
Case No. 14-cv-3644 (S.D.N.Y.)

9. Pontiac General will not accept any payment for serving as a representative party on behalf of the Class beyond Pontiac General's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this ___ day of November, 2014.

Charlie J. Harrison III
Chairman
*City of Pontiac General Employees'
Retirement System*

**City of Pontiac General Employees' Retirement System**
**Transactions in Hanger, Inc. (HGR)**

| Transaction | Date | Shares | Price |
|---|---|---|---|
| Purchases | 10/10/2013 | 23 | 33.4323 |
| Purchases | 11/12/2013 | 712 | 35.9000 |
| Purchases | 3/26/2014 | 23 | 32.7224 |
| Purchases | 5/6/2014 | 302 | 31.4050 |
| Purchases | 5/6/2014 | 847 | 31.1751 |
| Purchases | 5/7/2014 | 642 | 30.2976 |
| Purchases | 5/8/2014 | 565 | 30.4661 |
| Purchases | 6/4/2014 | 311 | 29.8000 |
| Purchases | 6/4/2014 | 326 | 29.8644 |
| Purchases | 6/5/2014 | 65 | 30.3060 |
| Purchases | 6/6/2014 | 149 | 32.1580 |
| Sales | 8/1/2013 | (145) | 31.5210 |
| Sales | 8/1/2013 | (164) | 31.2481 |
| Sales | 8/1/2013 | (415) | 31.4216 |
| Sales | 8/13/2013 | (221) | 32.8700 |
| Sales | 1/31/2014 | (1,905) | 33.6601 |