IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

CITY OF PONTIAC GENERAL EMPLOYEES'
RETIREMENT SYSTEM, on Behalf of Itself and
All Others Similarly Situated,
                                    Plaintiff,

-vs-                                                    Case No.  A-14-CA-1026-SS

VINIT K. ASAR, GEORGE McHENRY, and
HANGER, INC.,
                                    Defendants.

# O R D E R

BE IT REMEMBERED on the 11th day of December 2015, the Court held a hearing in the
above-styled cause, and the parties appeared by and through counsel.  Before the Court is Defendants
Hanger, Inc., Vinit Asar, and George McHenry's Motion to Dismiss [#61], Lead Plaintiff Alaska
Electrical Pension Fund's Response [#64] in opposition, and Defendants' Reply [#68] in support.
Having reviewed the documents, the arguments of the parties at hearing, the governing law, and the
file as a whole, the Court now enters the following opinion and orders.

## Background[1]

This is a securities fraud class action brought on behalf of all persons who purchased
common stock of Defendant Hanger, Inc., an orthotic and prosthetic (O&P) patient care services

---

[1] On March 24, 2016, the Court held a status conference in this case at the parties' request.  During that status
conference, counsel for Plaintiff endeavored to inform the Court of "recent developments" in this case which allegedly
corroborate the allegations in the complaint.  Counsel seems perhaps to misunderstand the permissible scope of the
Court's inquiry on a motion to dismiss.  A motion to dismiss tests the sufficiency of the allegations as pled in the
complaint.  Hearings or filings related to a motion to dismiss are improper fora for the introduction of evidence.

company, between July 1, 2013 and November 6, 2014 (the Class Period). Lead Plaintiff Alaska

Electrical Pension Fund, on behalf of the plaintiff class, alleges that during the Class Period, Hanger,

its CEO, Defendant Vinit Asar, and its former CFO, Defendant George McHenry, made a variety

of misrepresentations to shareholders in violation of §§ 10(b) and 20(a) of the Securities Exchange

Act of 1934 and SEC Rule 10b-5. Defendants have moved to dismiss, arguing Plaintiff has failed

to adequately plead scienter, falsity, and loss causation. Defendants also contend many of the

allegedly misleading statements identified by Plaintiff fall within the Private Securities Litigation

Reform Act (PSLRA)'s safe harbor. As set forth below, the Court agrees with Defendants that

Plaintiff has failed to adequately plead scienter. The motion to dismiss is therefore GRANTED, and

the Court need not reach Defendants' remaining arguments at this time.

## A.     Hanger

Hanger is America's "dominant provider of products and services" in the O&P industry. Am.

Compl. [#58] ¶ 7. Reimbursements from government-funded health insurance programs—primarily

Medicare, Medicaid, and care provided by the U.S. Department of Veterans Affairs—account for

approximately 40% of Hanger's net sales. *Id.* ¶ 8. Prior to the Class Period, Hanger had reported

positive same-store sales growth[2] in every quarter since 2005, operated approximately 740 clinics

across the nation, and captured approximately 20% of the national market, the largest market share

held by any single O&P provider. *Id.* ¶¶ 7, 8.

---

[2] Same-store sales is a statistic used to track the sales of a company's established stores, or stores that have been open for at least one year, over a certain period of time. Same-store sales figures "allow[] analysts and investors to evaluate the actual internal growth of [a] company, unclouded by acquisitions or divestitures." *In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, MDL-1530, 2004 WL 5278716, at *1 (E.D. Tex. 2004).

Beginning in mid-2008, however, the Centers for Medicare and Medicaid Services (CMS), the federal agency that administers Medicare and Medicaid, recognized that Medicare had become "particularly vulnerable" to fraud and waste in the area of O&P claims. *Id.* ¶ 9. In 2010, Congress strengthened programs designed to combat waste in Medicare spending via the Affordable Care Act. One such program was the Recovery Audit Contractor (RAC) program, which aimed to identify and recoup past improper payments made by Medicare through more frequent post-payment audits of medical providers' claims. *Id.* In conducting those audits, RAC auditors reviewed the medical records furnished by providers in support of their Medicare claims to determine whether the medical devices and services paid for by Medicare were, in fact, medically necessary for the patient. *See id.* ¶¶ 53, 54.

Given its large share of the national O&P market, this change in the regulatory environment had a significant impact on Hanger, which was not prepared for the increased scrutiny. *See id.* ¶¶ 13, 26. Because of a "widespread failure to secure the medical records required . . . before submitting a Medicare claim," beginning sometime in 2012, Hanger began to "routinely" fail the RAC audits. *Id.* ¶¶ 19, 23, 27. According to Plaintiff, Hanger did not collect sufficient documentation in support of its Medicare claims even though it was aware of Medicare guidelines indicating what was and was not sufficient to pass an audit. *See id.* ¶¶ 23, 27, 29. Failing the audits meant Hanger was required to return to Medicare money it had already recorded as revenue, and while Hanger successfully appealed the majority of the unfavorable audit determinations, the lengthy appellate process created significant financial uncertainty for Hanger. *See id.* ¶¶ 19, 20, 21. Despite this experience, "Hanger did not improve its documentation processes after 2012" and "[b]y 2013, audits were coming in on a regular basis." *Id.* ¶ 24.

Hanger's documentation deficiencies, audit failures, and financial difficulties were compounded by two additional problems during the Class Period. The first, in essence, is that Hanger spread itself too thin by continuing to acquire smaller O&P clinics while already financially squeezed by the increased regulatory oversight. *See id.* ¶¶ 30–32. According to Plaintiff, Hanger's "documentation issues were exacerbated each time Hanger made an acquisition . . . because the clinics then had to devote resources that they did not have toward . . . moving patient data from the acquired company's [clinic management] system to Hanger's system[.]" *Id.* ¶ 31. This movement of data was a "major undertaking and a disruption" that "actually decreased [Hanger's] sales growth" by increasing employees' workloads and encouraging turnover. *Id.* ¶ 32.

The second problem was Hanger's rollout of Janus, a new clinic data management system. *See id.* ¶ 30. As the rollout began, the first clinics involved reported that using Janus led to a reduction in clinical efficiency; specifically, Hanger clinicians were required to spend more time entering patient data into Janus than they had using the old system, which meant they had less time to see patients and make sales. *Id.* ¶ 34.

## B.     The Allegedly False & Misleading Statements

These difficulties set the stage for the various allegedly false and misleading statements identified by Plaintiff in its lengthy complaint. The statements Plaintiff identifies are legion, and are all drawn from Hanger's press releases, conference calls, and SEC forms disclosing and discussing Hanger's financial results in every quarter during the Class Period. The allegedly false and misleading statements can be loosely divided into four different substantive categories: statements related to (1) Hanger's financial results, particularly its same-store sales growth numbers; (2) Hanger's rate of success with the RAC audits; (3) the state of Hanger's internal controls,

particularly its documentation collection practices; and (4) Hanger's acquisition strategy and the Janus implementation.  In general, Plaintiff alleges that in light of the problems outlined above, Hanger painted an overly rosy picture of its financial health and reported materially false financial results during the second, third, and fourth quarters of 2013 (2Q13, 3Q13, and 4Q13), the 2013 fiscal year (FY2013), and the first and second quarters of 2014 (1Q14 and 2Q14).  The specific allegedly false or misleading statements identified by Plaintiff are, set forth as briefly as possible, as follows.

      1.      **2Q13 Press Release**

Hanger announced its 2Q13 financial results in a press release issued on July 31, 2013.  In addition to the specific dollar amounts of income and income per share reported, Defendants represented "[s]ame store sales in [Hanger's] Patient Care segment continued to be strong, delivering 3.9% growth in the quarter" and "net sales [were] $273.7 million for the quarter . . . an increase of $22.0 million, or 8.7%" from the year prior.  Am. Compl. [#58] ¶ 63.  The press release "acknowledged that 'higher costs in the quarter related to increased [RAC] audits . . . had a negative impact on operating margin,'" but stated Hanger would "remain sharply focused on the key value drivers of our business—same center sales and O&P acquisitions—while we weather regulatory pressures[.]" *Id.*

      2.      **2Q13 Conference Call**

On August 1, 2013, Asar and McHenry led a conference call to discuss the 2Q13 results. During the call, Asar stated that "same-center sales [were] up 3.9%, compared to the prior year, showing a healthy increase in our sales momentum" and noted Hanger's "proven ability to produce consistent same-store growth of 3% to 5%, in an industry growing at approximately 2% . . . demonstrat[es] the strength of our business model and support[s] our long-term goals for growth in

this $4.3 billion market." *Id.* ¶ 64.  Asar explained Hanger was "not seeing any slowdown in volume of patients or the work that we have in process.  So that trajectory continues and that's reflected in the same-store sales growth number." *Id.*  Concerning the regulatory environment, Asar noted "the increased RAC audits [were] a challenge, more so perhaps for the independent O&P providers than [Hanger]." *Id.* ¶ 65.  Finally, concerning internal controls, Asar remarked he had "confidence . . . that we have the appropriate documentation and the processes.  If we do get audited down the road, we'll have the documentation." *Id.*

McHenry stated Hanger's drop to a "90% success rate on RAC audits" and "reserves estimates on the approximate[ly] $9.8 million in RAC audits still outstanding" resulted from "sett[ling] a number of appeals" that quarter.  *Id.* ¶ 66.  Despite the additional reserves, McHenry explained, Hanger's "methodology is exactly the same.  The only thing that's changed is we changed our assessment of how much reserve we needed in the second quarter." *Id.*  McHenry further stated the settlements reflected "a fair number . . . timing out" of the deadline to appeal, a problem he alleged Hanger fixed by "put[ting] some new processes in place" and "beef[ing] up our documentation around the medical necessity[.]" *Id.*  Henry remarked that Hanger was "going to get better as time moves forward" and that the "[reserve] balance shouldn't grow materially going forward . . . it's probably crescendoed at this point." *Id.*

Concerning Hanger's acquisition strategy and the Janus implementation, Asar stated that Hanger's "acquisition program remains on track to meet or exceed our goal of approximately $20 million in annualized revenues" and explained Hanger's "biggest criteria" in choosing companies to acquire is that the targets "ha[ve] the correct elements of [Medicare audit] compliance embedded with[in] them[.]" *Id.* ¶ 67.  Asar remarked Hanger "expected [Janus] to begin to bear fruit" as

Hanger had "completed the pilot phase and [was] in the process of beginning [the] national rollout." *Id.*

### 3.    2Q13 SEC Forms 10-Q and 8-K

Hanger filed its SEC Form 10-Q for 2Q13 on August 7, 2013.  The Form 10-Q stated Hanger's reported financial results were a "fair statement of the Company's financial position, results of operations[,] and cash flows for such periods." *Id.* ¶ 68.  As required by the Sarbanes-Oxley Act, both Asar and McHenry attached to the Form 10-Q "a joint certification stating 'that information contained in the [Form 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company,'" as well as individual certifications stating the Form 10-Q did "not contain any untrue statement[s]" or "omit to state . . . material fact[s]," the financial results were "fairly present[ed] in all material respects," and Hanger's internal controls "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles." *Id.*

Hanger also issued a Form 8-K on August 21, 2013, disclosing its current investor presentation materials.  The materials disclosed stated that government reimbursements for Hanger's Patient Care business had a "[l]ow compliance risk due to significant investment in internal processes and controls." *Id.* ¶ 69.  A second Form 8-K issued on November 12, 2013, and contained the same statement. *Id.*

### 4.    3Q13 Press Release

Hanger announced its 3Q13 financial results in a press release issued on October 29, 2013. Again, Plaintiff alleges the income and income-per-share figures reported were false and misleading in and of themselves.  Additionally, the press release represented Hanger made "net sales of $271.1

million for the quarter . . . , an increase of $28.6 million, or 11.8%," from the previous year, with

"strong same center sales growth of 3.8% in our Patient Care segment." *Id.* ¶ 77.  Concerning audits,

the press release stated "the number of RAC and other Medicare audits stabilized in the quarter, as

did [Hanger's] overall success rate." *Id.*

**5.     3Q13 Conference Call**

On October 30, 2013, Asar and McHenry led a conference call to discuss Hanger's 3Q13

financials.  Both reiterated Hanger's net sales and same-store sales figures for 3Q13.  Asar stated the

growth represented was a "testament to our strategy of driving organic growth in our existing Patient

Care clinics, supplemented with our successful acquisition program" and "appropriately reflect[ed]

the strength of our underlying business in this environment." *Id.* ¶ 78.

Concerning the Medicare audits and Hanger's internal controls, Asar remarked "that due to

the focus and strength of [Hanger's] internal compliance and audit programs, we have maintained

[a] 90% success rate in our appeals processes at final adjudication[.]" *Id.* ¶ 79.  Asar indicated the

"large backlog of appeals in the administrative law system" was the reason for the "longer time

required to resolve these audits." *Id.*  McHenry stated that in "all audits," Hanger was "still winning

90% of the time," and noted that in contrast with the "distress in the industry" over the audits,

"especially with the smaller, independent O&Ps," Hanger continued to "fight those appeals as they

c[a]me in" and would "appeal every RAC audit . . . just because of the confidence we have in our

processes." *Id.* ¶¶ 79–80.

Regarding acquisitions, Asar stated Hanger's "acquisition pipeline remain[ed] healthy with

a robust number of interested sellers." *Id.*  Finally, concerning the Janus implementation, Asar

explained that "what we're seeing is probably the 4 or 5 days leading up to . . . the implementation,

there is some disruption because there's some training and hardware changes happening.  And then the scheduling slows down for about anywhere between three and six weeks.  We do see a slight slowdown in patient schedules." *Id.* ¶ 81.

### 6.     3Q13 SEC Form 10-Q

Hanger filed its SEC Form 10-Q on November 8, 2013.  The Form 10-Q repeated the 3Q13 financial results, and certified those figures fairly and reliably presented Hanger's financial picture with language identical to the assurances contained in the 2Q13 Form 10-Q.  Again, Plaintiff alleges all such statements were false and misleading.

### 7.     FY2013 Press Releases

On January 30, 2014, Hanger issued a press release disclosing its preliminary financial results for 4Q13 and FY2013.  The press release announced an "anticipate[d] adjusted diluted earnings per share ['EPS'] for fiscal year 2013 to be between $1.94 and $1.96, which [wa]s below the previous guidance range of $2.08 to $2.11," but stated Hanger "still anticipate[d] delivering adjusted EPS growth of at least 8% for 2013." *Id.* ¶ 89.

The final financial results were announced by press release on February 12, 2014.  Again, Plaintiff alleges the results themselves were false and misleading.  *See id.* ¶ 93.  As for same-store-sales numbers, the press release stated Hanger experienced a "fourth quarter net sales increase of $8.6 million, or 3.2%, . . . as the result of an $11.1 million, or 4.9%, increase in the Patient Care segment . . . comprised of a $2.8 million, or 1.3%, increase in same center sales." *Id.* ¶ 94.  The press release further reported that "[n]et sales for the year . . . increased $72.0 million, or 7.4%, to $1,046.4 million from $974.4 million in the same period of 2012 . . . driven by an $18.8 million, or 2.4%, increase in same center sales in the Patient Care segment." *Id.*  Revenues for 2014 were

projected to be "between $1.110 and $1.130 billion, resulting from 3% to 5% same center sales growth in [Hanger's] Patient Care Segment." *Id.* ¶ 95.

Concerning Medicare audits, the press release stated Hanger had achieved its 2013 financial results "while weathering . . . an increase in the number of Medicare audits . . . and operational issues in one of [Hanger's] businesses[,]" and declared that "[e]ntering 2014[, Hanger's] core business remains healthy[.]" *Id.* Regarding the Janus implementation, the press release noted Hanger was investing in "centralization of [Hanger's] billing and processing activities and improvements in its finance, accounting[,] and information technology functions." *Id.* ¶ 95.

### 8.    FY2013 Conference Call

Again, the following day, Asar and McHenry led a conference call to discuss the financial results. During the call, McHenry reiterated all of the financial figures set forth in the press release. *See id.* ¶ 96. Referencing the 2014 projected revenues, Asar noted Hanger's "projected same-store growth of 3% to 5%, combined with a slightly higher acquisition outlook of between $35 million and $45 million, reinforces our confidence in [Hanger's] core business." *Id.* McHenry stated Hanger's "success rate on appeals of Medicare audits remain[ed] at 90%" and described the "core O&P business" as "strong despite the headwinds of Medicare audits and the increasingly delayed appeals process." *Id.* ¶ 97.

Asar and McHenry also positively characterized Hanger's acquisition strategy, explaining acquisitions were a "driver to our growth in the Patient Care segment," the "pipeline for acquisitions had remained strong," and Hanger had in 2014 already acquired companies "with approximately $20 million in annualized revenue[.]" *Id.* ¶ 98. Expanding on the 2014 acquisitions, McHenry explained they "happened mid-January, so we'll get the benefit from that for the year." *Id.* McHenry also

addressed the process of integrating those companies' clinic management systems with Hanger's, noting Hanger would "integrate their procurement, and their backup software is just to get the synerg[y] we're looking for." *Id.*

Turning specifically to the Janus implementation, Asar remarked that "Janus will allow [Hanger] to more effectively embrace the Electronic Health Records environment, and also provide more efficiencies and transparency in [Hanger's] Revenue Cycle Management processes[.]" *Id.* ¶ 99. Asar characterized Janus as a "multiyear $35 million investment in [Hanger's] infrastructure that will continue to strengthen [Hanger's] process and systems capabilities," and stated Hanger's "core business . . . will only get stronger as Janus . . . continue[s] to take hold and provide value for . . . shareholders." *Id.*

### 9.    FY2013 SEC Form 10-K

As with Hanger's previous SEC filings, Plaintiff alleges the Sarbanes-Oxley certifications in Hanger's FY2013 Form 10-K were false and misleading. *See id.* ¶ 103.  Additionally, Plaintiff alleges the Form 10-K's statement Hanger disclosed to its auditors "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information" was false and misleading. *Id.*

### 10.   1Q14 Press Release

Hanger issued a press release announcing its 1Q14 financials on May 5, 2014.  Again, Plaintiff alleges the financial results themselves were false and misleading statements. *See id.* ¶ 110. The press release described "net sales of $235.6 million for the quarter . . . , an increase of $6.2 million" from the previous year, and stated the increase "was the result of a $6.5 million, or 3.5%[,]

-11-

increase in the Patient Care segment." *Id.* ¶ 111.  The press release also disclosed "a $3.5 million, or 1.8%, decline in same center sales" which was attributed to "the impact of severe weather in the eastern and central parts of the U.S." *Id.*  Overall, however, the press release stated Hanger's "outlook on the core business remains very positive" and although "the reimbursement environment[] will put some pressure on [Hanger's] top line this year . . . , we still anticipate healthy same center sales between 3% and 5% for the remainder of 2014." *Id.*

**11.     1Q14 Conference Call**

Asar and McHenry hosted a conference call discussing Hanger's 1Q14 financial results on May 6, 2014.  McHenry reiterated all of the financial results set forth in the press release, adding that in the "Western zone, where the weather was not a significant factor, . . . sales increased by 2.4%" and that he believed Hanger "will get . . . to the 3% — the 5% range for the remainder of the year" and to "2% to 4% for the full year." *Id.* ¶ 112.  "[D]espite the . . . weather-related results," Asar added, "we remain confident in the fundamental patient flow of our core O&P business for the rest of the year." *Id.*

McHenry noted Hanger's "success rate on [Medicare] appeal[s] remained just under 90%" and characterized the "build in the receivables" as "simply because there aren't very many claims that are getting settled at the other end of the equation[.]" *Id.* ¶ 113.  Similarly, Asar stated Hanger "continue[d] to monitor and to adapt to the changing reimbursement environment driven by the volume of Medicare audits and delayed appeals processes," again contrasting Hanger with smaller O&P providers who "have not invested in regulatory or reimbursement experts." *Id.* ¶ 114.  Asar also represented that "the volume of RAC audits ha[d] slowed down." *Id.*

In response to a question about increased scrutiny from Medicare on Hanger's higher-tech, more expensive prosthetics, Asar stated it was "tak[ing] longer to get authorizations . . . for the higher ticket items" because Hanger was required to "provid[e] a little more documentation or answer[] more questions." *Id.* ¶ 115.  Asar confirmed that "if we do get audited, . . . we are going to appeal it because we have the confidence in our own paperwork." *Id.*

Asar also discussed Hanger's acquisition strategy and the Janus implementation, stating "[t]he fundamentals of our O&P business also remain strong when we look at our patient flow combined with our acquisition results and pipeline. . . .  O&P acquisition activity remains right on track as we see a continued healthy pipeline of independent O&P providers that are interested in selling their businesses to us." *Id.* ¶ 116.  Asar explained "we carefully scrutinize [potential acquisitions] to ensure we acquire businesses that are healthy, have a good record of regulatory and reimbursement compliance[,] and are a good cultural fit." *Id.*  Finally, Asar noted the Janus "implementation continue[d] to go as planned.  We are pleased with the continued rollout and associated training events that our teams are going through as part of these implementations." *Id.*

### 12.     1Q14 SEC Form 10-Q

Plaintiff alleges Defendants' Sarbanes-Oxley certifications in Hanger's 1Q14 Form 10-Q were, like the other SEC filings at issue, themselves false and misleading. *See id.* ¶ 118.

### 13.     2Q14

Finally—although, as explained below, Plaintiff alleges Hanger's August 7, 2014 press release disclosing its 2Q14 financial results and August 8, 2014 conference call discussing those results contained corrective disclosures—Plaintiff also claims that same press release and conference call contained false and misleading statements in that they reported false financial results.  Plaintiff

also alleges Hanger's 2Q14 SEC Form 10-Q contained the same false and misleading certifications as the previous SEC filings.  *See id.* ¶ 131.

## C.    The Alleged Corrective Disclosures

Plaintiff alleges Defendants' corrective disclosures came in an August 7, 2014 press release disclosing Hanger's 2Q14 preliminary financial results, an August 8, 2014 conference call with Asar and McHenry discussing that press release, and a November 6, 2014 "announce[ment]."  *See id.* ¶¶ 126–127, 179.  The August 7, 2014 press release reported Hanger had experienced a 1.5% decline in same-store sales, which was attributed to "a slowdown in authorizations from payors" and "a slowdown in payments, which requires increased accounts receivable reserves and lowers net sales." *Id.* ¶ 126.  The press release further stated that "[t]he continuing pressure on authorizations, collections[,] and patient flow has had a significant impact on our top and bottom line to date, and will continue to pressure our earnings growth at least through the remainder of this year." *Id.*

During the August 8, 2014 conference call discussing the press release, Asar reiterated the statements made in the press release and characterized the decline in sales as due to "increased pressure and a slowdown in payment authorizations from both government and commercial payors," the "impact of Medicare audits continu[ing] to lock up our funds, and the "amplifi[cation]" of those issues "against the backdrop of . . . Janus, . . . where those clinics that are on Janus are working on two collection systems . . . as they transition to Janus." *Id.* ¶ 127.  McHenry noted Hanger expected "same-center sales for the second half of 2014 will be flat to down 2%" and down "1% to 2%" for the year. *Id.*  After the August 7 press release and August 8 conference call, Hanger stock fell from $29.87 per share to $22.48 per share. *Id.* ¶ 130.

As for the November 6, 2014 alleged corrective disclosure, Plaintiff's complaint provides little detail.  On that date, Defendants announced the release of Hanger's 3Q14 financial results would be delayed "to complete accounting reviews."  *Id.* ¶ 179.  Following the announcement, Hanger stock fell "almost another 18% in value on heavy trading volume."  *Id.* ¶ 179.

## D.      The Restatement Announcement

On February 17, 2015, Hanger issued a press release announcing it would be restating the majority of its previously issued financial statements for 2012, 2013, and 2014, including all of the SEC Forms 10-Q and 10-K described above.  In the announcement, Hanger disclosed that there were "material weaknesses" in its "internal control over financial reporting," including "the design and operation of effective controls" over billing, invoicing, and accounts receivable allowances.  *Id.* ¶ 135.  The press release further disclosed Hanger had "[d]elayed commencement of depreciation expense related to [Janus]," which had resulted in an overstatement of $1.5 million in income through the first half of 2014.  *Id.*

Finally, on March 24, 2015, Hanger announced the release of its FY2014 financial results would be delayed.  *Id.* ¶ 136.  Following the announcement, Moody Investors Service downgraded Hanger's Corporate Family Rating and Probability of Default Rating, two ratings that reflect the likelihood of default on a corporation's debt and debt-like obligations, from Ba3 to B1 and Ba3-PD to B1-PD, respectively.  As of the date the amended complaint was filed, May 1, 2015, Hanger had yet to file its 3Q14 or FY2014 financial results.

## E.      Plaintiff's Scienter Allegations

According to Plaintiff, Asar and McHenry knew all of the statements described above were materially false and misleading at the time they were made.  Specifically, Plaintiff claims Asar and

McHenry "were well aware of all the facts concerning Hanger's same store sales, Medicare audits[,] and internal processes and controls" because "Hanger's success depended upon its ability to receive approval for reimbursements from government . . . sources" which "accounted for approximately 40%" of Hanger's net sales. *Id.* ¶ 165.  Because the information that would enable Hanger to obtain those reimbursements and account for its sales was all entered into Hanger's clinic management system, Plaintiff alleges, the transition to Janus was "of key importance" to Hanger, and Asar and McHenry were updated on the status of the rollout "through monthly presentations." *Id.*  Plaintiff also cites Asar and McHenry's certifications attached to Hanger's SEC filings and the disclosures made in Hanger's February 17, 2015 press release announcing the forthcoming restatement as establishing scienter. *See id.* ¶ 166.

Plaintiff alleges Defendants made the false statements "to maintain the inflation in Hanger's stock price"; according to Plaintiff, the market had previously reacted negatively to Hanger's same-store sales growth results coming in below estimate, and Asar and McHenry knew "[t]hat type of reaction . . . would wipe out the value of their holdings and their income." *Id.* ¶ 164.  Plaintiff alleges 53% of Asar's compensation and 42% of McHenry's compensation was paid in stock, and both "made it a practice of supplementing their income with stock sales." *Id.*  Finally, Plaintiff points out Hanger's compensation policies also included performance-based equity awards given "only if long-term value creation is generated for [Hanger] stockholders." *Id.*

## Analysis

### I.    Legal Standard

### A.    Motion to Dismiss—Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the

complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## B.      Securities Exchange Act § 10(b) Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities.  15 U.S.C. § 78j(b).  Under this grant of authority, the SEC issued Rule 10b-5, which makes it unlawful:

> (a)      To employ any device, scheme, or artifice to defraud,

> (b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).  To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is limited to "highly unreasonable omissions or misrepresentations" involving

an "extreme departure from the standards of ordinary care." *Nathenson v. Zonagen, Inc.*, 267 F.3d 400, 408 (5th Cir. 2001).

Both Federal Rule of Civil Procedure 9(b) and the PSLRA impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b).   Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b).   In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit has held a plaintiff must:

(1)   specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2)   identify the speaker;

(3)   state where and when the statement was made;

(4)   plead with particularity the contents of the false representations;

(5)   plead with particularity what the person making the misrepresentation obtained thereby; and

(6)   explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways.   First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

[T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b).  Second, for claims under which the plaintiff must prove a particular state of

mind to recover:

> [T]he complaint shall, with respect to each act or omission alleged to violate this
> chapter, state with particularity facts giving rise to a *strong inference* that the
> defendant acted with the required state of mind.

*Id.* (emphasis added).  Based on the elements of a § 10(b) claim described above, it is clear that

§ 10(b) claims are subject to both of these requirements of the PSLRA.

## C.    "Strong Inference" of Scienter Requirement

The United States Supreme Court has outlined a framework for courts to use in analyzing

motions to dismiss § 10(b) complaints for failing to establish a "strong inference" of scienter.  First,

as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true.

Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6)

motion, sources incorporated by reference into the complaint, and matters of which a court may take

judicial notice.  Third, in determining whether the pleaded facts give rise to a "strong" inference of

scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken

collectively, and should also take into account plausible opposing inferences.  *Tellabs*, 551 U.S. at

322–23.  The inference need not be irrefutable, nor even the most compelling of all competing

inferences, but must be strong in light of other inferences.  *Id.* at 324.  Ultimately, a complaint will

only survive if "a reasonable person would deem the inference of scienter cogent and at least as

compelling as any opposing inference one could draw from the facts alleged." *Id.*

## II.    Application

Defendants' motion to dismiss contends Plaintiff's 96-page Amended Complaint fails to

satisfy the PSLRA's heightened pleading requirements for four reasons: first, because the complaint

fails to plead facts giving rise to a strong inference of scienter; second, because Plaintiff fails to plead any facts indicating the challenged statements were false when made; third, because many of the challenged statements are inactionable forward-looking statements or permissible puffery; and fourth, because Plaintiff has failed to plead loss causation, as the two corrective statements alleged do not contain any information that revealed the truth of any false statements. Because the Court agrees with Defendants that Plaintiff has failed to plead facts giving rise to a strong inference of scienter, Plaintiff's complaint must be dismissed, and the Court declines to reach Defendants' remaining arguments at this time.

## A.    Scienter

Defendants contend Plaintiff has failed to plead facts raising the requisite "strong inference" of scienter, instead resorting to circular logic and boilerplate or legally insufficient assertions. Specifically, Defendants contend Plaintiff relies for its inference of scienter upon an amalgam of allegations, none of which support scienter: the post-Class Period financial restatements themselves; Asar and McHenry's positions, involvement within the company, and Sarbanes-Oxley certifications; the importance of same-store sales growth to the company; and the motivation to keep Hanger's stock price high.

Plaintiff responds that "it is truly hard to believe that defendants were not aware" of Hanger's problems, given the scope of the financial restatements announced, Asar and McHenry's involvement in "three separate earnings delays 'to complete accounting reviews' in less than a year, and the magnitude of Hanger's internal control issues, including a lack of appropriate accounting resources to meet financial reporting requirements and inadequate billing and documentation practices in its core Patient Care business. *See* Resp. [#64] at 23–24. In support of its position,

Plaintiff cites *Central Laborers' Pension Fund v. Integrated Electric Services*, 497 F.3d 546 (5th Cir. 2007), and this Court's holding in *In re ArthroCare Securities Litigation*, 726 F. Supp. 2d 696 (W.D. Tex. 2010). Neither case is helpful to Plaintiff's position.

Plaintiff cites *Central Laborers* for the proposition that when a company discloses its inability to meet its financial filing deadlines, later discloses material weaknesses in its internal controls, and then restates a significant portion of its previous financial results, "it is hard to believe that the top executives at that company had no knowledge of its problems." Resp. [#64] at 23. The *Central Laborers* panel, however, did not find that such facts, in and of themselves, established a strong inference of scienter, and ultimately granted the defendant's motion to dismiss. Far from assisting Plaintiff, *Central Laborers* demonstrates why Plaintiff's claims, as pled, are subject to dismissal.

As here, the plaintiff in *Central Laborers* brought suit against a defendant company under §§ 10(b) and 20(a) of the Securities Exchange Act, alleging the defendant company made false and misleading statements which artificially inflated its stock price. 497 F.3d at 549. The defendant had made sixteen months of confident public statements regarding its financial status, steadily increasing its stock price, then one month publicly disclosed "that it could not release its quarterly earnings on time due to an ongoing evaluation of certain projects." *Id.* Following that initial disclosure, the defendant "acknowledged that 'material weaknesses' in [its] internal controls might require restatement of prior financial figures," and ultimately restated all of its financials covering a two-and-a-half-year period. *Id.* The allegedly false and misleading statements identified by the plaintiff were the defendant's public press releases, SEC filings, and company-created investment reports discussing its financials. *See id.* at 549–50.

Responding to the defendant's motion to dismiss for failure to plead scienter, the plaintiff pointed to its allegations regarding (1) significant violations of generally accepted accounting principals [GAAP], the defendant's public statements, and the defendant's restatement of its financials; (2) confidential sources; (3) insider trading; and (4) the defendant's Sarbanes-Oxley certifications. *See id.* at 552–55. Despite its acknowledgment that a company's "public [financial] statements and subsequent restatement due to GAAP violations provide some basis to infer scienter," 497 F.3d at 552, the Fifth Circuit affirmed dismissal. As here, the plaintiff urged its assertions about "the accounting errors and internal controls . . . serve as strong circumstantial evidence" of scienter. *Id.* Nevertheless, without more, those allegations were not enough. Examining the plaintiff's additional allegations, the Circuit concluded that, viewed collectively, the plaintiff failed to plead facts giving rise to a strong inference of scienter. *See id.* at 555.

The facts of *Central Laborers* can be contrasted with those in *ArthroCare*, in which the undersigned held the lead plaintiff's scienter allegations sufficient to state a claim for relief. *ArthroCare* arose from the defendant company's restatement of four years of financial reports and admissions in those restated reports of "wrongdoing and lack of internal controls." 726 F. Supp. 2d at 702. The *ArthroCare* plaintiff sued under §§ 10(b) and 20(b), alleging the defendants made false and misleading statements in conference calls, press releases, and SEC filings that failed to disclose known improper practices within the company, including insurance fraud, healthcare compliance fraud, and fraudulent revenue recognition practices. *See id.* Prior to announcing it would be restating its financial reports, the financial news media scrutinized the defendant company regarding those issues and with increasing intensity for the better part of a year. *See id.* at 705–06.

-23-

The individual defendants argued the plaintiff failed to plead facts permitting a strong inference of scienter; this Court disagreed in part. As the undersigned explained, "[t]he media reports detailed with striking specificity some of the major improprieties at ArthroCare, and were based on publicly available information which would have been readily available to [the individual defendants]." *Id.* at 717. Despite those media reports, the individual defendants on several occasions specifically denied any improprieties were occurring. Particularly given the media reports were based on public information, it was "simply not plausible to infer [the defendants] reasonably believed their denials and misstatements were true[.]" *Id.* at 718. At minimum, "the red flags in the media should have led [the defendants] to investigate" potential fraud and impropriety within the company, and thus were strong indicia of at least severe recklessness as to the truth or falsity of their public statements made after the media began reporting the story. *Id.* at 718, 725.

This Court agreed with the defendants, however, that the facts as pled did not support a strong inference of scienter as to those allegedly false statements made *prior* to the appearance of the news reports. *Id.* at 725. This was so even in light of the plaintiff's allegations regarding (1) the magnitude of the defendant's financial restatements, which decreased net income by 98.9%, 12.6%, and 19% in three years; (2) the defendants' insider trading; (3) incentive compensation; (4) the defendants' SEC certifications; and (5) the defendants' resignations from their employment with the defendant company. *See id.* at 721–25. Here, in light of the teachings of *Central Laborers* and *ArthroCare*, it is clear to the Court that Plaintiff has failed to allege facts collectively giving rise to a strong inference of scienter.

### 1.    Scope of the restatements

First, the scope of Hanger's restatements contributes only somewhat to an inference of scienter.  GAAP violations are insufficient in and of themselves to establish scienter, but can contribute significant weight to the analysis based on their "number, size, timing, nature, frequency, and context[.]" *Arthrocare*, 726 F. Supp. 2d at 721 (citation omitted); *see also Central Laborers*, 497 F.3d at 552 (finding a detailed description of GAAP violations and subsequent restatement "provide some basis to infer scienter"). As alleged in the amended complaint, Hanger's preliminary restatements reduced net income by approximately 7.8% in 3Q13, 41% in 1Q14, and 8.3% in 2Q14. *See* Am. Compl. [#58] ¶¶ 147–48.  Notably, the preliminary restatement *increased* net income by 14% in 4Q13. *See id.* ¶ 148. The 3Q13, 1Q14, and 2Q14 quarterly figures provide some basis from which to infer scienter, but it is not strong enough on its own to satisfy the pleading standard nor exceedingly weighty. *See, e.g.*, *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620 (E.D. Va. 2000) (restatements warranted some inference in favor of scienter where company overstated revenue by $66 million over a three-year period, had actually been operating at a loss, and overstatement occurred because revenue was recognized on company's three largest unexecuted contracts).

### 2.    Asar & McHenry's involvement and Sarbanes-Oxley certifications

Second, Asar and McHenry's involvement within the company and Sarbanes-Oxley certifications provide little, if any, additional support for an inference of scienter.  Officers' Sarbanes-Oxley certifications on SEC financial reports are not, standing alone, indicative of scienter, but may provide support for such an inference where the officers had reason to know or suspect the financial statements contained material inaccuracies "due to the presence of glaring accounting

irregularities or other 'red flags[.]'" *See Central Laborers*, 497 F.3d at 554–55. Here, attempting to demonstrate it has pled such "red flags," Plaintiff points to Asar and McHenry's "intimate[] involve[ment] in three separate earnings delays 'to complete accounting reviews' in less than a year," Hanger's increase in reserves against Medicare audits, and the restatement itself. Resp. [#64] at 23.

These allegations do not render Asar and McHenry's certifications indicative of scienter. First, the restatement was announced after the Class Period and well after the allegedly misleading certifications occurred, and thus provides no support for Plaintiff's claim. Second, Plaintiff fails entirely to explain how Hanger's alleged increase in its reserves against Medicare audits supports an inference Asar and McHenry knew their certifications on Hangar's financial reports were misleading. It is not clear to the Court how the decision to increase reserves based on the increasing number of Medicare audits constitutes an accounting irregularity. Increasing reserves due to a chance Hanger might not be able to collect the funds tied up in Medicare audits seems to the Court to be the correct and responsible choice from an accounting standpoint. It would, in contrast, be irregular for a company to conceal its potentially uncollectible debt in an attempt to hide a negative trend.

As for the "earnings delays," the Court notes at the outset neither Plaintiff's amended complaint nor its response to the motion to dismiss make plain when these delays occurred or what their substance actually was; the complaint is vague, scattered, and rather confusing on this point, and the response merely references the complaint. *See* Resp. [#64] at 23 (citing Am. Compl. ¶¶ 6, 39, 133, 172–73, 179). As best as the Court can discern, of the SEC filings Plaintiff alleges contained misleading certifications, only the 2Q14 filing is implicated by the delays. *See* Am. Compl. [#58] ¶ 133 (stating that on November 6, 2014, Hanger "announced that it was delaying the

release of its 3Q14 financial results . . . for the second quarter in a row"). In any event, to the extent the delays in question occurred within the Class Period, it seems to the Court that delaying the release of financial reports to conduct accounting reviews suggests a desire to *avoid* inaccurately certifying financial results and to address any accounting problems that might be causing inaccuracies. At best, the delays weakly suggest the possibility of scienter with respect to the 2Q14 filing alone. Consequently, Plaintiff's allegations concerning Asar and McHenry's Sarbanes-Oxley certifications and involvement within Hanger provide little support for an inference of scienter.

### 3.   Importance of same-store sales growth & motivation to keep stock price high

Finally, Plaintiff points to its allegations regarding the importance of continual same-store sales growth to Hanger and Defendants' concomitant motivation to keep Hanger's stock price high. Specifically, Plaintiff alleges "Defendants knew that any negative movement in Hanger's same store sales growth would be met with a severe reaction from the market," causing Hanger's stock price to fall, which in turn "would wipe out the value of [Asar and McHenry's] holdings and their income," which was "comprised of a significant amount of stock[.]" Am. Compl. [#58] ¶ 164. Additionally, Plaintiff alleges Hanger's executive compensation policies include annual and long-term performance-based equity awards received "only if long-term value creation is generated[.]" *See id.*

All of these allegations boil down to an assertion that Asar and McHenry must have acted with scienter because they were motivated by incentive compensation. In the vast majority of cases, incentive compensation does not provide a sufficient basis from which to infer scienter; if the desire to make money was all it took, virtually all corporations and their executives could successfully be alleged to have acted with scienter in securities fraud cases. *E.g.*, *Nathenson v. Zonagen Inc.*, 267

-27-

F.3d 400, 420 (5th Cir. 2001) ("[A]llegations that corporate officers and directors would benefit from enhancing the value of their stock and/or stock options and that the corporation would benefit by receiving more for its shares to be issued . . . are . . . insufficient to support a strong inference of scienter." (citing *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994))); *Tuchman v. DSC Comm'cns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994) (affirming dismissal for failure to plead scienter where plaintiffs alleged defendants "acted for the purpose of . . . preserving defendants' positions, perquisites and emoluments of office, securing, maintaining and/or increasing compensation for themselves, and/or inflating the value of their shares and options . . . ."); *In re Dell Inc., Secs. Litig.*, 591 F. Supp. 2d 877, 897 (W.D. Tex. 2008) (citing *Tuchman*).

Given all of the foregoing, the Court finds that as pled, the amended complaint does not give rise to a strong inference Defendants acted with scienter. As in *Central Laborers*, Hanger's preliminary financial restatements and alleged GAAP violations alone are insufficient from which to draw a strong inference of scienter, and unlike in *ArthroCare*, there is a marked absence of additional allegations supporting such an inference. Plaintiff has therefore failed to carry its pleading burden under the PSLRA.

## Conclusion

Given Plaintiff's failure to plead facts supporting a strong inference of scienter, the complaint is subject to dismissal on that basis alone. The Court need not reach Defendants' additional arguments at this time. In anticipation of an amended pleading, the Court emphasizes that Rule 8 of the Federal Rules of Civil Procedure requires a short and plain statement of the claim showing the pleader is entitled to relief. Plaintiff's next iteration of its operative complaint ought to be drafted with that teaching in mind.

Accordingly:

IT IS ORDERED that  Defendants Hanger, Inc., Vinit Asar, and George McHenry's Motion to Dismiss [#61] is GRANTED; and

IT IS FINALLY ORDERED that Lead Plaintiff Alaska Electrical Pension Fund shall have TWENTY (20) DAYS from date of entry of this order in which to file an amended complaint, or this case will be closed.

SIGNED this the  31st  day of March 2016.


_____
SAM SPARKS
UNITED STATES DISTRICT JUDGE