UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| CITY OF PONTIAC GENERAL EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated, | § § § § § | Civil Action No. 1:14-cv-01026-SS |
| | § | <u>CLASS ACTION</u> |
| | § | The Honorable Sam Sparks |
| Plaintiff, | § § | |
| vs. | § § | |
| HANGER, INC., et al., | § § | |
| Defendants. | § § § | |

**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

I.    SHORT AND PLAIN STATEMENT OF THE CLAIM ....................................1

II.   JURISDICTION AND VENUE ................................................................5

III.  THE PARTIES.......................................................................................6

    A.    Lead Plaintiff ............................................................................6

    B.    The Corporate Defendant ...........................................................6

    C.    The Individual Defendants ..........................................................6

IV.   PARTICULARIZED STATEMENT OF THE CASE ...................................9

    A.    Overview of Hanger's Business....................................................9

    B.    Hanger Reported Admittedly False Financial Results Throughout the
        Class Period, Including Its Same-Store-Sales Growth Rate .................10

        1.    Hanger's Admittedly False Financial Statements....................11

        2.    Hanger's Admittedly False Same-Store-Sales and Same-Store-
            Sales Growth ........................................................................15

    C.    Defendants' Statements About Hanger's RAC Audit Appeal Success Rate
        and the State of Hanger's Internal Controls, Particularly Relating to Its
        Documentation Collection Practices, Were Materially False and
        Misleading...............................................................................17

        1.    Hanger's Fragmented Documentation System Ensured Failed
            Audits, Jeopardized Medicare Reimbursements and Forced Hanger
            into a Lengthy, Uncertain Medicare Appeals Process ..............18

        2.    Hanger Was Losing Appeals on Its High-End Microprocessor
            Prosthetics ..........................................................................21

        3.    Hanger's Janus Implementation "Amplifies" Its RAC Audit
            Failures as Defendants Report a Smooth Implementation.........23

    D.    Hanger Revealed the Truth in Successive Disclosures..........................25

V.    DEFENDANTS' SCIENTER ...................................................................29

VI.   LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS...............37

VII.  APPLICABILITY OF THE PRESUMPTION OF RELIANCE: THE FRAUD-
      ON-THE-MARKET DOCTRINE ................................................................43

VIII. CLASS ACTION ALLEGATIONS ..........................................................44

IX.   PRAYER FOR RELIEF ..........................................................................49

**Page**

X.      JURY DEMAND ...............................................................................................................49

Lead Plaintiff Alaska Electrical Pension Fund ("Lead Plaintiff" or "Alaska Electrical") alleges the following based upon personal knowledge as to itself and its own acts, and upon an investigation conducted by and through Lead Plaintiff's attorneys, which included, *inter alia*, a review of the Securities and Exchange Commission ("SEC") filings made by Hanger, Inc. ("Hanger" or the "Company"), Company releases, conference calls, public statements issued by Defendants, media reports, analyst reports, and consultation with persons familiar with Hanger's business, including former employees of Hanger.   Lead Plaintiff believes that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.       SHORT AND PLAIN STATEMENT OF THE CLAIM

1.       This is a securities fraud class action on behalf of the "Class" – all persons or entities who purchased Hanger common stock between July 31, 2013 and February 26, 2016, inclusive (the "Class Period").  Lead Plaintiff brings this action against Hanger – the largest owner and operator of orthotic and prosthetic ("O&P") patient care services in the U.S. – its President and Chief Executive Officer ("CEO") Vinit K. Asar ("Asar"), and its former Chief Financial Officer ("CFO") and Chief Accounting Officer ("CAO") George McHenry ("McHenry") (collectively, "Defendants") for misrepresenting Hanger's financial condition and its supposed success in defeating Medicare audits in order to facilitate an acquisition strategy upon which Defendants depended for Hanger to continue reporting positive revenue growth.  As Defendants revealed the truth about Hanger's business in successive disclosures, however, including that the Company had falsified its financial results while its executives engaged in "inappropriate activities," Lead Plaintiff and the Class suffered massive losses from the resulting drops in Hanger's stock price and its ultimate collapse and delisting from the New York Stock Exchange ("NYSE").  Defendants violated §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.       After a multi-year investigation – which is still ongoing – Hanger has now admitted the accuracy of Lead Plaintiff's allegations in the Amended Complaint for Violations of the Federal Securities Laws (Dkt. No. 58) and has restated the Company's financial results for an extraordinary

five-and-a-half year period – specifically because of **disallowed sales** primarily from commercial and **governmental** entities, including Medicare.[1]  By its own admission, Hanger's reported income during the Class Period was false, as was its accounts receivable balances and related reserves, because Defendants were submitting claims to Medicare that were not reimbursable.  Hanger's pre-tax income was overstated by $39.5 million (**approximately 52%** of the pre-tax income that it actually earned during the Class Period) and its AR and related reserves were misstated by $24.1 million.  The restatement of these specific accounts, in large part, due to "disallowances" (**i.e.**, **disallowed sales**) proves that Hanger's financial results, including its same-store-sales growth, and Defendants' statements about Hanger winning Medicare's audit appeals 90% of the time because of its strong internal processes and controls were false and/or misleading.  The latest restatement update on February 26, 2016 confirmed that contrary to Defendants' misrepresentations, Hanger was simultaneously reporting revenue on illegitimate claims to Medicare, failing increased Medicare audits at an increasing rate (both substantively on high-end microprocessor prosthetics and for lacking the documentation to prove medical necessity), and undergoing a disastrous implementation of a new clinic management system, Janus, that severely limited Hanger's clinics' ability to generate sales and that "amplified" the "impact of Medicare audits continu[ing] to lock up [Hanger's] funds."  The Janus implementation alone was responsible for Hanger reporting as revenue $38 million in illegitimate receivables.  To put it plainly, Defendants materially misrepresented the strength and fundamentals of Hanger's business to investors throughout the Class Period.

3.      Hanger's February 26, 2016 restatement update also revealed that Defendants' Class Period misstatements were deliberate.  In fact, it noted that these misstatements resulted in part from "an inappropriate 'tone at the top,'" a term explained in the Committee of Sponsoring Organizations Framework for Internal Controls ("COSO Framework") that implicates the top-level of an

---

[1]    In its restatement update on February 26, 2016, Hanger disclosed that its accounts receivable ("AR") were materially overstated because "disallowances and write-offs of receivables have exceeded the related allowances originally recorded for 2011, 2012, 2013 and the first and second quarters of 2014."  As revealed by Hanger's SEC filings, the "disallowances and write-offs" referenced in the restatement update represented two separate AR allowances: 1) "allowance for disallowed sales" (**i.e.** "allowances for future contractual adjustments") and 2) "allowances for doubtful accounts."

organization's management, including the CEO, CFO and CAO – the roles Defendants occupied at Hanger. And while the update qualified the conclusion, stating that "the Company **may** conclude that an inappropriate 'tone at the top' contributed to the material weakness in its overall control environment," the tone at the top was anything but appropriate based on other disclosures in the update as well as the facts alleged herein. The update admits to multiple separate instances of "inappropriate activities" from "**former officers**" and "employees," including "intentionally fabricat[ing] records" that "were provided to our internal and external auditors" and "other inappropriate activities that contributed to certain of the previously disclosed accounting misstatements underlying the restatement." There was also pressure on the clinics during "crunch time" to meet revenue targets that contributed significantly to Hanger's illegitimate Medicare claims and resulting audit failures. Accordingly, while Defendants were posting strong financial results and boasting about Hanger's Medicare audit appeal success rate, they knew that Hanger's financial results were fraudulent and that they had no reasonable basis for their statements as they themselves had created the control environment that, by their own admission, lacked "appropriate accounting resources to meet [Hanger's] financial reporting requirements" and operated with material weaknesses in Hanger's internal controls relating to, *inter alia*, revenue and accounts receivable. This case thus involves intentional deceit or, at a minimum, deliberate recklessness by Hanger and its top executives.

4.      Defendants' partial disclosures throughout the Class Period conveyed increasingly severe and negative news about Hanger to investors – more of which will come as the investigation continues – and tie the resulting full collapse of the Company's stock to the fraud alleged in this case. First, on August 7, 2014, Defendants revealed a 1.5% same-store-sales decline in 2Q14[2] – the first time since 1Q05 that Hanger had experienced a non-weather related decline in same-store-sales growth – because of "a slowdown in [treatment] authorizations by both commercial and **government**

---

[2]      Hanger's fiscal quarters are abbreviated by quarter and year. Thus, "2Q 2014" or "2Q14," for example, represents the second quarter fiscal year 2014. 1H 2014 represents the first half of 2014. Hanger's fiscal year ("FY") follows the calendar year, beginning on January 1 and ending on December 31.

*payers*" and the "impact of Medicare audits continu[ing] to lock up our funds," a dynamic that Defendants admitted was "amplified" by the Janus implementation.  Then, on November 6, 2014, Defendants announced a delay in filing Hanger's financial results for 3Q14 "to complete accounting reviews" – a revelation that Hanger had not remediated the deficiencies in its internal controls and that they were worse than Defendants had previously represented.  Defendants then announced on February 17, 2015 that Hanger would be restating "Certain Previously-Issued Unaudited Interim Financial Statements" and disclosed new "material weaknesses in the Company's internal control over financial reporting" relating "to the design and operation of effective controls over," *inter alia*, "billing data and invoicing controls" and an overall "ineffectiveness of the Company's [overall] control environment."  Finally, on February 26, 2016, Defendants revealed a full-blown accounting fraud relating specifically to illegitimate accounts receivable and net sales, involving "inappropriate activities" by "employees" and "former officers," and requiring the dramatic restatement of Hanger's reported income because of disallowed sales attributed to governmental entities, including Medicare – the Company's single largest individual payor.  As set forth in the chart below, Hanger's stock collapsed in response to Defendants' revelations on heavy trading volume, dropping an extraordinary 91.6% from the trading day prior to the first disclosure, on August 6, 2014, to the trading day after the final disclosure, on February 29, 2016.  Lead Plaintiff and the Class suffered devastating losses resulting from Defendants' false and misleading statements or omissions.



## II.   JURISDICTION AND VENUE

5.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C.

§1331 and §27 of the Exchange Act (15 U.S.C. §78aa) as the claims asserted herein arise under and

pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule

10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

6.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C.

§1391(b).  Hanger maintains its principal executive offices in this District and many of the acts and

conduct that constitute the violations of law complained of herein, including dissemination to the

public of materially false and misleading information, occurred in and/or were issued from this

District.  In connection with the acts alleged herein, Defendants used the means and instrumentalities

of interstate commerce, including, but not limited to, the United States mails, interstate telephone

communications, and the facilities of the national securities exchanges and markets.

1138025_1

### III.    THE PARTIES

#### A.    Lead Plaintiff

7.    Lead Plaintiff Alaska Electrical, as set forth in the certification attached hereto, purchased Hanger securities during the Class Period and has been damaged thereby.  Alaska Electrical was established in 1968 to provide retirement benefits for the employees of Alaska's electrical construction community and currently manages over $1.6 billion in assets.  As a result of the conduct alleged herein, Alaska Electrical has suffered damage from its purchases of Hanger securities.

#### B.    The Corporate Defendant

8.    Hanger is a Delaware corporation with its principal executive offices at 10910 Domain Drive, Suite 300, Austin, Texas 78758.  Hanger describes itself as the world's premier provider of O&P services and products and comprises nine business units that each fit within one of its two core business segments – Patient Care and Products & Services.  Hanger common stock was, until the end of the Class Period, listed and widely traded on the NYSE, which is an efficient market, under the ticker "HGR."  Hanger's stock was suspended from trading on February 26, 2016 because of Hanger's failure to comply with the NYSE's listing regulations.  Hanger's stock now trades under the symbol "HNGR" on the OTC Pink, operated by OTC Markets Group Inc.  Per the Company's 2013 Form 10-K filed with the SEC on April 4, 2013 ("2013 Form 10-K"), there were approximately $35 million outstanding shares of Hanger common stock held by hundreds of record holders during the Class Period.

#### C.    The Individual Defendants

9.    Asar served as Hanger's President, CEO and a member of the Board of Directors (the "Board") throughout the Class Period.  During the Class Period, Asar made statements in Company press releases and conference calls, as alleged herein, and signed and/or certified the Company's SEC filings pursuant to Sarbanes-Oxley Act of 2002 ("SOX"), including, but not limited to, Hanger's Forms 10-Q[3] and 2013 10-K.  Asar has a finance and business education, earning a

---

[3]    *See* Form 10-Q for 2Q13 filed with the SEC on August 7, 2013, Form 10-Q for 3Q13 filed on November 8, 2013 ("3Q13 Form 10-Q"), Form 10-K for 4Q13 and FY13 filed with the SEC on

bachelor's degree in business administration from Aquinas College and a master's of business administration from Lehigh University.  Prior to joining Hanger in 2008, Asar held various roles of increasing responsibility over the course of 18 years at Johnson & Johnson in finance, product development, manufacturing, marketing and sales.  Defendant Asar sold over 8,000 of his Hanger shares during the Class Period for insider trading proceeds of over $281,000.

10.     McHenry served as Hanger's CFO throughout the Class Period until December 31, 2014, when, as a result of his purportedly planned retirement, he was replaced by Thomas Kiraly. McHenry also signed Hanger's Form 10-Q's and Form 10-K during the Class Period as the Principal Accounting Officer.  During the Class Period, McHenry made statements in Company press releases and conference calls, as alleged herein, and signed and/or certified the Company's SEC filings pursuant to SOX, including, but not limited to, Hanger's Forms 10-Q and 10-K.  Prior to joining Hanger in 2001, McHenry was a senior executive at U.S. Vision for over 14 years, including serving as CFO, Executive Vice President and Principal Accounting Officer.  McHenry is a Certified Public Accountant with a degree in accounting from St. Joseph's University.  Defendant McHenry sold over 33,000 of his Hanger shares during the Class Period for insider trading proceeds of over $1,045,000.

11.     Defendants Asar and McHenry are referred to herein as the "Individual Defendants."

12.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Hanger, were in possession of the adverse undisclosed information alleged herein about Hanger's business, operations, sales, audits, trends, financial statements, and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets, forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via the reports, presentations and other information provided to them in connection therewith.  Due to approximately 83% of its sales coming from the

---

April 4, 2014, Form 10-Q for 1Q14 filed on May 9, 2014, and Form 10-Q for 2Q14 filed on August 11, 2014 ("2Q14 Form 10-Q").

Patient Care business segment, Hanger's internal processes and controls to substantiate those sales was of paramount importance to the Individual Defendants throughout the Class Period.

13.     The Company's press releases and SEC filings represented the collective actions of Company management.  The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, sales, audits, growth, financial statements and financial condition, as alleged herein.  The Individual Defendants involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or deliberately disregarded, that false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and presentations to securities analysts, money and portfolio managers, and institutional investors during the Class Period.  Each Individual Defendant was provided copies of the documents alleged herein to be misleading prior to and/or shortly after their issuance and had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Because the Individual Defendants knew that the adverse facts and omissions alleged herein had not been disclosed to, and were being concealed from, the public, and that the positive representations and omissions that were being made were materially false and/or misleading, each Individual Defendant is primarily liable for those representations contained therein.

15.     Hanger and the Individual Defendants are liable as participants in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Hanger securities by disseminating materially false and misleading statements and/or concealing adverse material facts.  The scheme: (i) deceived the investing public regarding Hanger's business, operations and management and the intrinsic value of Hanger's stock; (ii) enabled the Individual Defendants to sell

over 41,000 shares of their personally-held common stock for over $1.3 million in proceeds during the Class Period while in possession of material adverse non-public information about the Company; and (iii) caused Lead Plaintiff and other members of the Class to purchase Hanger securities at artificially inflated prices.

## IV.   PARTICULARIZED STATEMENT OF THE CASE

### A.   Overview of Hanger's Business

16.     Hanger has been, and continues to be, the dominant provider of products and services in the O&P industry.  During the Class Period, Hanger captured 20% of the $4.3 billion total addressable market for O&P patient care services.  No other provider had more than a 2% market share, with the majority of them having a single facility with annual revenues of less than $1 million. Resulting, in part, from its relative size in the industry, Hanger historically reported solid, predictable and consistent top line growth.  In fact, leading up to the Class Period, Hanger enjoyed an unbroken track record of positive same-store-sales growth every quarter since 2005.  These positive results drove increases in Hanger's stock price and rewarded Defendants as they secured bonuses and restricted stock awards while also selling stock at increasing prices.

17.     Hanger's success hinged on its ability to receive approval for reimbursement of O&P products it provided.  Hanger's principal sources of reimbursements are Medicare, Medicaid, the U.S. Department of Veterans Affairs ("VA"), and commercial private insurance companies – all of which require specific documentation for reimbursement.  From 2011 to 2013, government reimbursements accounted for approximately 40% of Hanger's net sales.  Since the documentation supporting those sales had to be secured and maintained at Hanger's more than 740 clinics (with over 1,300 clinical practitioners), robust internal processes and controls were required to ensure compliance with payor guidelines and success with payor audits – particularly Medicare audits that began increasing in 2010 when the President signed into law the Patient Protection and Affordable Care Act (the "PPACA").  The PPACA amended the Social Security Act (the "SSA") to "enhance the federal government's ability to discover and prosecute provider fraud, waste, and abuse" and "Expan[ded] the Recovery Audit Contractor (RAC) Program" – a program that had had immense

- 9 -

success recovering Medicare overpayments.  As the Centers for Medicare and Medicaid Services ("CMS") reported to Congress in 2010, the increased scrutiny by Medicare, including through the RAC program, had led to the recovery of billions of dollars in Medicare overpayments where Medicare's coverage and medical necessity criteria had not been met and where claims had not been correctly coded and/or substantiated with the required documentation.

18.     Hanger's elevated stock price, and the benefits it brought to Defendants, depended on continuing the Company's unbroken track record of positive same-store-sales growth and strong financial results.  But the regulatory environment constricted Hanger's ability to produce those results as CMS intensified its focus on the documentary support for Medicare claims – documents which Hanger routinely failed to secure but needed in order to continue reporting the financial results it had historically reported.  Even though Hanger's control environment could not support its historical growth going forward given the regulatory environment in which it was operating, Defendants elected to press forward with business as usual – with the added complexity of also transitioning Hanger's clinics over to Janus to manage patient data.  Defendants thus reported false financial results, including same-store-sales, and misleadingly bragged about Hanger's success with intense and increasing RAC audits, particularly in light of its strong internal processes and controls, throughout the Class Period – all in an effort to continue its historic streak of positive financial results while maintaining its inflated stock price.

**B.      Hanger Reported Admittedly False Financial Results Throughout the Class Period, Including Its Same-Store-Sales Growth Rate[4]**

19.     As the largest O&P provider in the nation, Hanger was far more exposed to the increased scrutiny by CMS than its competitors and suffered greatly as CMS intensified its audits. Yet, alleged below, Hanger reported strong (but admittedly false) financial results throughout the Class Period, including same-store-sales growth, while emphasizing that its superior performance

---

[4]     Attached hereto as Exhibit A is a chart listing in chronological order Defendants' statements that Lead Plaintiff alleges are false and/or misleading.  For each statement, identified herein as "Appendix, Statement No. __," the chart provides on a numbered basis: the speaker(s), date(s), medium, and Complaint ¶¶___ explaining why the statement is false and/or misleading.

- 10 -

against the increased Medicare audits actually demonstrated the strength of its core Patient Care

business, particularly because of its internal processes and controls.

### 1.   Hanger's Admittedly False Financial Statements

20.     Hanger reported the following materially false and misleading financial figures

during the Class Period:[5]

| ($000's except per share data) | Net Sales | Net A/R | Pre-tax Income | Net Income | Diluted Income per Share |
|---|---|---|---|---|---|
| **2Q 2013** | $273,735 | $170,601 | $22,291 | $14,079 | $    0.40 |
| **1H 2013** | $507,270 | $170,601 | $37,230 | $23,569 | $    0.67 |
| **3Q 2013** | $271,053 | $176,663 | $33,889 | $21,659 | $    0.61 |
| **4Q 2013** | $278,237 | $185,769 | $29,625 | $18,356 | $    0.52 |
| **FY 2013** | $1,046,438 | $185,769 | $100,744 | $63,584 | $    1.80 |
| **1Q 2014** | $235,605 | $183,548 | $9,932 | $5,997 | $    0.17 |
| **2Q 2014** | $275,854 | $205,325 | $20,202 | $12,619 | $    0.35 |
| **1H 2014** | $511,459 | $205,325 | $30,134 | $18,616 | $    0.52 |

21.     Hanger's true results, as admitted in the Company's February 26, 2016 restatement

update (but which are subject to further restatement as Hanger's investigation continues), were as

follows:

| ($000's except per share data) | Pre-tax Income Reported | Pre-tax Income Restated | $ Overstatement | % reported amount overstated | % actual amount overstated |
|---|---|---|---|---|---|
| **2Q 2013** | $22,291 | $14,596 | $7,695 | 34.5% | 52.7% |
| **1H 2013** | $37,230 | $20,577 | $16,653 | 44.7% | 80.9% |
| **3Q 2013** | $33,889 | $26,454 | $7,435 | 21.9% | 28.1% |
| **4Q 2013** | $29,625 | $24,839 | $4,786 | 16.2% | 19.3% |
| **FY 2013** | $100,744 | $71,871 | $28,873 | 28.7% | 40.2% |
| **1Q 2014** | $9,932 | ($6,272) | $16,204 | 163.1% | 258.4% |
| **2Q 2014** | $20,202 | $16,810 | $3,392 | 16.8% | 20.2% |
| **1H 2014** | $30,134 | $10,538 | $19,596 | 65.0% | 186.0% |

The largest contributor to Hanger's material overstatement of its pre-tax income during the Class

Period was its failure to adequately establish allowances for its accounts receivable.  By admitting

that it materially overstated its accounts receivable balances, Defendants in turn, admit that Hanger

also materially overstated its net sales, net income and diluted earnings per share.

---

[5]     *See* Appendix, Statement Nos. 11, 29, 39, 44, 50, 54-55.

22.     Hanger's Form 10-Q's for each quarter during the Class Period and its 2013 Form 10-K also falsely represented that Hanger's reported financial statements and other financial information for each quarter "fairly present[ed] in all material respects the financial condition, results of operations and cash flows" and were "prepared in accordance with accounting principles generally accepted in the United States of America ('GAAP')."  Pursuant to SOX, both Individual Defendants also attached to each of these SEC filings, a joint certification falsely stating "that information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company" and separate certifications stating that they had reviewed each of the filings, that each filing did "not contain any untrue statement[s]" or "omit to state . . . material fact[s]," that the financial results were "fairly present[ed] in all material respects," and that Hanger's internal controls "provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."[6]

23.     Hanger has now admitted through its multiple restatement announcements that these Class Period statements were false.  Defendants first announced on February 17, 2015 that the financial statements and other financial data previously released in Hanger's quarterly reports on Form 10-Q's, including for the quarters ended June 30, 2013, September 30, 2013, March 31, 2014 and June 30, 2014, and its Annual Report on Form 10-K for the year ended December 31, 2013 "*should no longer be relied upon*" and that "[t]he Company intend[ed] to file *restated financial statements* and other financial data covering these periods as soon as practicable."  This restatement announcement was an admission that two-and-a-half years of previously reported financial statements by Hanger from 2012 through 2Q14, including the Class Period financial results detailed in ¶20, were false when made.  Since the initial restatement announcement in February 2015, Defendants have issued three additional updates to the restatement, on June 9, 2015, November 12, 2015, and February 26, 2016.  Each subsequent restatement update provided more bad news

---

[6]     *See* Appendix, Statement Nos. 12-17, 45, 56.

regarding the magnitude of the restatement, thereby increasing the magnitude of Defendants' false statements.

24.     The last restatement update (February 26, 2016) includes a restatement of five-and-a-half years of false financial statements, from 2009 through 2Q14 (the "Restatement Period"), which includes the Class Period financial results detailed in ¶20.  Defendants admit their Class Period representations were false and misleading when made as to the financial information reported because that information was not prepared in conformity with Generally Accepted Accounting Principles ("GAAP") and did not "fairly present" Hanger's financial condition and operations (*see* ¶23).  Accordingly, the February 26, 2016 restatement update is another admission that the Class Period financial results in Hanger's SEC filings for 2Q13, 3Q13, 4Q/FY13, 1Q14 and 2Q14 were false when made.  Hanger's true financial results, as estimated by Defendants, show that pre-tax income had been overstated by ***$89.4 million*** over the Restatement Period and by ***$39.5 million*** during the Class Period.  Accordingly, pre-tax income had been overstated by ***no less than 19%*** and ***as much as 258%*** in each quarter (52% overall) throughout the Class Period.  And even these results may grow in magnitude.  Defendants' last restatement announcement on February 26, 2016 also stated that the Company did not expect to make its required filings with the SEC prior to the fourth quarter of 2016 – ***over two years*** since the Company filed its last financial statements for the quarter ended June 30, 2014.

25.     Hanger's February 17, 2015 restatement also admitted that Defendants' statements about Hanger's internal processes and controls were false.  In fact, it acknowledged that previously unreported material weaknesses existed in the Company's internal controls as of December 31, 2013 and in subsequent periods.  Hanger provided another restatement update on November 12, 2015, revealing that its investigation had uncovered even more previously unreported material weaknesses. In total, eight new unreported material weaknesses, listed below, have been announced as existing at the very same time Defendants were boasting to investors about the strength and effectiveness of Hanger's internal processes and controls:

- (1) An overall material weakness in the control environment, including an insufficient complement of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP,

insufficient systems to support its accounting processes, ineffective managerial oversight and monitoring, a lack of sufficient financial statement review, and deficiencies in the accounting close process;

- (2) A material weakness in revenue due to Hanger not properly designing and/or maintaining effective controls over the completeness and accuracy of its payor contracts and related billing data in its software systems and activities related to invoicing and adjustments to revenue;

- (3) A material weakness in accounts receivable over the calculation of allowances for future contractual adjustments and allowances for doubtful accounts;

- (4) A material weakness in the technical accounting procedures and review relating to lease accounting to ensure that lease agreements are accounted for in accordance with GAAP;

- Separate material weaknesses in the following areas: (5) fixed assets; (6) accounts payable; (7) account reconciliations; and (8) journal entries.

26.     While Defendants had previously announced on April 4, 2014 that Hanger's internal controls were ineffective as of December 31, 2013 due to three material weaknesses identified in the Company's accounting for its inventory, Defendants failed to disclose that eight additional material weaknesses (identified in ¶25) existed as of December 31, 2013 and subsequent periods that related to, *inter alia*, Hanger's overall control environment, revenue, and accounts receivable.  Defendants have thus admitted that they did not, as represented in their SOX certifications, disclose to the Company's auditors and audit committee the following:

> "*[A]ll significant deficiencies and material weaknesses* in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information."

27.     The February 26, 2016 restatement announcement provided an update to Hanger's material weaknesses in its internal controls to include more damaging information relating to its material weakness in the Company's overall control environment.  Specifically, Hanger disclosed that based on "*evidence suggesting that certain former officers and employees may have engaged in inappropriate activities*," the Company may conclude that "*an inappropriate 'tone at the top' contributed to the material weakness in its overall control environment*."  These admissions implicate Defendants Asar and McHenry in the fraudulent scheme alleged herein and further

undermine their statements about the strength of Hanger's internal processes and controls.  *See* Appendix, Statement Nos. 16-18, 25.

### 2.     Hanger's Admittedly False Same-Store-Sales and Same-Store-Sales Growth

28.     Contemporaneously with reporting false financial results, Defendants highlighted for investors, falsely, strong quarter-over-quarter same-store-sales growth in Hanger's core Patient Care business as reflective of its purportedly strong business model.  Specifically, Defendants emphasized a 3.9% same-store-sales growth rate in 2Q13, 3.8% in 3Q13, 1.3% in 4Q13 and 2.4% in FY13[7] – these results were within the range of Hanger's historic string of 32 consecutive quarters of positive same-store-sales growth leading up to the Class Period.  While Hanger's 4Q13 growth rate came in significantly below its historic range, Defendants had an explanation.  As they described it on February 12, 2014, same-store-sales growth would have been 2.7% in 4Q13 and 3.4% for FY13 if not for certain accounts receivable write-offs and reserves being reclassified as a reduction in net sales from previously classified bad debt expense – a reclassification which was undertaken following an SEC investigation into how Hanger accounted for its "bad debt expense and allowance for doubtful accounts."  On the conference call the next day, Defendant Asar minimized the reclassification, noting that the "reclass had no impact on earnings."  As late as May 5, 2014, although Defendants disclosed a 1.8% decline in same-store-sales for 1Q14 due to severe weather issues – Hanger's clinics shut their doors resulting in approximately 1,000 closed clinic days (five times the number in 1Q13) because of unprecedented weather on the east coast – Defendants still did not disclose that the Company's internal controls and processes were preventing it from achieving the same-store-sales that it had historically achieved.

29.     Defendants' statements about Hanger's purportedly strong same-store-sales, including its same-store-sales growth rates, were false.  In the February 26, 2016 restatement update, Defendants announced that the Company had substantially completed analyses of its accounts receivable balances for the years 2011 through 2014 and had preliminarily concluded that its original

---

[7]     *See* Appendix, Statement Nos. 1-4, 19-24, 30-32, 34, 37, 46-49.

accounts receivable allowances were ***materially misstated*** as its disallowances and write-offs of receivables had exceeded the related allowances on its sales originally recorded for 2011, 2012, 2013 and the first and second quarters of 2014.  These misstatements resulted in the overstatement of accounts receivable and of pre-tax income in the applicable periods.  *See* ¶¶21, 24.  The overstatement of pre-tax income specifically related to these AR adjustments was ***$40.4 million*** for the period from 2011 through 2Q14 and ***$24.1 million*** for the Class Period.  Given that Hanger's same-store-sales were directly impacted by its allowance for disallowed sales, as mandated by GAAP and its own reclassification, Hanger's admission that this allowance was materially misstated is also an admission that its same-store-sales figures, including its same-store-sales growth rates, were materially misstated.  In fact, as disclosed in Hanger's 3Q13 Form 10-Q, additions to Hanger's allowance for disallowed sales, primarily for commercial and ***governmental*** contractual adjustments, were reported as a reduction of net sales.

> "Accounts Receivable: Certain accounts receivable may be uncollectible, even if properly pre-authorized and billed.  The Company estimates an allowance for disallowed sales primarily for commercial & governmental contractual adjustments and discounts not identified at the time of sale.  The allowance is estimated based upon historical experience.  ***Additions to the allowance are reported as a reduction of Net sales***."

30.     These admitted misstatements relate specifically to Hanger's Medicare claims and its failed Medicare audits.  Defendants' admission that Hanger materially understated the necessary allowances for its uncollectible accounts receivable during the Class Period included receivables subject to RAC audits because 29% of Hanger's sales were from Medicare reimbursements that were subject to audit by Medicare.  As of December 31, 2013, Medicare represented 33.3% of the accounts receivable from Hanger's patient care business (*see* 2013 Form 10-K at 27) and as of June 30, 2014, Medicare represented 36.6% of accounts receivable (*see* 2Q14 Form 10-Q at 20).  Analysts also acknowledged the connection between Medicare's audits and Hanger's receivable issues.  Standard & Poor's ("S&P") issued a report on August 15, 2014, noting "***a $35 million increase in receivables primarily from*** slower payments and payors and ***an increase in Medicare audits***" and "that ***an extended audit process could result in*** weaker than expected cash flow metrics that require ***further revolver draws if receivables do not normalize by year end*** [2014]."  And when describing

- 16 -

its decision to place Hanger's rating on "watch negative" on December 16, 2014, S&P did so because "*the company's stretched Medicare* and commercial *receivables* [were] a threat to liquidity, and the *uncertain future for Medicare reimbursement threaten[ed] earnings*." Given that Medicare was Hanger's single largest individual payor and that the Company's receivables were negatively impacted by Medicare's increasing audits and Hanger's increasing RAC audit failures, Defendants' admission that the necessary allowances for the Company's sales were materially understated because of disallowed sales, in part, from governmental entities evidences that they failed to adequately reserve for Medicare claims that were subject to RAC audits.

C.    **Defendants' Statements About Hanger's RAC Audit Appeal Success Rate and the State of Hanger's Internal Controls, Particularly Relating to Its Documentation Collection Practices, Were Materially False and Misleading**

31.    Not only did Defendants report false financial results and misleading same-store-sales growth in Hanger's core Patient Care business, they misleadingly boasted about the Company's RAC audit appeal success rate and embraced the RAC audits as demonstrating the strength of Hanger's business, pointing repeatedly to its "internal process and controls." Defendants told investors that Hanger had "beef[ed] up our documentation around the medical necessity to make sure that we were in a good place there" and repeatedly highlighted the Company's "90% success rate on RAC audits." Throughout the Class Period, Defendants declared "that we have the appropriate documentation and the processes. If we do get audited down the road, we'll have the documentation." Defendants even went so far as to minimize the audits, stating that "[t]he regulatory environment, with the increased RAC audits, is a challenge, more so perhaps for the independent O&P providers than [Hanger]." And, according to Defendants, reimbursement from the government was a "[l]ow compliance risk due to [Hanger's] significant investment in internal process and controls." The story was the same for Hanger's high-end and very expensive microprocessor prosthetics. For those audits, according to Defendants, "[w]e have to provide a little more documentation or answer more questions" and that "if we do get audited, whether it's a prepay or a RAC, we are going to appeal it because we have confidence in our paperwork."[8]

---

[8]    *See* Appendix, Statement Nos. 5-9, 18, 25-27, 38, 40-41, 50-52, 57.

32.     These statements were materially false and/or misleading.  As alleged below, at the very same time that Defendants were making these boastful claims about Hanger's Medicare audit successes, in particular because of its internal processes and controls and its documentation, the Company was failing Medicare audits because it lacked the required supporting documentation to demonstrate medical necessity while its microprocessor prosthetics were being rejected by Medicare as "space age" and unnecessary.  Defendants' statements created an impression of successful Medicare compliance when, as Hanger's restatement because of disallowed sales now confirms, the opposite was true.

> **1.     Hanger's Fragmented Documentation System Ensured Failed Audits, Jeopardized Medicare Reimbursements and Forced Hanger into a Lengthy, Uncertain Medicare Appeals Process**

33.     Defendants' statements about Hanger's success with Medicare audits, particularly because of its "beef[ed] up" internal processes and controls, were false and misleading.  As Defendants knew when making those statements to investors, Hanger had a fragmented documentation system and lacked internal processes and controls to ensure that payments it received from Medicare met the requirements for reimbursement and were properly accounted for.  In fact, as Defendants were boasting about Hanger's processes, controls, and documentation, its fragmented documentation system and non-existent internal processes and controls were actually compounding the pressure on its clinics to meet revenue goals within compressed timeframes and resulted in a widespread failure to secure the medical records required to pass a RAC audit before a claim was submitted to Medicare.  That widespread failure caused Hanger to routinely *fail* RAC audits, not succeed at them, as Medicare scrutiny increased throughout the Class Period, requiring it to return the related reimbursement to Medicare and rely on the Medicare appellate process to recollect that reimbursement – dollars that it had already possessed and recognized as revenue.  Thus, what Defendants described as a "beef[ed] up" control environment that was a "[l]ow compliance risk due to significant investment in internal process[es] and controls" and that was responsible for the 90% RAC audit appeal "success rate" was, in reality, a non-existent internal control environment that jeopardized Hanger's Medicare reimbursements, prevented it from passing audits, and forced it into

a long process to recapture revenue it once had, which led to the Company under-reserving for the underlying claims. Defendants' repeated reference to Hanger's internal processes and controls were clearly false, as its admissions about its material weaknesses confirm, while Defendants' claims about Hanger's RAC audit success rate were materially false and/or misleading, as its accounts receivable restatement acknowledges.

34.     Defendants' February 26, 2016 admission that during the Class Period, Hanger failed to adequately reserve for disallowed sales and uncollectible receivables proves that Defendants' statements about its RAC audit success, including the 90% success rate for audit appeals, were misleading. Hanger recorded revenues from the sale of O&P devices, based on contracts with commercial insurers and government agencies, including Medicare, net of contractual adjustments and discounts. Hanger's accounts receivable were based off the net revenues expected to be reimbursed from these commercial and government payors. Each quarter, Defendants were required to estimate an allowance for disallowed sales primarily for commercial and governmental contractual adjustments and discounts not identified at the time of sale. Additions to the allowance were reported as a reduction of net sales. *See* 3Q13 Form 10-Q at 20. By admitting that the allowance established each quarter for disallowed sales was materially understated, Defendants have admitted that Medicare sales were not adequately reserved for during the Class Period – a fact that Defendants' statements about Hanger's 90% RAC audit appeal success rate had obscured.

35.     Defendants also admitted on February 17, 2015 that Hanger suffered from a material weakness "relating to the ineffectiveness of the Company's control environment" and additional "material weaknesses in multiple aspects of the Company's accounting controls" during the Class Period, notably: (i) in revenue over the completeness and accuracy of its payor contracts and related billing data in its software systems and activities related to invoicing and adjustments to revenues, and (ii) in accounts receivable over the calculation of allowances for future contractual adjustments and allowances for doubtful accounts.[9] On November 12, 2015, Defendants admitted "additional

---

[9]     "A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely

material weaknesses" existed during the Class Period, and on February 26, 2016, suggested that "an inappropriate 'tone at the top' contributed to the material weakness in [Hanger's] overall control environment."   These now-acknowledged material weaknesses manifested themselves in a fragmented documentation system that caused audit failures and invited further audits because Hanger's non-existent internal controls directly caused its dependence on Medicare's appellate process – had the clinics secured the required medical records before receiving an audit inquiry, they would have passed the audit at the outset (albeit at a much lower rate) and eliminated the appeals process.   Accordingly, Hanger's admitted lack of controls and fragmented documentation system directly contradicted Defendants' claims about the Company's RAC audit successes.

36.     Hanger's material weaknesses in revenue, accounts receivable and its control environment were a driving force behind its Medicare audit failures.   Under Hanger's revenue recognition policy, a clinic recognized revenue when a claim was sent to a patient's insurance or Medicare.   But in their submissions to Medicare, Hanger's clinics did not always include all the necessary documentation because, for example, it could take over 30 days to receive the letter of medical necessity or other patient records from the referring physician.   Yet the clinics, in order to meet their revenue requirements, still reported revenue on the prosthetic devices for those incomplete submissions.   The delay in securing the necessary documentation directly caused Hanger to fail RAC audits, leading to forfeited Medicare payments and long delays as well as uncertainty in the Medicare appeals process requiring the Company to increase its reserves during the Class Period, which Defendants have now admitted they failed to do by up to $24.1 million.   As Defendants knew, failing to meet Medicare audit deadlines, including the 45-day response time, was the number one reason for failing an audit.   Hanger's administrators often did not meet the deadline because if a patient's records were not already in a clinic's files, it was difficult to obtain the supporting documentation for the claim from the referring physician in a timely manner.   And if a clinic was unable to respond to a RAC audit within the required 45 days, the clinic would have to refund the

---

basis."   *See* Public Company Accounting Oversight Board ("PCAOB") Auditing Standard No. 5 at A7.   SEC Regulation S-K §229.308 requires management to disclose material weaknesses.

payment to Medicare.  It was thus weak internal controls and processes that were driving Medicare audit failures, not strong internal processes and controls, as Defendants represented, driving Medicare audit successes.

37.    Matters were worse for Hanger at the end of each quarter, when the drive to meet financial targets caused clinics to press to make their revenue targets.  For most prosthetic devices, there was about a two week turnaround time from the day a patient comes into a clinic for an evaluation to the day the patient receives his or her device.  Larger and/or more complex devices could take closer to two-and-a-half or three weeks to reach the patient, with diabetic shoes taking anywhere from one to four months.  But that turnaround time for a device during crunch time, which was near the end of a month or a quarter when clinics were trying to meet their numbers, could be closer to one-and-a-half weeks.  These practices, which impacted the admitted inadequate reserving for "disallowances" referenced in Hanger's February 26, 2016 restatement update, invited documentation errors, prevented Hanger's clinics from securing the documentation required to support their Medicare claims and caused further RAC audit failures, forcing Hanger to reserve against those audits and reduce its sales.  Again, an act Defendants failed to do by up to $24.1 million.  Defendants' claims about Hanger's Medicare audit appeal success rate, especially relating to its "documentation" and "processes," concealed these failures and misled investors about the strength of Hanger's core Patient Care business and the effectiveness of its internal controls.

### 2.    Hanger Was Losing Appeals on Its High-End Microprocessor Prosthetics

38.    Defendants' statements about Hanger's high-end microprocessor prosthetics were also false and misleading.  *See* ¶31; Appendix, Statement Nos. 27, 51.  Indeed, Defendants concealed when minimizing the seriousness of the audits for these devices as simply requiring "a little more documentation" and "answer[ing] more questions," that Hanger was experiencing increasing substantive losses on appeals relating to these expensive devices based on findings that they were not medically necessary.  Since the microprocessor prosthetics were expensive, Hanger had a corporate office in St. Louis Park, Minnesota to provide support to its clinics for those prosthetics in the form of vetting the documentation for the procedures before they were performed.

- 21 -

This support included reviewing clinical evaluations to ensure that the paperwork would pass a Medicare audit and telling the clinics to proceed with the procedure only if the paperwork passed muster.  But despite this pre-review process, and the participation of employees from the St. Louis Park office at the Administrative Law Judge-level of the RAC appeal process, Hanger's loss trend in RAC audits involving microprocessor prosthetics increased – as did the number of RAC audits and appeals of failed RAC audits.  Understandably, there was a lot of frustration at the St. Louis Park office and at the corporate level.  By mid-2014, when Defendants were expressing "confidence in our paperwork," Hanger was still struggling to get a handle on the situation.  Defendants' statements about Hanger's performance relating to Medicare audits on its microprocessor devices clearly created an impression of Medicare audit success that differed in a very material way than the failures that actually existed on these devices.  In fact, corroborating these allegations, CMS proposed a rule change in May 2014 that would require "[p]rior [a]uthorization" for certain Durable Medical Equipment, Prosthetics, Orthotics, and Supplies ("DMEPOS") devices because these devices, which included Hanger's microprocessor prosthetics, "are frequently subject to unnecessary utilization" based on CMS's "prior payment experience."

39.     Defendants' misrepresentations about the Medicare audits on these microprocessor prosthetic devices as simply requiring "a little more documentation," "answer[ing] more questions," and still having "confidence in our paperwork" were especially egregious given the lengths that Hanger underwent internally to get these microprocessor devices approved.  The internal application process for qualifying a microprocessor prosthetic was based, in part, on criteria from the VA and Medicare, including determining whether a procedure would be money well spent, *i.e.*, that a patient maintained an active daily lifestyle to justify the high expenditure.  The internal application process also included determining whether a patient satisfied Patient Assessment Validation Evaluation Test ("PAVET"), a test derived by Hanger from VA and Medicare requirements to ensure that the patient was eligible for a prosthetic procedure and to enable the procedure to be billed to and reimbursed by Medicare.  While the St. Louis Park office received very few applications that did not meet the necessary criteria that Hanger had established, the clinics did not include supporting medical records

and there were no separate efforts undertaken to validate and ensure the truthfulness of the information in the PAVET forms. Indeed, Medicare had cautioned that these types of check-the-box applications were "NOT" sufficient to pass an audit.[10] Defendants' representations about only needing to "provide a little more documentation and answer more questions" and a certain, victorious appeal "because we have confidence in our paperwork" were simply false and/or misleading.

### 3. Hanger's Janus Implementation "Amplifies" Its RAC Audit Failures as Defendants Report a Smooth Implementation

40. In addition to reporting false financial results, including same-store-sales growth, and misleadingly boasting about Hanger's success in RAC audit appeals as reflective of its strong internal processes and controls, Defendants convinced investors that Hanger's transition to Janus, a "next-generation clinic management system" – in which Hanger had invested over $35 million – was smoothly rolling out as planned. For instance, during Hanger's August 1, 2013 conference call, Defendants simply declared that Janus "has completed the pilot phase and we are in the process of beginning our national rollout." Defendants then downplayed Janus's "disruption" to Hanger's business on October 30, 2013, stating that only in the "4 or 5 days leading up to the actual crossover" to Janus was there any disruption, and that there was only a "slight slowdown in patient schedules" resulting from the implementation. On February 13, 2014, Defendants further underscored Janus as having "strengthen[ed] [Hanger's] process and systems capabilities" as it had taken hold. On May 6, 2014, Defendants assured investors that the Janus "implementation continues to go as planned."[11]

41. These statements about Hanger's Janus implementation, along with Defendants' claims about Hanger's strong same-store-sales growth and RAC audit successes, were false and misleading. Contrary to Defendants' positive claims, Janus contributed to Hanger's control failures and disrupted its operations, causing same-store-sales growth to slow. It was not only "4 or 5 days leading up to the actual crossover" of disruption or a "slight slowdown in patient schedules."

---

[10] *See* Medicare Program Integrity Manual 3.3.2.1.1.

[11] *See* Appendix, Statement Nos. 10, 28, 33, 42-43, 53.

Hanger's documentation issues, in fact, were seriously exacerbated each time the Company converted more clinics to Janus because clinics then had to devote resources they did not have toward, *inter alia*, moving patient data from the old clinic management system to Janus. Defendant McHenry even acknowledged on August 7, 2014 that "those clinics that are on Janus are working on two collection systems until they work off the AR balances from the old system as they transition to Janus." This process was labor intensive, as was using Janus after it was implemented, and dramatically cut the amount of time clinicians – Hanger's sales producers – had to see patients, directly contributing to the Company's August 7, 2014 sales miss. Defendants even admitted that Janus "significantly impacted the company's cash collection resulting in a $38 million increase in the allowances for contractual adjustments and doubtful accounts." These adverse facts not only undermined Hanger's reported same-store-sales and same-store-sales growth rate, but they also contradicted Defendants' statements about the success of the Company's RAC audit appeals, the strength of its compliance and audit programs, and the smoothness of the Janus implementation.

42. While boasting that Janus had "strengthen[ed] [Hanger's] process and systems capabilities," Defendants concealed that the Janus implementation was a debacle from the outset. In fact, the first group of clinics that Hanger transitioned to Janus – including clinics located in Riverside outside of Kansas City, Missouri – was not a success. Those first 27 clinics reported that transitioning to Janus reduced their efficiency because they could not see as many patients as they had been able to previously, which resulted in fewer sales. And the issue was fundamental to Hanger's financial results. Indeed, while Defendants were emphasizing sales growth in line with Hanger's historical averages to investors, the clinics were internally reporting that Janus required more responsibility from the clinicians, who had to choose the correct coding for the products – which was the basis for what Hanger billed for the product – and who were not applying as many codes as they could have. After Janus was implemented, clinicians spent substantial additional time devoted to each patient, with some of Hanger's clinicians spending upwards of 60-75 minutes on a patient, rather than the 30 minutes they spent on a patient before Janus. Thus, clinicians served up to less than half the number of patients they could previously and achieved correspondingly less sales.

Indeed, as Defendants admitted, Hanger "encountered workflow constraints and issues" with the Janus implementation so severe that it "halted the implementation of . . . Janus" completely in 3Q14 and had to take a $38 million charge for illegitimate receivables.  Defendants were regularly updated about the Janus implementation through, *inter alia*, monthly presentations about the delays that Janus created.  They therefore had actual knowledge about these sales-restricting issues, the resulting declining sales at the clinics transitioning to Janus, and the accounts receivable collection issues Janus caused at each transitioned clinic.

### D.    Hanger Revealed the Truth in Successive Disclosures

43.    On August 7, 2014, Hanger stunned investors by announcing after the market closed that same-store-sales growth *declined* 1.5% in its core Patient Care business – the first non-weather related decline in nearly a decade – due to "a slow-down in prosthetic patient flow driven by a slowdown in authorizations from payors" and "a slowdown in payments, which requires increased accounts receivable reserves and lowers net sales."  On the conference call the next day, August 8, 2014, Defendants reiterated that the same-store-sales decline was directly attributable to "a slowdown in [pre]payment authorizations from both government and commercial payers" and to the "impact of Medicare audits continu[ing] to lock up our funds," which was "amplified against the backdrop of . . . Janus, our new clinic management system, where those clinics that are on Janus are working on two collection systems until they work off the AR balances from the old system as they transition to Janus."  Hanger's stock plummeted nearly 25% in response, dropping from $29.87 per share on August 7, 2014 to close at $22.48 per share on August 8, 2014.

44.    Reaction from analysts reveal that Defendants' disclosures are directly connected to the statements alleged herein to be false, noting specifically that Hanger's miss resulted from "slowing patient volumes," "the impact of RAC audits and Medicare pre-payment audits," and "the rollout of [Hanger's] Janus IT system":

- Stephens – "While accounting and expense issues have been known, the newest hiccup is slowing revenue [which] *is attributed to slowing patient volumes*." "[C]ompany-specific issues" contributed to the "changed HGR's current business environment."

- Jefferies – listed the company-specific issues that Hanger was "going through" as including "*the impact of RAC audits and Medicare pre-payment audits*," "increased

scrutiny and lengthening of prior authorization timelines from commercial payors" *and "the rollout of its Janus IT system*."

45.     Defendants had assured investors on August 8, 2014 that they had "made good progress in [their] remediation efforts" to remediate the previously disclosed material weaknesses in Hanger's internal controls over financial reporting relating to the Company's inventory issues.  But after the markets closed on November 6, 2014, Hanger again shocked investors when it announced it was delaying the release of its 3Q14 financial results "to complete accounting reviews" – for the second quarter in a row.

> Hanger, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q (the "Form 10-Q") for the quarter ended September 30, 2014 within the prescribed time period without unreasonable effort or expense because *the additional time required to complete accounting reviews resulted in a delay in the subsequent quarterly close and Form 10-Q preparation process*.  The Company intends to file the Form 10-Q with the Securities and Exchange Commission as soon as practicable.

46.     As Moody's Investors Service ("Moody's) noted, this second delay in filing with the SEC within a year "highlights continuing deficiencies in Hanger's internal controls concerning financial reporting and may lead to additional delays and expenses in reporting future financial results."  Upon this news, which revealed that Hanger still had not remediated the deficiencies in its internal controls and that they were worse than previously revealed, the Company's stock price dropped almost 18% from $24.19 on November 6, 2014 to close at $19.88 on November 7, 2014.

47.     Hanger's 3Q14 earnings delay and the underlying accounting issues created considerable anxiety in the market, as reflected in analyst commentary.  For example, an analyst from Jefferies explained on November 10, 2014 that "[management] delayed its Q3 earnings release as its auditors continue to scrutinize accounting policies for inventories/costs of goods, accounts receivable/bad debt, and leases" and noted on November 17, 2014 that "investor anxiety on persistent accounting issues grows."  Then, after the market closed on February 17, 2015, Defendants announced that Hanger would be restating "Certain Previously-Issued Unaudited Interim Financial Statements," which focused on two of the three areas on which analysts were expressing concern – inventories/costs of goods and leases.  The restatement adjustments identified other

miscellaneous errors besides inventory and leases, but none of the restatement adjustments related to Hanger's accounts receivable:

> The errors that caused the Company to restate these prior periods were identified during the course of the Company's preparation of its financial statements for its quarter ended September 30, 2014.  A list of the errors, including their estimated impact on pre-tax income, is included in the Company's Current Report on Form 8-K filed with the Securities and Exchange Commission on February 17, 2015.

The errors fall into the following general categories:

- Cost of Materials – Absence of elimination of certain intercompany profit amounts between segments and other computational errors;

- Education Fair – Timing of in year expense recognition related to the Company's annual employee education conference;

- Depreciation – Delayed commencement of depreciation expense related to the Company's new clinic management system;

- Lease Accounting – Incorrect application of GAAP accounting requirements for lease accounting; and

- Other Recurring and Non-Recurring Errors.

48.      Hanger's February 17, 2015 press release, in fact, stated that Defendants had "completed its work associated with its accounts receivable allowances," suggesting that Hanger did not have any issues with its accounts receivable that would require restatement:

> The Company has completed its work associated with its accounts receivable allowances and cost of materials related to the quarter ended September 30, 2014, and it continues to review its lease accounting and the indirect effect of lease accounting on other items for that quarter and prior periods.

49.      While defendants did not include accounts receivable in Hanger's restated financial figures, the announcement partially disclosed what Defendants knew throughout the Class Period – that Hanger operated through a fragmented and non-compliant documentation and accounting process that exposed it to increasing Medicare audits, slower sales and higher reserves.  The announcement, in fact, disclosed "material weaknesses in the Company's internal control over financial reporting" relating "to the design and operation of effective controls over," *inter alia*, "billing data and invoicing controls."  Defendants revealed that Hanger had concluded that due to the existing and newly identified material weaknesses, it had an additional material weakness relating to the ineffectiveness of its control environment.  Specifically, Hanger did not have appropriate

accounting resources to meet its financial reporting requirements.  In essence, Defendants were admitting that the accounting resources in place during the Class Period were materially insufficient to ensure that Hanger's financial results were reported in compliance with GAAP.

50.     Hanger's February 17, 2015 restatement announcement provided the market with considerable relief, precisely because it did not include accounts receivable among the errors requiring the restatement.  In fact, an analyst with Jefferies noted on February 18, 2015 – completely unaware that Defendants were concealing illegitimate accounts receivable from governmental entities like Medicare – that Hanger's restatement had "put[] to rest our largest concern" because of "[t]he lack of A/R-related issues:"

> ***Modest EPS impact and lack of A/R-related issues gives us more comfort about HGR's intact earnings trajectory***.  When HGR announced the delay of its 3Q14 earnings release due to factors that included receivables/bad debt and inventories/cost of goods sold, ***we admittedly grew concerned that these key profitability drivers could have a structural impact on HGR's future earnings outlook***.  Our concern at the time was that a long-drawn audit could result in accounting policy changes that would have a lasting impact on the company's margins and profitability.  ***The lack of A/R-related issues in HGR's prior-period restatement puts to rest our largest concern, while inventory-related earnings restatements were fairly modest***.  With these two key issues now essentially addressed, we believe the risk of a change in HGR's LT outlook as a result of accounting policies has diminished significantly. We have received inbound calls about 8-K language on 'payor-related billing data . . . and invoicing controls' and this appears to be more of a documentary issue (*i.e.*, documentation that every clinic has adequate controls and procedures) than an accounting concern.

51.     After the markets closed on November 12, 2015, Defendants provided a restatement update which announced four additional material weaknesses that existed during the Class Period and brought the total number of material weaknesses existing up to eleven.  Defendants continued to conceal from investors, however, the full extent of the accounting fraud and material weaknesses on Hanger's sales and reserves relating to Medicare.

52.     Then, after the markets closed on February 26, 2016, Defendants revealed that a full-blown accounting fraud had existed at Hanger during the Class Period ***and that it specifically related to illegitimate accounts receivable***.  The fraud involved a likely "inappropriate 'tone at the top'" of Hanger's control environment and "certain former officers and employees" being engaged in "inappropriate activities," including with regard to the accounting misstatements underlying the

- 28 -

restatement which resulted in the Company overstating pre-tax income by $39.5 million during the Class Period and $89.4 million for the Restatement Period, primarily because Hanger's original allowances did not adequately cover the disallowances and write-offs of receivables.  Given that Medicare was Hanger's single largest individual payor (29% of Hanger's reimbursements were from Medicare), this admission that the largest aggregate (*i.e.* most material) restatement adjustment was the understatement of its allowances for its sales to governmental entities indicates that a significant portion of the understated allowances pertained to Medicare sales, which were subject to RAC audits.  Upon this news, the Company's stock price dropped over 80% from $12.88 on Friday, February 26, 2016 to close at $2.49 on February 29, 2016 on heavy trading volume.

## V.   DEFENDANTS' SCIENTER

53.    The Individual Defendants acted with scienter in that they knew, as alleged herein, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information, reports and attendance at meetings reflecting the true facts regarding Hanger, their control over, and/or receipt and/or modification of their allegedly materially false and misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Hanger, participated in the fraudulent scheme alleged herein.

54.    Hanger's massive and ongoing restatement, complete with admitted acts of intentional wrongdoing and self-described "inappropriate activities" by the Company's "officers" and "employees," including the establishment and use of an unsupported general reserve account from 2008 through 2012, the intentional fabrication of records by an employee used in the valuation of work-in-process inventory at October 31, 2013 that were provided to Hanger's internal and external auditors, and "other inappropriate activities that contributed to certain of the previously disclosed accounting misstatements underlying the restatement" proves that Defendants deliberately

intended to defraud investors.  The size of the restatement, the accounts involved, the reasons for the restatement (including disallowed sales), and the acknowledgment that it all likely stemmed from an "inappropriate 'tone at the top'" raises a strong inference of scienter not only for Hanger, but in particular for Defendants Asar and McHenry.  The concept of "tone at the top" is directed at an organization's CEO and CAO – positions that defendants Asar and McHenry held in this case.  In accounting parlance, the concept of "tone at the top" and its importance to accurate financial reporting is outlined in the COSO Framework.  For example, the COSO Framework discusses the importance of a CEO's role in ensuring a positive control environment, including a proper "tone at the top."

> In any organization, '*the buck stops' with the chief executive*.  He or she has ultimate ownership responsibility for the internal control system.  One of the most important aspects of carrying out this responsibility is to ensure the existence of a positive control environment.  More than any other individual or function, *the chief executive sets the 'tone at the top*' that affects control environment factors and other components of internal control.  *The influence of the CEO on an entire organization cannot be overstated*.

55. Similarly, the COSO Framework discusses a CAO's role in setting the tone of the organization and identifying "unusual situations caused by fraudulent financial reporting."

> 'As a member of top management, *the chief accounting officer helps set the tone of the organization's ethical conduct*; is responsible for the financial statements; generally has primary responsibility for designing, implementing and monitoring the company's financial reporting system; and *is in a unique position regarding identification of unusual situations caused by fraudulent financial reporting*.'

Thus, when Hanger's February 26, 2016 restatement update raised the spectre of "an inappropriate 'tone at the top,'" it implicated Defendants Asar and McHenry in the "inappropriate" misconduct that led to the "accounting misstatements underlying the restatement."  Accordingly, Hanger's restatement, the admissions of "inappropriate activities" by "employees" and "former officers," and Defendants Asar and McHenry's involvement in the Class Period statements which required restatement raises a strong inference of scienter.

56. The "control environment" is the foundation of a company's internal control system[12] and is extremely important to effective internal controls over financial reporting.[13]  In its restatement

---

[12]   COSO Framework Executive Summary at 4.

announcement on February 16, 2015, Hanger specifically noted that it had an ineffective control environment for its internal controls because it "did not have appropriate accounting resources to meet its financial reporting requirements."  On November 12, 2015, Hanger provided more details about this very prominent control environment failure:

> [T]he Company did not maintain a sufficient complement of accounting personnel with an appropriate level of accounting knowledge, experience and training in the application of GAAP commensurate with its financial reporting requirements and business environment.   Additionally, the Company did not implement and sufficiently maintain systems that adequately supported its accounting processes. These deficiencies, together with ineffective managerial oversight and monitoring, a lack of sufficient financial statement review and deficiencies in the accounting close processes have been key contributing factors to a general and overall weakness in the Company's control environment.

More simply, the Company concluded that the accounting resources and financial statement review in place during the Class Period were inadequate to ensure that a material misstatement in its financial statements would not occur. [14]  Defendants Asar and McHenry knew this.  They had been aware that Hanger's internal controls were ineffective, at least relating to inventory, dating back to March 18, 2013.  Defendants Asar and McHenry thus had no reasonable basis to sign SOX certifications during the Class Period, which attested to the accuracy of the Company's financial statements and effective internal controls, given the lack of accounting resources and inadequate financial statement review that existed at Hanger.  At a minimum, Defendants Asar and McHenry knew or were deliberately reckless in not knowing that the Company's financial results, including its same-store-sales, were unreliable given the lack of accounting knowledge and resources at Hanger.

57.     Defendants Asar and McHenry also knew that Hanger's accounting department was overwhelmed and unreliable given the Company's history of accounting and internal control problems, including delays in the release of financial results, existing material weaknesses and past accounting misstatements.  First, three separate times during the Class Period Hanger announced delays in its issuance of financial results due to the need to complete additional accounting reviews and internal controls assessments before the results could be released to the public: (i) on March 3,

---

[13]    PCAOB No. 5 at 25.

[14]    PCAOB No. 5 at A7.

2014, delaying the filing of the 2013 Form 10-K; (ii) on August 5, 2014, delaying the release of the 2Q14 earnings; and (iii) on November 6, 2014, delaying the release of the 3Q14 earnings.[15]   Second, defendants were aware of existing material weaknesses in inventory that were reported in the 2012 and 2013 Form 10-K's, which signified that a "reasonable possibility" existed that a material misstatement of Hanger's financial statements would not be prevented or detected on a timely basis. Third, Hanger had announced past misstatements of financial results for incorrect accounting on the Company's inventory and bad debt expense.   These accounting and internal control issues cumulatively put Defendants Asar and McHenry on notice that significant risks existed with the propriety of Hanger's Class Period financial statements and internal control assessments.   Despite this knowledge, Defendants Asar and McHenry signed false SOX certifications every quarter during the Class Period attesting to the accuracy of Hanger's accounting and that its non-existent internal control structure somehow allowed its financial statements to be reliable and prepared in accordance with GAAP.   Hanger's admission of an ineffective control environment in order to produce accurate financial results and Moody's commenting that the accounting delays highlighted "continuing deficiencies in Hanger's internal controls concerning financial reporting" are simply confirmations of what Defendants knew, or recklessly disregarded, about Hanger's false Class Period financial statements and unreported material weaknesses.

58.     Defendants Asar and McHenry had to have known of, or recklessly disregarded, the underlying problems requiring such a massive, still ongoing restatement.   The sheer enormity of the restatement during the Class Period (***more than half of Hanger's actual pre-tax income***), the length of time it is taking Hanger to complete its investigation, and the number of different accounts impacted – at last count no fewer than nine (a number that increases with every restatement update provided by the Company) demonstrates a pervasive problem that could only exist in the SOX-era if

---

[15]   Before the Class Period, Hanger was forced to file a notification of late filing for its 2012 Form 10-K filed with the SEC on March 18, 2013 ("2012 Form 10-K") in order to complete a review of its inventory-related policies, which were raised by the SEC's review of Hanger's 2011 Form 10-K filed with the SEC on February 29, 2012 as part of the SEC Comment Letter process.   The SEC review resulted in Hanger identifying errors in its valuation of work-in-process inventory and restating certain prior financial results.

Defendants acted intentionally or with recklessness.  When Hanger announced its restatement on February 16, 2015, it revealed that its pre-tax income was overstated by $6.8 million over two-and-a-half years.  That number has ballooned to $89.4 million over five-and-a-half years based on Hanger's February 26, 2016 restatement update.  That is a *1,215% increase* in overstated pre-tax income, numbers that were driven by what the Company now concedes were illegitimate accounts receivable.  Hanger's accounting issues have blown up to a restatement of $90 million with 11 different material weaknesses existing in Hanger's internal controls.  And despite this latest update, which led to the ultimate collapse and delisting of Hanger's stock, investors are still waiting to see the final details of the Company's restatement, as well as its 3Q14, FY14 and FY15 financial results. Defendants' certifications were blatantly – and now admittedly – false.  If Hanger is able to finalize its financial statements by December 31, 2016, it will have taken over two years of investigating (and at least $50 million in professional fees) to sort out Defendants' fraudulent scheme.  This is the epitome of scienter.

59.    The types of accounts that were manipulated, and the reasons for the restatement of those accounts, also raise a strong inference of scienter because those accounts reflected the core of Hanger's core Patient Care business.  Defendants have admitted that Hanger's accounts receivable were overstated by $40.4 million from 2011 through 2Q14 and $24.1 million during the Class Period as the Company failed to adequately reserve for "disallowances and write-offs," which includes disallowed sales by payors of whom the largest was Medicare.  This misstatement is directly at odds with (and completely undermines) Defendants' statements that Hanger was winning appeals over Medicare's increasing audits 90% of the time and reporting sales (including same-store-sales growth rates in line with Hanger's historic results) from the underlying Medicare claims.  Contrasting Defendants' Class Period tale with: (1) this accounts receivable material misstatement which existed throughout the Class Period; (2) the halted implementation of Janus in 3Q14 (which still has not been resumed 18 months later) and the resulting $38 million increase in allowances for its accounts receivable; (3) the admitted material weakness in revenue due to "the completeness *and accuracy* of payor-related billing data in the Company software systems, and invoicing controls"; and (4) the

admitted material weakness in accounts receivable over the calculation of allowances for future contractual adjustments as well as for doubtful accounts, leads to the inescapable conclusion that Defendants acted with scienter.  Defendants' inappropriate "tone at the top" drove the practices that caused these issues in the Company's core Patient Care business and Hanger's need to restate.

60.     Defendants' actions as alleged herein were deliberate in that they were motivated to maintain the inflation in Hanger's stock price and as same-store-sales slowed, had to increasingly rely on acquisitions to grow, which required the Company to maintain the appearance of financial health and strength.  As analysts had recognized, Hanger had posted positive revenue growth in every quarter since 2005.  It did so through a combination of its own same-store-sales and revenue from smaller, independent O&P businesses that it acquired.  Hanger, in fact, acquired eight O&P businesses operating 21 clinics for a revenue contribution of $20.5 million in 2011, 18 O&P businesses operating 59 clinics for a revenue contribution of $30.2 million in 2012, and nine O&P businesses operating 18 clinics for a revenue contribution of $51.2 million in 2013.  Hanger paid for these acquisitions using a combination of cash, promissory notes, and "contingent consideration," which vested these O&P business owners with an interest in Hanger over the long-term.  Having a financially and fundamentally strong business, especially with respect to the increasing Medicare audits, and positive same-store-sales were therefore critical to convincing these O&P business owners to sell to (and join) Hanger.  In fact, analysts at Stephens Inc. have even noted since Hanger delayed the filing of its 3Q14 Form 10-Q, and throughout the restatement process, that the revenue contribution from acquisitions at Hanger is now nearly non-existent:

- 3-30-15: "Hanger (HGR, EW/Vol) dropped 14.9% for the week after announcing that its revolving credit facility had been frozen pending the completion of the accounting restatement. With $48 million in cash we expect the company should be OK and it appears a full restatement should be complete at some point this summer. *Our larger concern is that organic growth is not returning to HGR's historic 3%-5% range, there is little to no contribution from acquisitions*, and the margin profile likely needs to be reset lower."

- 6-10-15 "Hanger took another step closer in completing its epic accounting review and we suspect the Company is a current filer in the next few months. *We still have no update on the actual business fundamentals, but speculate that organic growth has been de minimis with little if any contribution from acquisitions*.

Hanger's "track record of positive SSS every quarter for nine years," as Defendants knew, played an instrumental role in convincing the owners of these independent O&P businesses to take promissory notes and "contingent consideration" and to develop a long-term relationship with Hanger instead of securing a one-time buy-out at the highest price.

61.     Defendants were aware of Hanger's Medicare audit failures and the underlying illegitimate claims.  Defendants paid close attention to Medicare reimbursements, discussing the Company's performance in Medicare audits with investors on a regular basis.  *See, e.g.*, "The CMS audits have been a contributing factor but we have also seen a general slowdown in payments which have not yet significantly influenced our reserve calculations, but *we are watching this very closely*" (McHenry); "*We continue to monitor* and adapt to the changing reimbursement environment driven by the volume of Medicare audits and delayed appeals process" (Asar).  As Hanger's single largest individual payor, representing 29% of its core Patient Care segment, Medicare reimbursements were critical to the success of the Company's business.  And its success depended on its ability to navigate Medicare's specific documentation requirements and receive approval for its submitted claims. From 2011 to 2013, government reimbursements accounted for approximately 40% of Hanger's net sales.  The documentation supporting those sales are secured and maintained at Hanger's more than 740 clinics with over 1,300 clinical practitioners, thus robust internal processes and controls were required to ensure uniform compliance with payor guidelines and success with payor audits – particularly Medicare audits.   Those internal processes and controls included the clinical management system into which Hanger's clinics input patient data and the related sale would roll up into Hanger's accounting systems.  Accordingly, Hanger's transition to a new clinic management system, Janus, was of key importance to its core Patient Care business and thus, to Defendants. Indeed, Defendants were given monthly presentations to update them on Janus's initial rollout. Hanger has now admitted in a series of disclosures that, in contrast to Defendants' upbeat conference call statements during the Class Period, the Janus implementation was a total disaster from the start. Hanger revealed on August 8, 2014 that the implementation hindered collections for its clinics, leading to uncollectible receivables, and on March 23, 2015 that the implementation caused

"workflow constraints" for its clinicians.  The problems with the implementation were so severe, in fact, that Hanger had to completely stop the implementation in 3Q14 – a decision that came only one quarter after Defendant Asar stated during the 2Q14 conference call that the Janus "implementation continue[d] to go as planned."  Given the direct material impact to Hanger's core Patient Care business, the Individual Defendants' constant discussion with investors of the Medicare reimbursement requirements, the clear reimbursement guidelines outlined in CMS's regulations, and the monthly presentations given to the Individual Defendants regarding how the Janus implementation was effecting Hanger's clinics, the Individual Defendants were well aware, or recklessly disregarded, that the clinics were failing Medicare audits at an increasing rate because of illegitimate claims, that its financial results were false, that their statements about Hanger's Medicare audit success were materially misleading, and that Hanger lacked the internal processes and controls needed to prevent the misstatements which admittedly occurred, as alleged herein.

62.     The Individual Defendants' compensation also provided them motive to maintain the inflation in Hanger's stock.  The Individual Defendants' compensation was comprised of a significant amount of stock – 53% of Asar's compensation and 42% of McHenry's in 2013 – and both made it a practice of supplementing their income with stock sales.  In the year before the Class Period, Asar sold 11,319 shares for proceeds of $329,687 and another 8,284 shares for proceeds of $281,696 during the Class Period.  McHenry did the same, but in much larger amounts, selling 67,758 shares the year before the Class Period for proceeds of $1,899,646 and another 33,057 shares during the Class Period for proceeds of $1,045,542 – immediately before retiring from Hanger amid a colossal accounting failure.  Hanger's compensation policies included annual incentives and "equity based awards, including performance-based equity awards, to ensure that executives receive[d] above median compensation only if long-term value creation is generated for our stockholders."  For Hanger's compensation policies to achieve that objective, Hanger's stock had to remain at elevated levels.  Defendants were therefore motivated to report the false and misleading financial results alleged herein.

63.     Hanger, according to the restatement announcement on February 26, 2016, admittedly acted with scienter.  The announcement revealed that "[t]he investigation has also uncovered evidence suggesting that former officers . . . of the Company may have engaged in other inappropriate activities that contributed to certain of the previously disclosed accounting misstatements underlying the restatement."  Since these "inappropriate activities" relate to Hanger's financial statements, and required a restatement of those financial statements, Hanger's announcement is an admission that employees of the Company at the "officer" level furnished information for inclusion in the Company's financial statements knowing that they would be issued to the investing public and that those financial statements were materially false and misleading because of the "inappropriate activities" of such officers, who knew that their "inappropriate activities" made those financial statements false and misleading.

## VI.    LOSS CAUSATION AND THE CLASS MEMBERS' ECONOMIC LOSS

64.     During the Class Period, as detailed herein, Defendants engaged in a scheme and wrongful course of business that was designed to and did artificially inflate Hanger's stock price, whose misconduct operated as a fraud and deceit on Class Period purchasers of the Company's common stock.  Defendants did this by issuing now admittedly false financial statements (including net income, accounts receivable and related reserves, and same-store-sales) and by making materially false and misleading statements regarding the strength of the Company's business as demonstrated by its positive same-store-sales growth and its success in Medicare audits.  Defendants' false or misleading statements had their intended effect, causing Hanger's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as ***$40.47 per share*** on January 22, 2014.  But as Defendants disclosed the truth about Hanger's true financial condition and revealed that their statements were false and misleading on August 7, 2014, November 6, 2014, and February 26, 2016, as detailed in ¶¶65-69 below, Hanger's stock price fell in response as the artificial inflation dissipated, reaching a low of ***$2.49 per share*** on February 29, 2016 as Hanger's stock was delisted from the NYSE.  Lead Plaintiff and other Class members suffered

significant damages resulting from their purchases of artificially inflated Hanger common stock during the Class Period.

65.    On August 7, 2014, Hanger announced after the market closed that same-store-sales growth had declined 1.5% in its core Patient Care business – the first non-weather related decline in nearly a decade.  On the conference call the next day, August 8, 2014, Defendants directly attributed the decline to "a slowdown in [prepayment] authorizations by both commercial and government payers" and to a "slowdown in collections rates," including the "impact of Medicare audits continu[ing] to lock up our funds."  Defendants further revealed that Hanger's Medicare audit appeal success rate had slipped to 88% and its collections shortfalls were "amplified against the backdrop of our implementation of Janus, our new clinic management system, where those clinics that are on Janus are working on two collection systems until they work off the AR balances from the old system as they transition to Janus."  Analysts attributed Hanger's miss to "slowing patient volumes," "the impact of RAC audits and Medicare pre-payment audits," and to "the rollout of its Janus IT system."  Hanger's announcement thus revealed facts that Lead Plaintiff alleges made Defendants' statements false and misleading.  Hanger's stock price dropped nearly 25% on this news, declining from $29.87 per share on August 7, 2014 to $22.48 per share on August 8, 2014 on trading volume of 5,212,700 shares, more than 20 times greater than the average daily volume during the Class Period.

66.    Hanger's announcement was a partial revelation of the relevant truth that Hanger's financial statements and its reported same-store-sales growth rates were false and that Defendants' statements about Hanger's Medicare audit success rate, including their statements about the strength of Hanger's internal controls, were false and/or misleading.  Indeed, Hanger was forced to report a same-store-sales decline because of the audit failures resulting from illegitimate Medicare claims, which caused the announced slowdown in pre-payment authorizations and collections rates from "government payers" and ultimately required Hanger to restate $89.4 million in income – $39.5 million of which was during the Class Period.  Defendants would later acknowledge that Hanger had to restate its financial results largely because of disallowed sales from commercial and governmental

1138025_1

entities like Medicare.  Hanger's August 7, 2014 announcement even directly connected Hanger's collections slowdown to its illegitimate Medicare claims, stating that "on cash collections, the impact of Medicare audits continues to lock up our funds."  It also acknowledged that Hanger's Medicare audit appeal success rate had slipped to 88%, implicating Hanger's inability to collect on its illegitimate Medicare claims, and that Janus, contrary to their earlier Class Period statements, "amplified" Hanger's collections issues, stating that those collections issues were "amplified against the backdrop of our implementation of Janus, our new clinic management system, where those clinics that are on Janus are working on two collection systems until they work off the AR balances from the old system as they transition to Janus."  These are facts that Lead Plaintiff alleges made Defendants' statements false and misleading.  Moody's, in fact, would report later that the Janus implementation caused $38 million in illegitimate receivables, noting that Hanger's delay in implementing Janus ultimately "significantly impacted the company's cash collection resulting in a $38 million increase in the allowances for contractual adjustments and doubtful accounts," which as disclosed in Hanger's SEC filings includes disallowed sales.  The disclosure of these true facts, previously concealed, caused Hanger stock price to depreciate and thereby proximately caused Lead Plaintiff's and the Class economic losses.

67.     Defendants had assured the market on August 8, 2014 that they had "made good progress in [their] remediation efforts" to remediate previously disclosed material weaknesses in the Company's internal controls over financial reporting, including relating to Hanger's inventory issues.  But after the markets closed on November 6, 2014, Hanger surprised the market again when it announced that it was delaying the release of its 3Q14 financial results for the second quarter in a row.  Notably, Defendants' reason for this delay was much more broad than the reasons cited for Hanger's previous delay announcements.  *See* ¶57.  Whereas Hanger's March 3, 2014 announcement cited the need for additional time "to complete the testing and assessment of internal controls," including Hanger's testing of its previously reported material weakness in inventory, and its August 5, 2014 announcement cited the need for additional time "for the completion and review of accounting for its cost of materials estimate," Hanger's November 6, 2014 announcement – issued in

a press release not filed with the SEC – broadly stated that additional time was necessary "for the completion and review of its third quarter financial statements," which analysts and the market understood included net sales, accounts receivable and income. *See* ¶47. Moody's added that contrary to Defendants' public representations, this delay "highlight[ed] continuing deficiencies in Hanger's internal controls." *See* ¶46. Upon this news, which revealed that Hanger still had not remediated the deficiencies in its internal controls and that they were worse than previously revealed, the Company's stock price dropped almost 18% from $24.19 on November 6, 2014 to close at $19.88 on November 7, 2014 on heavy trading volume of 1,484,400 shares, almost six times greater than the average daily volume during the Class Period. The disclosure of these true facts, previously concealed, caused Hanger stock price to depreciate and thereby proximately caused Lead Plaintiff's economic losses.

68.     Between February 17, 2015 and November 12, 2015, Hanger disclosed in successive announcements that it was restating more than five years of its financial results, that Hanger did not have "appropriate accounting resources to meet its financial reporting requirements," and that Hanger suffered from material weaknesses in its internal controls relating to, *inter alia*, "the completeness and accuracy of payor-related billing data in the Company's software systems, and invoicing controls." As alleged at ¶50, these disclosures were viewed with relief by analysts and investors because Hanger's restatement did not include accounts receivable. But a year later, on February 26, 2016, Hanger disclosed that its previously announced restatement had doubled, and that it specifically related to Hanger's accounts receivable. Hanger, in fact, disclosed that it had overstated its accounts receivable during the Class Period and understated its reserves by over $24 million because of "disallowances and write-offs," which Hanger's SEC filings tied directly to disallowed sales from governmental entities like Medicare – the very facts that Lead Plaintiff alleges made Defendants' statements false. The February 26, 2016 update acknowledged that Hanger's pre-tax income was overstated by $39.5 million during the Class Period directly because of these "disallowances and write-offs" and also revealed a full-blown accounting fraud during the Class Period, including "inappropriate activities" by Hanger's "employees" and "former officers."

- 40 -

Hanger's stock collapsed more than 80% in a single day of trading in response, dropping from $12.88 per share on February 26, 2016, to $2.49 per share on February 29, 2016, on extraordinary volume of 8,740,000 shares, more than 34 times greater than the average daily volume during the Class Period.

69.     Hanger's February 26, 2016 update was a further revelation of the relevant truth that Hanger's fraud concealed – *i.e.*, that the financial results that Hanger reported during the Class Period were false (specifically its net income, accounts receivable and related reserves, and its same-store-sales) and that Defendants' statements about Hanger's Medicare audit success rate, in particular because of its "internal processes and controls" and "documentation" were false and/or misleading.  In fact, the accounts that Hanger was forced to restate (accounts receivable and related reserves) and the reasons for the restatement of those accounts ("disallowances and write-offs") revealed the truth that Defendants concealed during the Class Period that Hanger had submitted illegitimate claims to Medicare, suffered from inadequate internal controls that facilitated those illegitimate claims, and was unable to collect on those claims because of inadequate documentation and non-existent internal processes and controls, directly implicating Hanger's Medicare audit failures as alleged herein.  Hanger's announcement also revealed that a fraud had been committed during the Class Period.  By revealing that "officers" and "employees" engaged in "inappropriate activities" and that those activities may cause even the Company to attribute the fraud to an "inappropriate 'tone at the top,'" Hanger's update revealed that Hanger's Class Period financial results and the illegitimate activities that led to those results, including the submission of illegitimate claims to Medicare, were the result of fraud and that Defendants Asar and McHenry were involved in that fraud.  The disclosure of these true facts, previously concealed, caused Hanger stock price to depreciate and thereby proximately caused Lead Plaintiff's and the Class economic losses.

70.     The market for Hanger common stock was open, well-developed and efficient at all relevant times, with average daily trading volume of more than 250,942 shares during the Class Period.  As a result of Defendants' materially false and misleading statements and failures to disclose the true state of the Company's business as demonstrated by its false financial results,

unsustainable same-store-sales growth, increasing failures in Medicare audits and utterly inadequate internal processes and controls as alleged herein, Hanger's stock traded at artificially inflated prices. Lead Plaintiff and other Class members purchased or otherwise acquired Hanger common stock relying upon the integrity of the market relating to Hanger common stock and suffered economic loss as a result thereof.

71.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and other members of the Class was a direct result of Defendants' misrepresentations artificially inflating Hanger's stock price and the subsequent significant decline in the value of Hanger common stock as the truth was revealed in a series of partial disclosures.  These stock price declines removed the artificial inflation from Hanger's stock price, causing real economic loss to investors who had purchased Hanger's stock during the Class Period.

72.    The declines in Hanger's stock price near and at the end of the Class Period were the direct result of the nature and extent of Defendants' prior false statements and material omissions being revealed to and/or leaking into the market.  The timing and magnitude of Hanger's significant stock price declines negates any inference that the loss suffered by Lead Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

73.    The economic loss Lead Plaintiff and other members of the Class suffered was a direct result of Defendants' fraudulent scheme to artificially inflate Hanger's stock price and maintain that price at artificially inflated levels, as was revealed by the subsequent and significant declines in the value of Hanger's stock when Defendants' earlier misrepresentations and omissions became publicly available, as illustrated in the chart below illustrates how Hanger's stock collapsed on each disclosure and compares the movement in Hanger's stock to the index that Hanger identifies as comparable in its 2013 Form 10-K.



## VII.   APPLICABILITY OF THE PRESUMPTION OF RELIANCE: THE FRAUD-ON-THE-MARKET DOCTRINE

74.     At all relevant times, the market for Hanger common stock was an efficient market for the following reasons, among others:

(a)     Hanger common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     Hanger common stock traded on large weekly volumes and millions of shares were available for arbitrage activity;

(c)     As a regulated issuer, Hanger filed periodic public reports with the SEC and the NYSE;

(d)     Hanger has filed SEC Form S-3 registration statements;

(e)     Hanger regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)     Hanger was followed by a number of securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace.

75.     As a result of the foregoing, the market for Hanger common stock promptly incorporated current information regarding Hanger from all publicly available sources and reflected such information in the prices of the stock.  Under these circumstances, all purchasers of Hanger common stock during the Class Period suffered similar injury through their purchase of Hanger common stock at artificially inflated prices and a presumption of reliance applies.

## VIII.   CLASS ACTION ALLEGATIONS

76.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons or entities who purchased Hanger common stock during the Class Period.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

77.     The Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  Hanger stock was actively traded on the NYSE.  Record owners and other Class members may be identified from records maintained by Hanger or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.  While the exact number of Class members is unknown to Lead Plaintiff, Hanger reported 212 record shareholders on March 28, 2014.  Accordingly, Lead Plaintiff reasonably believes there are hundreds of members in the proposed Class.

- 44 -

78.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

79.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     Whether statements made by Defendants to the investing public misrepresented or omitted material facts about the business, operations and financial conditions of Hanger;

(c)     Whether the price of Hanger common stock was artificially inflated during the Class Period; and

(d)     To what extent the Class members have sustained damages and the proper measure of damages.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**COUNT I**
**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

82.     Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

83.     Defendants are liable for making false statements and failing to disclose adverse facts known to them about Hanger.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Hanger common stock was a success, as it: (i) deceived the investing public regarding Hanger's business and financial condition; (ii) artificially inflated the price of Hanger common stock; and (iii) caused Lead Plaintiff and other members of the Class to purchase Hanger common stock at inflated prices.

84.     During the Class Period, Defendants participated in the preparation of and/or caused to be disseminated the false or misleading statements specified above, which they knew or recklessly disregarded were materially false or misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

85.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     Employed devices, schemes, and artifices to defraud;

(b)     Made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Hanger stock during the Class Period.

86.     Defendants, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about Hanger's business, operations and financial condition as specified herein.

87.     The Defendants employed devices, schemes and artifices to defraud, while in possession of material, adverse, nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein by, among other things, participating in the making of untrue statements of material fact and omitting to state material facts necessary in order to make the statements made

- 46 -

about the Company and its business operations and financial status, in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Hanger common stock during the Class Period.

88.     The Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants' misconduct was engaged in knowingly or with recklessness disregard for the truth, and for the purpose and effect of concealing Hanger's operating condition and financial status from the investing public and supporting the artificially inflated price of its common stock.

89.     As a result of the dissemination of the materially false or misleading information and failure to disclose material facts, as set forth above, the market price of Hanger common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market prices of the Company's stock were artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in Defendants' public statements during the Class Period, Lead Plaintiff and the other Class members acquired Hanger's stock during the Class Period at artificially high prices and were ultimately damaged thereby.

90.     At the time of said misrepresentations and omissions, Lead Plaintiff and other Class members were ignorant of their falsity, and believed them to be true.  Had Lead Plaintiff, and other Class members and the marketplace known the truth regarding the problems that Hanger was experiencing, which Defendants did not disclose, Lead Plaintiff and other Class members would not have purchased or otherwise acquired their Hanger stock, or, if they had acquired its stock during the Class Period, would not have done so at the artificially inflated prices which they paid.

91.     By reason of the foregoing, Defendants have violated §10(b) of the 1934 Act and Rule 10b-5.

92.     As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their Class Period purchases of Hanger common stock.

## COUNT II
### For Violation of §20(a) of the 1934 Act
### Against the Individual Defendants

93.     Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

94.     The Individual Defendants acted as controlling persons of Hanger within the meaning of §20(a) of the Exchange Act:

(a)     By reason of their positions as executive officers and/or directors, their participation in and awareness of the Company's operations and intimate knowledge of the false statements and omissions made by the Company and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading;

(b)     The Individual Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected; and

(c)     Because of their positions as CEO and CFO, the Individual Defendants directly participated in the Company's management and were directly involved in Hanger's day-to-day operations.  The Individual Defendants also controlled the contents of Hanger's quarterly reports and other public filings, press releases, conference calls, and presentations to securities analysts and the investing public.  The Individual Defendants prepared, reviewed and/or were provided with copies of the Company's reports, press releases and presentation materials alleged to be false and/or

misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected and failed to do so.

95.     By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.     Declaring that Defendants are liable pursuant to the Exchange Act;

B.     Determining and certifying that this action is a proper class action and certifying Lead Plaintiff as a class representative and its counsel as Lead Counsel pursuant to Rule 23 of the Federal Rules of Civil Procedure;

C.     Awarding compensatory damages in favor of Lead Plaintiff and the Class against Defendants, jointly and severally, for damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

D.     Awarding Lead Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

E.     Awarding such other relief as the Court may deem just and proper.

## X.    JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED:  April 20, 2016                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                          PATRICK J. COUGHLIN
                                          DOUGLAS R. BRITTON
                                          IVY T. NGO


                                          _____
                                                    s/ DOUGLAS R. BRITTON
                                                    DOUGLAS R. BRITTON

                                          655 West Broadway, Suite 1900
                                          San Diego, CA  92101
                                          Telephone:  619/231-1058
                                          619/231-7423 (fax)
                                          patc@rgrdlaw.com
                                          dougb@rgrdlaw.com
                                          ingo@rgrdlaw.com

Lead Counsel for Lead Plaintiff

KENDALL LAW GROUP, LLP
JOE KENDALL (State Bar No. 11260700)
JAMIE J. McKEY (State Bar No. 24045262)
3232 McKinney Avenue, Suite 700
Dallas, TX  75204
Telephone:  214/744-3000
214/744-3015 (fax)
jkendall@kendalllawgroup.com
jmckey@kendalllawgroup.com

Liaison Counsel

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

ALASKA ELECTRICAL PENSION FUND ("Plaintiff") declares:

1.   Plaintiff has reviewed a complaint and authorized its filing.

2.   Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.   Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.   Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.   (a)   Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Krystek v. Ruby Tuesday, Inc., et al.*, No. 3:14-cv-01119 (M.D. Tenn.)
*Ho v. Flotek Industries, Inc., et al.*, No. 4:15-cv-03327 (S.D. Tex.)

(b)   Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

*Kenney v. Pier 1 Imports, Inc., et al.*, No. 3:15-cv-02798 (N.D. Tex.)

(c)   Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*Ortuzar v. Francesca's Holdings Corp., et al.*, No. 13-cv-06882 (S.D.N.Y.)
*Arkansas Teacher Retirement System v. Insulet Corporation, et al.*, No. 1:15-cv-12345 (D. Mass.)

6.     The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _18th_ day of April, 2016.

ALASKA ELECTRICAL PENSION FUND

By: _Gregory R Stokes_

Gregory R. Stokes, Administrator

HANGER

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/17/2013 | 1,300 | $31.58 |
| 09/18/2013 | 100 | $31.65 |
| 09/18/2013 | 1,200 | $31.66 |
| 09/19/2013 | 700 | $32.15 |
| 09/20/2013 | 1,700 | $32.32 |
| 09/23/2013 | 200 | $32.27 |
| 09/24/2013 | 100 | $32.76 |
| 09/24/2013 | 1,000 | $33.10 |
| 09/25/2013 | 2,200 | $32.93 |
| 09/26/2013 | 800 | $32.89 |
| 09/27/2013 | 1,400 | $32.78 |
| 09/30/2013 | 300 | $33.25 |
| 10/01/2013 | 1,300 | $33.94 |
| 10/02/2013 | 800 | $34.47 |
| 10/03/2013 | 1,100 | $34.28 |
| 01/31/2014 | 1,500 | $33.84 |
| 05/08/2014 | 2,800 | $30.31 |
| 07/16/2014 | 1,300 | $29.76 |
| 07/17/2014 | 500 | $29.89 |
| 07/18/2014 | 100 | $29.64 |
| 07/21/2014 | 800 | $29.71 |
| 07/22/2014 | 800 | $30.08 |
| 07/23/2014 | 300 | $30.17 |
| 07/24/2014 | 800 | $30.38 |
| 07/25/2014 | 400 | $30.38 |
| 07/28/2014 | 300 | $30.46 |
| 07/29/2014 | 200 | $30.87 |
| 07/30/2014 | 200 | $31.48 |
| 07/31/2014 | 900 | $31.56 |
| 08/08/2014 | 2,700 | $22.34 |
| 08/08/2014 | 3,700 | $22.21 |
| 08/11/2014 | 8,500 | $22.20 |
| 08/12/2014 | 3,900 | $22.26 |
| 08/15/2014 | 1,800 | $21.09 |
| 08/18/2014 | 800 | $21.07 |
| 10/06/2014 | 600 | $20.83 |
| 10/07/2014 | 600 | $20.84 |
| 10/08/2014 | 600 | $20.59 |
| 10/09/2014 | 1,000 | $21.06 |
| 10/10/2014 | 1,200 | $20.99 |
| 10/13/2014 | 400 | $21.41 |
| 10/15/2014 | 400 | $21.50 |
| 10/16/2014 | 600 | $22.55 |
| 10/17/2014 | 1,300 | $22.17 |
| 10/20/2014 | 600 | $22.10 |
| 10/21/2014 | 1,700 | $22.09 |

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/22/2014 | 700 | $22.15 |
| 10/23/2014 | 800 | $22.73 |
| 11/12/2014 | 300 | $20.70 |
| 11/12/2014 | 1,100 | $20.71 |
| 12/23/2014 | 1,000 | $22.91 |
| 12/23/2014 | 1,800 | $22.96 |
| 12/24/2014 | 1,600 | $23.09 |
| 12/26/2014 | 2,000 | $23.45 |
| 01/15/2015 | 1,600 | $20.70 |
| 01/16/2015 | 300 | $21.03 |
| 01/20/2015 | 700 | $21.21 |
| 01/22/2015 | 200 | $21.11 |
| 01/23/2015 | 100 | $21.38 |
| 01/26/2015 | 200 | $21.75 |
| 01/27/2015 | 100 | $21.40 |
| 01/28/2015 | 100 | $21.76 |
| 05/19/2015 | 1,200 | $21.81 |
| 06/10/2015 | 100 | $22.08 |
| 06/10/2015 | 1,400 | $22.05 |
| 06/11/2015 | 300 | $22.25 |
| 06/12/2015 | 200 | $22.18 |
| 06/12/2015 | 300 | $22.14 |
| 06/15/2015 | 100 | $21.90 |
| 06/15/2015 | 400 | $22.19 |
| 09/03/2015 | 700 | $17.38 |
| 09/04/2015 | 400 | $17.10 |
| 09/08/2015 | 400 | $17.51 |
| 09/08/2015 | 900 | $17.29 |
| 09/08/2015 | 1,700 | $17.25 |
| 09/09/2015 | 1,100 | $17.14 |
| 09/10/2015 | 400 | $17.19 |
| 09/10/2015 | 700 | $17.04 |
| 09/11/2015 | 900 | $16.96 |
| 09/11/2015 | 4,400 | $16.98 |
| 09/14/2015 | 700 | $16.88 |
| 09/14/2015 | 1,300 | $16.70 |
| 09/16/2015 | 300 | $16.39 |
| 09/16/2015 | 800 | $16.36 |
| 09/17/2015 | 300 | $16.48 |
| 09/17/2015 | 1,300 | $16.70 |
| 09/17/2015 | 1,500 | $16.88 |
| 09/18/2015 | 200 | $16.31 |
| 09/18/2015 | 300 | $15.80 |
| 09/18/2015 | 300 | $16.38 |
| 09/21/2015 | 200 | $15.76 |
| 09/21/2015 | 400 | $15.75 |
| 09/23/2015 | 700 | $14.92 |
| 09/23/2015 | 1,300 | $14.95 |
| 09/24/2015 | 300 | $14.74 |
| 09/24/2015 | 1,400 | $14.75 |
| 09/25/2015 | 1,000 | $14.63 |
| 09/28/2015 | 2,000 | $13.90 |

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 09/29/2015 | 500 | $13.61 |
| 09/29/2015 | 800 | $13.51 |
| 09/30/2015 | 1,600 | $13.55 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 11/19/2014 | 5,400 | $20.01 |

CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April 20, 2016.

s/ DOUGLAS R. BRITTON
DOUGLAS R. BRITTON

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
619/231-7423 (fax)

E-mail:  DougB@rgrdlaw.com

# Mailing Information for a Case 1:14-cv-01026-SS City of Pontiac General Employees' Retirement System v. Asar et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Paul R. Bessette**
  pbessette@kslaw.com,jworsham@kslaw.com,ccisneros@kslaw.com

- **Michael J. Biles**
  mbiles@kslaw.com,kbryan@kslaw.com,jworsham@kslaw.com

- **Douglas R. Britton**
  dougb@rgrdlaw.com,kathyj@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Luke O. Brooks**
  lukeb@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Daniel S. Drosman**
  dand@rgrdlaw.com,tholindrake@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Gerald Thomas Drought**
  gdrought@mdtlaw.com,rboan@mdtlaw.com,kmilligan@mdtlaw.com

- **Avi Josefson**
  avi@blbglaw.com,matthew.mahady@blbglaw.com,errol.hall@blbglaw.com

- **Joe Kendall**
  jkendall@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Mark L. Kincaid**
  mkincaid@gbkh.com,cgonzalez@gbkh.com

- **Jamie Jean McKey**
  jmckey@kendalllawgroup.com,administrator@kendalllawgroup.com

- **Ivy T. Ngo**
  ingo@rgrdlaw.com,e_file_sd@rgrdlaw.com,tjohnson@rgrdlaw.com

- **Gerald H. Silk**
  jerry@blbglaw.com,matthew.mahady@blbglaw.com,errol.hall@blbglaw.com

- **James P. Sullivan**
  JSullivan@kslaw.com,kbryan@kslaw.com,jworsham@kslaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)