**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

FILED

17 JAN 26  PM 1:58

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

CITY OF PONTIAC GENERAL EMPLOYEES'
RETIREMENT SYSTEM, on Behalf of Itself and
All Others Similarly Situated,
                              Plaintiff,

-vs-                                                    Case No.  A-14-CA-1026-SS

HANGER, INC., VINIT K. ASAR, GEORGE
McHENRY, and THOMAS KIRK,
                              Defendants.

---

# O R D E R

BE IT REMEMBERED on this day, the Court reviewed the file in the above-styled cause, and specifically Defendants Hanger, Inc. and Vinit Asar's Motion to Dismiss [#112], Defendant Thomas Kirk's Motion to Dismiss [#114], and Defendant George McHenry's Motion to Dismiss [#115]. Lead Plaintiff Alaska Electrical Pension Fund (Plaintiff) submitted a Response [#120] in opposition. Defendants Hanger, Inc. and Vinit Asar, Defendant Thomas Kirk, and Defendant George McHenry (collectively, Defendants) submit three separate Replies [#126, #125, #128, respectively] in support. Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

In this case, the Court once again considers whether the lead Plaintiff in a securities fraud class action has met the heightened pleading standard.[1] As Plaintiff offers its Third Amended

---

[1] Securities litigation motions to dismiss are as perennial as the grass. *See Huang v. EZCorp, Inc.*, No. A-15-CA-00608-SS, 2016 WL 6092717 (W.D. Tex. Oct. 18, 2016); *Tran v. XBiotech Inc.*, No. A-15-CA-01083-SS, 2016 WL 5408382 (W.D. Tex. Sept. 23, 2016); *KB Partners I, L.P. v. Pain Therapeutics, Inc.*, No. A-11-CA-1034-SS, 2015 WL 7760201 (W.D. Tex. Dec. 1, 2015). Imposing heightened pleading requirements on such litigation, Congress

Complaint (TAC) following the Court's dismissal of its First Amended Complaint (FAC), the stakes are high. *See* Order of Mar. 21, 2016 [#78]. Recognizing these stakes, Defendants marshal considerable force, submitting three separate motions to dismiss. Collectively, Defendants argue Plaintiff's TAC should be dismissed because it inadequately alleges scienter, falsity, and loss causation.

Previously, in authorizing Plaintiff to file an amended complaint, this Court warned Plaintiff its next iteration of the complaint should be drafted with attention to Rule 8 of the Federal Rules of Civil Procedure's requirement a complaint should contain a short and plain statement of the claim showing the pleader is entitled to relief. *Id.* at 28. Yet, Plaintiff refused to heed this Court's warning. Although Plaintiff created a section titled "Short and Plain Statement of the Claim," Plaintiff failed to comprehensively set out the facts underlying its claims. As a result, the Court was again forced to cobble together the facts and events forming the background of this suit in order to understand Plaintiff's claims. The Court repeatedly looked to Defendants' Motions to Dismiss and Defendants' exhibits to interpret Plaintiff's allegations.[2]

---

endeavored to create a mechanism, using the motion to dismiss, to "deter or at least quickly dispose of those suits whose nuisance value outweighs their merits [by] plac[ing] special burdens on plaintiffs seeking to bring federal securities fraud class actions." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 82 (2006).

[2] Although the Court used Defendants' Motions to Dismiss as a roadmap, the Court was forced to use that roadmap to construe Plaintiff's meandering complaint because the standard for evaluating a motion to dismiss requires the Court to look to at the facts of the complaint and resolve all reasonable inferences in favor of the plaintiff. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322 (2007) ("[C]ourts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."). Thus, the recited facts forming the basis for this order were assembled from Plaintiff's TAC and documents incorporated therein. *See Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 & n.1 (5th Cir. 1996) (allowing courts deciding a motion to dismiss in a securities fraud action to consider the complaint, the documents attached to or incorporated in the complaint, and public disclosure documents required by the SEC and actually filed with the SEC but **not** consider other forms of disclosure such as press releases or announcements at shareholder meetings if not incorporated into the complaint). While Plaintiff failed to provide the Court with copies of any of the documents incorporated into the TAC, Defendants thankfully furnished the Court with the documents Plaintiff referenced.

Resolving all reasonable inferences in favor of the Plaintiff, the Court finds Plaintiff has failed to meet the required pleading standard. Therefore, for the reasons set forth below, Defendants' Motions to Dismiss are GRANTED. While the Court previously recounted its understanding of the background of this case, the Court must begin the story afresh, especially as Plaintiff expanded the scope of the lawsuit.

## Background

Lead Plaintiff Alaska Electrical Pension Fund sues on behalf of all persons who purchased common stock of Defendant Hanger, Inc., an orthotic and prosthetic (O&P) patient care services company, between July 27, 2011, and February 26, 2016 (the Class Period).[3] Plaintiff alleges Hanger; CEO Vinit Asar, former CFO George McHenry; and former CEO Thomas Kirk made a variety of misrepresentations to shareholders during the Class Period in violation of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5.

## I.    Hanger

Hanger is the largest O&P provider in the United States. TAC [#85] ¶ 1. Hanger's business model focuses on receiving reimbursements for its services and products from Medicare, Medicaid, the United States Department of Veteran Affairs, and private insurance companies. *Id.* ¶ 23. Hanger's biggest customer is the United States government, accounting for about 40% of Hanger's total revenue during the Class Period. *Id.* ¶¶ 2, 23. Over the Class Period, Hanger also captured between 20% and 29% of the national market for O&P services, operated approximately 740 clinics

---

[3] Plaintiff has expanded the Class Period asserted in the FAC. Plaintiff originally claimed the Class Period ran from July 1, 2013, to November 6, 2014.

across the nation, and reported positive same-store sales[4] growth in every quarter since 2005. *Id.* ¶¶ 22–23.

Kirk, Asar, and McHenry (Individual Defendants) all played a role in Hanger's management during the Class Period. Defendant Kirk was Hanger's President from March 2008 until May 2012 and the CEO from March 2008 until May 2012. *Id.* ¶ 15. He remained on the board of directors until 2014. *Id.* Defendant Asar served as the President and COO from September 2011 to May 2012. *Id.* ¶ 13. In addition to President, Asar is now also CEO and a member of the board of directors. *Id.* Defendant McHenry worked as the company's CFO until his retirement in December 2014. *Id.* ¶ 14.

## II.    The Class Period Context

Plaintiff's claims must be understood in the context of the events and trends of the Class Period. Three overarching developments are particularly relevant: (1) increased government scrutiny of Medicare spending; (2) Hanger's transition to a new data management system; and (3) the identification of three material weaknesses in Hanger's accounting.

First, in 2010, Congress strengthened programs designed to combat waste in Medicare spending via the Affordable Care Act. *Id.* ¶ 23. One such program was the Recovery Audit Contractor (RAC) program, which aimed to identify and recoup past improper payments made by Medicare through more frequent post-payment audits of medical providers' claims. *Id.* In conducting those audits, RAC auditors reviewed the medical records furnished by providers in support of their Medicare claims to determine whether the medical devices and services paid for by Medicare were,

---

[4] Same-store sales is a statistic used to track the sales of a company's established stores, or stores that have been open for at least one year, over a certain period of time. Same-store sales figures "allow[] analysts and investors to evaluate the actual internal growth of [a] company, unclouded by acquisitions or divestitures." *In re Fleming Cos. Sec. & Derivative Litig.*, No. CIVA503MD1530TJW, MDL-1530, 2004 WL 5278716, at *1 (E.D. Tex. 2004).

in fact, medically necessary for the patient. *Id.* As the largest O&P provider in America, Hanger experienced significant scrutiny for the Medicare reimbursements it received and was increasingly the subject of audits over the Class Period. *Id.* ¶ 25.

Because of "widespread failure to secure the medical records required . . . before submitting a Medicare claim," Hanger began to "routinely fail RAC audits . . . as Medicare scrutiny increased throughout the Class Period . . . ." *Id.* ¶ 40. According to Plaintiff, Hanger did not collect sufficient documentation in support of its Medicare claims even though it was aware of Medicare guidelines indicating what was and was not sufficient to pass an audit. *Id.* ¶¶ 40, 43. Failing the audits meant Hanger was required to return to Medicare money it had already recorded as revenue and then pursue the Medicare appellate process to recollect that revenue. *Id.* Plaintiff claims Hanger increasingly suffered from substantive losses on its appeals, particularly with regard to expensive, high-end microprocessor prosthetics. *Id.* ¶ 45.

Second, at the same time Hanger was experiencing increased RAC audits, Hanger rolled out a new clinic data management system called Janus. *Id.* ¶47 As the rollout began, the first clinics using Janus reported a reduction in clinical efficiency; specifically, Hanger clinicians were required to spend more time entering patient data into Janus than they did with the old system, which meant they had less time to see patients and make sales. *Id.* ¶ 49.

Third, on April 4, 2014, Hanger announced its internal controls were ineffective as of December 31, 2013, because of three material weaknesses identified in Hanger's inventory accounting. *Id.* ¶ 33.

III.    **The Allegedly False and Misleading Statements**

In general, Plaintiff alleges that in light of the problems outlined above, Defendants misrepresented Hanger's financial status by reporting materially false results for the fiscal years of 2011, 2012, and 2013; the second, third, and fourth quarters of 2011; during all quarters of 2012 and 2013; and the first and second quarters of 2014.[5] In particular, Plaintiff alleges Defendants falsely stated Hanger's net sales, net accounts receivable, inventories, pre-tax income, net income, and diluted earnings per share at numerous points throughout the Class Period. Plaintiff also claims Defendants misrepresented Hanger's success in defending against Medicare audits and implementing Janus, painting a falsely rosy picture.

In a summary spanning twenty pages, Plaintiff points to ninety-three allegedly false and misleading statements by Defendants, all drawn from Hanger's press releases, conference calls, and SEC forms disclosing and discussing Hanger's financial results. TAC Ex. A [#85-1] (Ex. A). For each statement, Plaintiff identifies the speaker, date, and medium. *Id.* The allegedly false and misleading statements can be loosely divided into five different substantive categories: statements related to (1) Hanger's financial results, particularly its same-store sales growth numbers; (2) Hanger's rate of success with the RAC audits and appeals; (3) the state of Hanger's internal controls, particularly its documentation collection practices; (4) the Janus implementation; and (5) initial disclosures and restatements.[6]

---

[5] The Court refers to the financial time periods using financial abbreviations. FY indicates fiscal year and is followed by the last two digits of the year being referenced. For example, fiscal year 2011 is abbreviated FY11. A quarter is referenced by the number of the quarter, "Q," and the last two digits of the year. For example, the third quarter of 2011 is abbreviated 3Q11.

[6] Although it is generally this Court's practice to describe each specific statement a plaintiff alleges to be false or misleading in a securities fraud case, to do so here would be onerous and inefficient. Instead, the Court describes archetype statements in each of the substantive categories.

## A.    Financial Results

Repeatedly, Plaintiff alleges reported financial metrics, such as income, income-per-share, and net sales, were false and misleading in and of themselves. *See* TAC [#85] ¶ 26 (stating the financial numbers reported at intervals during the Class Period).

In addition to specific dollar amounts reported, Plaintiff claims Defendants' statements depicting same store sales as strong were false and misleading. *See id.* ¶ 35 (stating the same-store-states growth rates originally announced by Hanger from 2Q11 to the end of FY13). For example, in a press release attributed to Asar and McHenry as well as the entire Hanger corporation, Defendants declared "[s]ame center sales in our Patient Care segment continued to be strong, delivering 3.9% growth in the quarter." *See* Ex. A, at 10 (reporting a statement from a press release issued on July 31, 2013). The next day, Asar and McHenry led a conference call to discuss the 2Q13 results. During the call, Asar stated that "same-center sales [were] up 3.9%, compared to the prior year, showing a healthy increase in our sales momentum" and noted Hanger's "proven ability to produce consistent same-store growth of 3% to 5%, in an industry growing at approximately 2% . . . demonstrat[es] the strength of our business model and support[s] our long-term goals for growth in this $4.3 billion market." *Id.*

Less than a year later, on May 5, 2014, Defendant Asar and McHenry informed investors Hanger had experienced a "$3.5 million, or 1.8%, decline in same centers sales. . . . driven by the impact of severe weather in the eastern and central parts of the U.S." TAC [#85] ¶ 35; Ex. A, at 12.

## B.    Success with RAC Audits & Appeals

Concerning the regulatory environment facing Hanger, Plaintiff alleges Defendants made false or misleading statements about Hanger's success with RAC audits and appeals. During the

August 1, 2013 conference call, Defendant McHenry noted, "[W]e have approximately a 90% success rate on RAC audits, which had been settled, compared to our estimate earlier in the year of 95%. We did settle a number of appeals [this quarter] and we find our reserves estimates on the approximate $9.8 million in RAC audits still outstanding as of June 30, 2010." TAC [#85] ¶ 38; Ex. A, at 17. A few months later, Asar declared, "[D]ue to the focus and strength of our internal compliance and audit programs, we have maintained [a] 90% success rate in our appeals processes at final adjudication." *Id.* (relaying Asar's statements from a conference call on August 10, 2013).

At a later conference call, McHenry again confirmed, "Our success rate on appeals of Medicare audits remains at 90%." TAC [#85] ¶ 38; Ex. A, at 17 (call on February 13, 2014). During the same call, Asar reassured investors, "Our core O&P business remains strong despite the headwinds of Medicare audits and the increasingly delayed appeals process." *Id.*

With regard to expensive, high-end microprocessor prosthetics, Asar explained Hanger experienced "more scrutiny in the sense it takes longer to get authorizations from payers for the higher ticket items. We have to provide a little more documentation or answer more questions." TAC [#85] ¶ 38; Ex. A, at 18 (conference call on May 6, 2014). Asar emphasized Hanger's strategy to appeal post-audits denials because "we have confidence in our paperwork."*Id.*

C.    **Internal Controls**

Related to Defendants' statements concerning RAC audits, Plaintiff also alleges that Defendants' statements about Hanger's internal processes and controls were false and misleading. In particular, Plaintiff points to the Individual Defendants' Sarbanes-Oxley Act (SOX) certifications included with SEC filings from December 31, 2013 through the remainder of the Class Period. TAC [#85] ¶ 32. As required by SOX, the certifications promise the certifying officers disclosed "all

significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information." *Id.*; Ex. A, at 16.

In light of the RAC audits and the three material weaknesses revealed in 2014, Defendants reassured investors by repeatedly pointing to its internal processes and controls. For instance, Defendants Asar and McHenry indicated that Hanger had "beef[ed] up [its] documentation around the medical necessity[,]" and "we have confidence in our documentation that we have the appropriate documentation and the processes. If we do get audited down the road, we'll have the documentation." TAC [#85] ¶ 38 (citing statements made by Asar and McHenry during a conference call on August 1, 2013).

Hanger also issued a Form 8-K on August 21, 2013, disclosing that government reimbursements for Hanger's Patient Care business had a "[l]ow compliance risk due to significant investment in internal processes and controls." *Id.* A second Form 8-K issued on November 12, 2013, contained the same statement. *Id.*

**D.      Janus Implementation**

Plaintiff also claims Defendants misrepresented the progress of the Janus implementation. At a conference call in August 2013, Defendant Asar informed investors, "For the longer term, our Janus project, which is our next-generation clinic management system, has completed the pilot phase and we are in the process of beginning our national rollout." *Id.* ¶ 47. Two months later, in October 2013, Asar reported on the rollout: "What we're seeing is probably the 4 or 5 days leading up to . . . implementation, there is some disruption because there's some training and hardware changes happening. And then the scheduling slows down for about anywhere between three and six weeks.

We do see a slight slowdown in patient schedules." Ex. A, at 18. At the end of 2013, Hanger also warned investors via a SEC disclosure, "The implementation of Janus . . . could interfere with our patient care clinic operations and adversely affect our business, financial condition and results of operations." *See* Biles Decl. [#113-9] Ex. 9 (Form 10-K, FY13), at 16.

The next year, Asar reassured investors, "[Janus] is a multiyear $35 million investment in [Hanger's] infrastructure that will continue to strengthen our process and systems capabilities." TAC [#85] ¶ 47; Ex. A, at 19 (February 12, 2014 conference call). Three months later, Asar announced, "Our Janus Clinic Management System implementation continues to go as planned." *Id.* (May 6, 2014 conference call).

E.      **Initial Disclosures & Restatements**

In the summer of 2014, Hanger began to disclose a series of problems. An August 7, 2014 press release reported a 1.5% decline in Hanger's same-store sales, which was attributed to "a slowdown in authorizations from payers" and "a slowdown in payments, which requires increased accounts receivable reserves and lowers net sales." TAC [#85] ¶¶ 8, 50. Defendants claimed these difficulties were "amplified" by the implementation of Janus. *Id.* ¶ 8. During a conference call the next day discussing the press release, Asar reiterated the statements made in the press release and explained the decline in sales resulted from "increased pressure and a slowdown in payment authorizations from both government and commercial payors," the "impact of Medicare audits continu[ing] to lock up our funds, and the "amplifi[cation]" of those issues "against the backdrop of . . . Janus . . . ." *Id.* ¶ 50; Biles Decl. [#113-9] Ex. 12 (2Q14 Earnings Call), at 5. McHenry also assured investors Hanger "made good progress in our remediation efforts to date, but frankly we still

have a lot of work to do throughout the remainder of the year." TAC [#85] ¶ 52;[7] 2Q14 Earnings

Call at 3. After the August 7th press release and August 8th conference call, Hanger stock fell from

$29.87 per share to $22.48 per share. TAC [#85] ¶ 50.[8]

A few months later, on November 6, 2014, Defendants announced the release of Hanger's

3Q14 financial results would be delayed in light of the "additional time required to complete

accounting reviews . . . ." *Id.* ¶ 52. Following the announcement, Hanger stock dropped almost 18%,

falling from $24.19 on November 6, 2014, to $19.88 on November 7, 2014. *Id.*

On February 17, 2015, Hanger issued a press release announcing it would be restating

financial statements for certain periods in 2012, 2013, and 2014. *Id.* ¶ 30, Biles Decl. [#113-15] Ex.

15 (February 2015 Press Release), at 17.[9] Hanger announced "investors should no longer rely upon

the Company's previously released financials" for the periods at issue and indicated it "intend[ed]

to file restated financial information as soon as practicable." *Id.* Hanger grouped its errors into five

general categories: cost of materials, education fair, depreciation expenses, lease accounting, and

other recurring and non-recurring errors. TAC [#85] ¶ 54; February 2015 Press Release at 17.

Hanger also disclosed there were additional "material weaknesses" in its "internal control over

financial reporting," including "the design and operation of effective controls" over lease accounting,

---

[7] In an effort to characterize McHenry's statement as deceptive Plaintiff only partially quoted this statement. *See* TAC ¶ 52 ("Defendants had assured investors . . . they had 'made food progress in [their] remediation efforts' to remediate the previously disclosed material weaknesses . . . .").

[8] Although Plaintiff claims the August 4, 2014 press release and August 8, 2014 conference call provided corrective disclosures, Plaintiff also claims that same press release and conference call contained false and misleading statements in that they reported false financial results and failed to reveal the full extent of the deficiencies in Hanger's controls. *See* TAC [#85] ¶¶ 52, 54, 58.

[9] Specifically, the press release indicated Hanger would restate the "financial information for the quarterly periods ended March 31, 2014, March 31, 2013, September 30, 2013, December 31, 2013 and March 31, 2012; and the year-to-date periods ended June 30, 2014, June 30, 2013, September 30, 2013 and June 30, 2012." Biles Decl. [#113-15] Ex. 15 at 17.

billing data and invoicing, and accounts receivable allowances. *Id.* ¶ 56; February 2015 Press Release at 18. In light of these material weakness and the ones it previously identified, Hanger "concluded that it [had] an additional material weakness relating to the ineffectiveness of the Company's control environment; specifically, that the Company did not have appropriate accounting resources to meet its financial reporting requirements." *Id.* The press release also addressed Hanger's failure to release its 3Q14 financial results:

> The Company has not release its financial results for the third quarter of 2014, and has previously announced that it was unable to timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2014 because of the additional time required to complete the accounting reviews relating to the determination of the amounts and applicability of certain accounts receivable allowances, real property lease expenses and material costs. The Company has completed its work associated with its accounts receivable allowances and cost of materials related to the quarter ended September 30, 2014, and it continues to review its lease accounting and the indirect affect of lease accounting on other items for that quarter and prior periods.

TAC [#85] ¶ 56; February 2015 Press Release at 19.

## IV.    Alleged Corrective Disclosures

Since the February 2015 Press Release, Hanger has issued five disclosures styled as "updates to the restatement" although the restatement of financials has yet to be issued. TAC [#85] ¶ 30. Over the course of the updates, Hanger disclosed additional material weaknesses, bringing the total number of material weaknesses to eleven. *Id.* ¶ 58.

Following the February 2015 Press Release, Hanger announced its Audit Committee had retained outside counsel to investigate the circumstances surrounding the restatement. On February 26, 2016, Hanger disclosed preliminary findings of the investigation:

> [T]he investigation has uncovered inappropriate activities by certain former employees . . . . In particular, a former employee intentionally fabricated records used in the valuation of work-in-process inventory at October 31, 2013 that were provided

to our internal and external auditors. Additionally, certain former officers and employees of the Company may have engaged in inappropriate activities in connection with the establishment and use of an unsupported general reserve from 2008 through 2012. The investigation has also uncovered evidence suggesting that former officers and employees of the Company may have engaged in other inappropriate activities that contributed to certain of the previously disclosed accounting misstatements underling the restatement.

Biles Decl. [#113-19] Ex. 19 (Form 8-K, Feb. 26, 2016), at 3. Afterward, "Hanger's stock price collapsed an extraordinary 91.6%" on heavy trading volume. TAC [#85] ¶ 8.

Subsequently, on June 7, 2016, the Audit Committee, after completing its investigation, released the investigation results:

[T]he Audit Committee concluded that it is more likely than not that certain former employees and officers, including in some instances the former Chief Financial Officer and former Chief Accounting Officer, engaged in inappropriate historical accounting practices relating to management estimates and certain accruals . . . . [T]he Audit Committee concluded that the current Chief Executive Officer did not engage in these practices.

. . . .

. . . . In particular, the Audit Committee concluded that the former Chief Executive Officer, former Chief Financial Officer, and former Chief Accounting Officer (but not any current officers) set an inappropriate "tone at the top." Specifically, emphasis placed by former executive management on meeting or beating consensus EPS and achieving certain financial targets, may have resulted in certain in appropriate accounting decisions and entries.

Biles Decl. [#113-21] Ex. 21 (Form 8-K, June 7, 2016), at 3; TAC [#85] ¶ 6. The Audit Committee also determined the material weaknesses in Hanger's internal control likely contributed to the Company's accounting errors. *Id.*

## V.    Plaintiff's Scienter Allegations

The Court struggled to piece together Plaintiff's scienter allegations in light of the poor organization of Plaintiff's TAC. Below is the Court's attempt to identify Plaintiff's allegations.

-13-

According to Plaintiff, the Individual Defendants knew all of the statements described above were materially false and misleading at the time they were made. Plaintiff summarized its scienter allegations for the Court: "Defendants – by virtue of their receipt of information and reports, attendance at meetings reflecting the true facts regarding Hanger, their control over, receipt, and/or modification of their allegedly materially false and misleading misstatements; and/or their associations with the Company which made them privy to confidential proprietary information concerning Hanger – participated in the fraudulent scheme alleged herein." TAC [#85] ¶ 60. In detailing the specifics of its scienter allegations, Plaintiff claims the combination of "admittedly inappropriate activities," size of the restatement, the accounts involved and the reasons for the restatement, the Audit Committee's acknowledgment of an inappropriate tone at the top, and the individual defendants' unusual stock trading is enough to raise a strong inference of scienter, especially in light of the Individual Defendants' SOX certifications. *Id.* ¶ 62.

In particular, maintaining that Defendants admitted to multiple fraudulent acts by officers and employees during the Class Period, Plaintiff recites a series of quotations, in the form of a sentence almost a page long, with no context, attribution, or citations. *Id.* ¶ 61. Plaintiff appears to be citing the Audit committee's investigation results.[10] *See* Form 8-K, June 7, 2016 at 3–5.

Plaintiff further argues the duration and magnitude of the errors warranting the forthcoming restatement favors finding scienter. Citing the restatement update from May 10, 2016, Plaintiff notes Hanger's pre-tax income overstatement "has ballooned to $95 million over five-and-a-half years . . . ." TAC [#85] ¶ 68. Plaintiff points to the specific accounts involved as evidence of scienter

---

[10] Although the Audit Committee did conclude a former employee intentionally fabricated records, Plaintiff does not attempt to claim this former employee was one of the Individual Defendants.

"because those accounts [involved] reflect[] the core of Hanger's . . . Patient Care business." *Id.* ¶ 69. Plaintiff also relies on the Individual Defendants' SOX certifications, claiming the certifications were false because the Individual Defendants knew Hanger's internal accounting controls were defective and its financial statements were false. TAC ¶ 29.

Plaintiff also claims the Individual Defendants' failure to correctly reserve for disallowances,[11] particularly those attributable to Medicare, while also stating Hanger was winning 90% of Medicare audits appeals, is evidence of scienter. *Id.* ¶ 41. Furthermore, Plaintiff emphasizes the Audit Committee's conclusion former officers set an inappropriate tone as demonstrating scienter. *Id.* ¶ 62.

Finally, Plaintiff alleges during the Class Period the Individual Defendants sold their stock in Hanger "out of line with their prior trading practice . . . at times calculated to maximize their personal profit and take advantage of the stock inflation . . . ." *Id.* ¶ 74. Plaintiff provided two charts, one summarizing the stock sales by the Individual Defendants at intervals within the Class Period and another summarizing stock sales by the Individual Defendants during intervals before the Class Period. *Id.* ¶¶ 73–74.

## Analysis

### I.    Legal Standard

### A.    Motion to Dismiss—Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). A

---

[11] Plaintiff declines to provide context or explanation for any of the accounting terms it uses. The Court is therefore forced to infer what the terms mean. For example, the Court assumes "reserving for disallowances" means estimating and setting aside a portion of revenue for sales for which a payor, such as Medicare, refuses to reimburse Hanger.

motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678. Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.* Determining plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc.*, 551 U.S. at 322.

## B.    Securities Exchange Act § 10(b) Pleading Requirements

Section 10(b) of the Securities Exchange Act of 1934 empowers the SEC to promulgate rules to prevent manipulative or deceptive practices in the sale or purchase of securities. 15 U.S.C. § 78j(b). Under this grant of authority, the SEC issued Rule 10b-5, which makes it unlawful:

(a)      To employ any device, scheme, or artifice to defraud,

(b)      To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c)      To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

The Fifth Circuit has held the elements of a claim under § 10(b) are: (1) a misrepresentation or omission; (2) of a material fact; (3) in connection with the purchase or sale of a security; (4) scienter by the defendant; (5) justifiable reliance by the plaintiff; (6) damages; and (7) proximate cause. *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

Both Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA) impose a heightened pleading requirement on § 10(b) claims. FED. R. CIV. P. 9(b); 15 U.S.C. § 78u-4(b). Rule 9(b) requires plaintiffs alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b). In order to avoid dismissal under Rule 9(b) for lack of particularity, the Fifth Circuit held a plaintiff must:

(1)      specify each statement alleged to have been misleading, i.e., contended to be fraudulent;

(2)      identify the speaker;

(3)      state where and when the statement was made;

(4)      plead with particularity the contents of the false representations;

(5)      plead with particularity what the person making the misrepresentation obtained thereby; and

> (6)    explain the reason or reasons why the statement is misleading, i.e., why the statement is fraudulent.

*Rosenzweig*, 332 F.3d at 866.

The PSLRA dictates a more rigorous pleading standard for private securities fraud actions in two ways. First, in any such action alleging the defendant made an untrue statement of material fact or a misleading omission:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b). Second, for claims under which the plaintiff must prove a particular state of mind to recover:

> [T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

*Id.* (emphasis added). Based on the elements of a §10(b) claim described above, it is clear that §10(b) claims are subject to both of these requirements of the PSLRA.

## C.    "Strong Inference" of Scienter Requirement

To establish scienter, a plaintiff must show the defendant intended to deceive, defraud, or manipulate, or that the defendant acted with severe recklessness. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 251 (5th Cir. 2009). Severe recklessness is defined by an "extreme departure from the standard of ordinary care," and "is limited to highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence." *Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (citing *Owens v. Jastrow*, 789 F.3d 529, 537 (5th Cir. 2015)). Severe recklessness only exists where there was a

danger of misleading buyers or sellers which was either known to the defendant or was so obvious the defendant must have been aware of it. *Id.*

The United States Supreme Court has outlined a framework for analyzing motions to dismiss § 10(b) complaints for failing to establish a strong inference of scienter. First, as in any other motion to dismiss, the court accepts all factual allegations in the complaint as true. *Tellabs*, 551 U.S. at 322–23. Second, the court considers the entire complaint, other sources typically examined in a 12(b)(6) motion, sources incorporated by reference into the complaint, and matters of which a court may take judicial notice. *Id.* Third, in determining whether the pleaded facts give rise to a strong inference of scienter, as required by the PSLRA, a court should consider all of the facts alleged, taken collectively, and should also take into account plausible opposing inferences. *Id.* The inference of scienter need not be irrefutable, nor even the most compelling of all competing inferences, but must be strong in light of other inferences. *Id.* at 324. Ultimately, to create an inference of scienter, "the allegations in the complaint must be 'cogent and compelling,' not simply 'reasonable,' or 'permissible.'" *Local 731*, 810 F.3d at 957 (quoting *Tellabs*, 551 U.S. at 323).

Building on this framework, the Fifth Circuit has stated "allegations of motive and opportunity standing alone" are not enough to establish scienter, but such circumstantial evidence may "meaningfully enhance the strength of the inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 727, 533 (5th Cir. 2008). The Fifth Circuit has also rejected the group pleading approach to scienter, which would allow a plaintiff to prove state of mind through the collective knowledge of all the corporation's officers and employees. *Id.* Instead, a court looks only to the state of mind of the corporate officials who made or issued the alleged misleading statement to determine if a complaint sufficiently pleads scienter. *Id.*

## II.    Application

Although Defendants submit three separate motions to dismiss, each alleging distinct grounds for dismissal, the motions to dismiss collectively offer three main reasons for dismissal: the TAC inadequately alleges scienter, falsity, and loss causation. Because the Court agrees with Defendants that Plaintiff has failed to plead facts giving rise to a strong inference of scienter, Plaintiff's complaint must be dismissed. The Court declines to reach Defendants' remaining arguments.

Plaintiff relies—as it is permitted to do—on circumstantial allegations of scienter. *See Ind. Elec.*, 537 F.3d at 533. Although the Court's "job is not to scrutinize each allegation in isolation but to assess all of the allegations holistically," *Tellabs, Inc.*, 551 U.S. at 326, the Court has categorized the scienter allegations for convenience. The Court then assesses the allegations holistically.

## A.    Privy to Confidential Information

In the TAC, Plaintiff begins its allegations of scienter by summarizing how the Individual Defendants participated in a fraudulent scheme "by virtue of their receipt of information and reports, attendance at meetings reflecting the true facts regarding Hanger, their control over, receipt, and/or modification of their allegedly materially false and misleading misstatements; and/or their associations with the Company which made them privy to confidential proprietary information concerning Hanger . . . ." TAC [#85] ¶ 60. At its core, such a claim is an argument the Individual Defendants knew or should have known their statements were false or misleading because they were Hanger's officers. Plaintiff identifies no specific report or information the Individual Defendants received or meeting the Individual Defendants attended.

Fifth Circuit case law makes clear "scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions in the company." *Ind. Elec.*, 537 F.3d at 535 (citations omitted). "An unsupported general claim" about the existence of reports or

data revealing information contradictory to a defendant's statements is insufficient to survive a motion to dismiss. *See Abrams*, 292 F.3d at 432 (finding the plaintiffs' pleading insufficient to demonstrate scienter where plaintiffs alleged individual defendants received daily, weekly, and monthly financial reports that appraised them of the company's financial status). "Such allegations must have corroborating details regarding the contents of allegedly contrary reports, their authors, and recipients." *Id.* Thus, without corroborating details, Plaintiff's allegation the Individual Defendants were privy to confidential information contradicting their statements cannot support an inference of scienter.

**B.      Inappropriate Activities**

Moreover, Plaintiff cites the inappropriate accounting activities the Audit Committee identified in its investigation, claiming the "inappropriate activities by [Hanger's] officers and employees . . . to meet financial and analyst consensus targets raises a strong inference of scienter." TAC [#85] ¶ 61 (internal quotations omitted). Yet, as noted above, the Fifth Circuit has rejected group pleading. In order for a plaintiff's allegations to justify an inference of scienter, the connection between an individual defendant, that defendant's state of mind, and the allegedly fraudulent statement must be specifically pleaded. *Southland Secs. Corp. v. Inspire Ins.,* 365 F.3d 353, 364–66 (5th Cir. 2004). Plaintiff's reliance on the Audit Committee's findings, without more details, amounts to an allegation Defendants as a group knowingly or recklessly made material misrepresentations and cannot substantiate an inference of scienter.

**C.      Accounting Errors and Restatement**

Furthermore, Plaintiff points to Hanger's accounting errors and the magnitude of the errors as evidence of scienter. According to Plaintiff, Hanger's total pre-tax income overstatement has

grown to $95 million. Moreover, Plaintiff argues the Individual Defendants must have been aware of the errors because the errors involved accounts that were integral to Hanger's core business.

Generally, the misapplication of accounting principles are not, by themselves, sufficient to establish scienter. *In re ArthroCare Corp. Sec. Litig.,* 726 F. Supp. 2d 696, 721–22 (W.D. Tex. 2010) But taking into account the combination of the number, size, timing, nature, frequency, and context of those errors, "the balance of inferences drawn from such allegations may shift significantly in favor o[f] scienter." *Id.* at 721. As this Court previously noted, "'[C]ommon sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly.'" *Id.* at 722 (quoting *In re MicroStrategy, Inc. Sec. Lit.*, 115 F.Supp.2d 620 (E.D. Va. 2000)).

Thus, the fact the errors occurred over a notable period of time, the magnitude of those errors, and the importance of the accounts involved, while perhaps not sufficient on their own to establish scienter, do contribute to a finding of scienter.

**D.    SOX Certifications**

Additionally, Plaintiff alludes to the Individual Defendants' SOX certifications, claiming the certifications were false because the Individual Defendants knew Hanger's internal accounting controls were defective and its financial statements were false. TAC [#85] ¶ 29. But, to infer scienter from a SOX certification, "[t]here must be . . . facts establishing that the officer who signed the certification had a reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." *Ind. Elec.,* 537 F.3d at 545 (internal quotations omitted). Despite emphasizing the magnitude and extent of the accounting errors, Plaintiff alleges no specific facts placing Asar, Kirk, or McHenry on notice of glaring irregularities at the time of the certifications.

Consequently, Plaintiff has not pled sufficient facts for the SOX certifications to add to an inference of scienter.

## E.      Inadequate Reserves

Plaintiff also attempts to show scienter based on the contradiction between the Individual Defendants' statements Hanger was winning 90% of the Medicare audit appeals with Hanger's later recognition it had failed to adequately reserve for disallowances. Although Plaintiff does not say so directly, it seems to imply the Individual Defendants knew or were severely reckless of Hanger's likelihood of failing Medicare audits and losing appeals. But Plaintiff does not to point to information the Individual Defendants knew or should have known contradicting the belief Hanger was successfully addressing the Medicare audits. Instead, Plaintiff's allegations amount to an example of fraud by hindsight: because the Medicare audits turned out badly and Defendants did not plan for such a problem, Plaintiff alleges the Defendants acted with scienter.

Poor business judgment, however, does not support a finding of scienter. *See Owens v. Jastrow,* 789 F.3d 529, 544 (5th Cir. 2015) (finding the combination of poor business judgment and a financial motive do not support the inference of scienter). Notably absent from Plaintiff's TAC are any allegations or facts suggesting Defendants should have known Hanger's reserves were possibly inadequate. Without such an assertion, the Court cannot conclude Defendant acted with an intent to deceive or with severe recklessness.

## F.      Inappropriate Tone at the Top

Similarly, Plaintiff repeatedly points to the Audit Committee's finding the former Chief Executive Officer, former Chief Financial Officer, and former Chief Accounting Officer set an inappropriate tone at the top as evidence of scienter. Yet, allegations of mismanagement, even gross mismanagement, do not establish a strong inference of scienter. *Goldstein v. MCI WorldCom,* 340

F.3d 238, 254 (5th Cir. 2003) (finding the complaint's allegations of mismanagement of the company's accounts receivable to be insufficient to establish a strong inference of scienter). Plaintiff's allegations the Individual Defendants set an inappropriate tone at the top amount to no more than allegations of mismanagement and thus do not contribute to a finding of scienter.

## G.    Insider Stock Sales

Finally, Plaintiff also alleges the Individual Defendants trading of Hanger stock permits a strong inference of scienter. Specifically, Plaintiff alleges the Individual Defendants acted inconsistently with their prior trading practice and sold stock at times calculated to maximize their personal profit and take advantage of the stock inflation.[12]

Insider trading can be a strong indicator of scienter if the trading occurs out of line with prior trading practices or at times calculated to maximize personal profit. *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 552–53 (5th Cir. 2007) (citing *Abrams,* 292 F.3d at 435). But here the Individual Defendants contend the timing of the stock sales is not suspicious because the Individual Defendants sold stock to cover taxes incurred as a result of the vesting of restricted shares and under a 10b–5–1 trading plan.[13] Hanger & Asar Mot. Dismiss [#112] at 14; Kirk Mot. Dismiss [#114] at 17. Review of the public filings accompanying the stock sales confirms the Individual Defendants' contentions. *See, e.g.,* Biles Decl. Ex. 22-A [#113-22], at n.1; Ex. 22-E [#113-26], at nn.1–2; Ex. 23-A [#113-33], n.2. Furthermore, the length of the Class Period in this case, 55 months, further weakens any inference of scienter that could be drawn from the Individual

---

[12] Plaintiff cites no source for the stock sales data it includes in its TAC. ¶¶ 73–74. However, Plaintiff presumably gathered this information from publically available SEC Form 4s. Thus, because Plaintiff's TAC incorporates these forms by reference, the Court takes judicial notice of the content of the forms.

[13] A 10b–5–1 plan is an agreement "which allows corporate insiders to set a schedule by which to sell shares" over time, and which can "raise an inference that the sales were pre-scheduled and not suspicious." *Cent. Laborers' Pension Fund,* 497 F.3d at 554 n.4 (internal quotation omitted).

Defendants' trades. *See In re ArthroCare*, 726 F. Supp. 2d at 723 (relying on the finding from *Teachers' Retirement Sys. of Louisiana v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007) that a class period of 46 months was exceedingly long and weakened an inference of scienter). Consequently, the Individual Defendants' stock sales bear little, if at all, on the scienter analysis.

## Conclusion

Viewed holistically, Plaintiff's allegations of scienter fail to satisfy its burden under the PSLRA. While Plaintiff's allegations do establish an inference of scienter, the allegations are not enough to meet the strong inference standard. As pled, only the time span over which the accounting errors occurred, the magnitude of those errors, and the importance of the accounts involved contribute to an inference of scienter. Plaintiff's allegations, therefore, do not present a strong inference of scienter against any Defendant "at least as compelling as any opposing inference of nonfraudulent intent." *See Tellabs,* 551 U.S. at 314. Thus, the TAC must be dismissed.

Because Plaintiff has twice before amended its complaint and the Court previously granted a motion to dismiss in this case, the Court finds further amendment would be futile. *See Stripling v. Jordan Prod. Co., LLC,* 234 F.3d 863, 872–73 (5th Cir. 2000) ("It is within the district court's discretion to deny a motion to amend if it is futile.") (citations omitted). Consequently, the Court dismisses the TAC with prejudice.

Accordingly:

IT IS ORDERED that Defendants Hanger, Inc. and Vinit Asar's Motion to Dismiss [#112] is GRANTED;

IT IS FURTHER ORDERED that Defendant Thomas Kirk's Motion to Dismiss [#114] is GRANTED;

IT IS ALSO ORDERED that Defendant George McHenry's Motion to Dismiss [#115] is GRANTED; and

IT IS FINALLY ORDERED that all claims brought by Plaintiff in this case are DISMISSED WITH PREJUDICE.

SIGNED this the _26_ day of January 2017.

SAM SPARKS
UNITED STATES DISTRICT JUDGE