IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit
**FILED**
April 10, 2019
Lyle W. Cayce
Clerk

---

No. 17-50162

---

D.C. Docket No. 1:14-CV-1026

ALASKA ELECTRICAL PENSION FUND,

Plaintiff - Appellant

v.

VINIT K. ASAR; GEORGE MCHENRY; HANGER, INCORPORATED; THOMAS F. KIRK,

Defendants - Appellees

Appeal from the United States District Court for the
Western District of Texas

Before WIENER, GRAVES, and HO, Circuit Judges.

JUDGMENT ON REHEARING

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that plaintiff-appellant pay to defendants-appellees the costs on appeal to be taxed by the Clerk of this Court.

**Certified as a true copy and issued as the mandate on May 02, 2019**

**Attest:** Lyle W. Cayce
**Clerk, U.S. Court of Appeals, Fifth Circuit**

# IN THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 10, 2019

Lyle W. Cayce
Clerk

No. 17-50162

ALASKA ELECTRICAL PENSION FUND,

Plaintiff - Appellant

v.

VINIT K. ASAR; GEORGE MCHENRY; HANGER, INCORPORATED; THOMAS F. KIRK,

Defendants - Appellees

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:14-CV-1026

ON PETITION FOR REHEARING

Before WIENER, GRAVES, and HO, Circuit Judges.

JAMES E. GRAVES, JR., Circuit Judge:*

Defendants' Petition for Panel Rehearing is GRANTED IN PART.

IT IS ORDERED that our prior panel decision, *Alaska Electrical Pension Fund v. Asar* (Aug. 6, 2018), is WITHDRAWN, and the following is SUBSTITUTED in its place.

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Plaintiff-Appellant Alaska Electrical Pension Fund ("the Fund") is a pension fund representing a class of investors. It claims that Defendants-Appellees Hanger, Inc. ("Hanger") and three of its officers engaged in securities fraud. The Fund's allegations are based predominantly on a report by Hanger's Audit Committee after Hanger restated its financial results. That report indicates that some defendants set an inappropriate "tone at the top" and engaged in improper accounting. The district court granted the defendants' motions to dismiss, holding that the complaint did not adequately allege scienter. For the reasons stated below, we affirm.

## I. Facts and Proceedings

Hanger is the largest provider of orthotic and prosthetic patient care services in the United States.[1] Hanger's principal sources of revenue are reimbursements for its services and products from public and private insurers. Federal programs, such as Medicare, Medicaid, and the Department of Veterans Affairs, are also the source of a significant portion of Hanger's revenue. Before the period of time at issue, Hanger recorded positive growth in same-store sales for every quarter since 2005.

Defendant Thomas Kirk was Hanger's President from March 2008 to September 2011 and its CEO from March 2008 until he retired in May 2012.[2] Defendant Vinit Asar was Hanger's President and COO from September 2011 to May 2012, when he became President and CEO. Defendant George McHenry was Hanger's CFO until he retired at the end of 2014. The Fund invested in Hanger stock.

---

[1] These facts are taken from the Third Amended Complaint, which are taken as true at the motion to dismiss stage. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

[2] Kirk remained on the Board of Directors until 2014.

In 2010, Congress expanded a Medicare audit program—one that reviewed medical records in support of Medicare claims—to scrutinize the medical necessity of the claimed services or devices. Hanger's clinics did not collect the required documentation in a timely manner, so after Medicare scrutiny increased under the expanded program, Hanger began failing audits more frequently. When Hanger failed an audit, it was required to return the reimbursement it had collected, even though it had already recognized that reimbursement as revenue. Hanger would then pursue recovery of those reimbursements via a lengthy Medicare appeals process.

The Fund contends that, despite these problems, Hanger continued to claim success in its Medicare audits and maintained that it had sufficient internal controls to ensure that it passed audits. Consequently, Hanger did not increase its reserve for disallowed Medicare sales.

At the same time, Hanger was implementing a new clinic data management system called Janus. The Fund contends that the defendants told investors that the Janus rollout caused only minimal disruptions when, in reality, clinicians made fewer sales because they had to spend significant time and resources transitioning patient data to the new system. In addition to these documentation troubles, and the related failure to increase its audit reserve, on April 4, 2014, Hanger identified three material weaknesses in its inventory accounting. In its SEC filings, the individual defendants certified that these were the only material weaknesses in Hanger's internal controls.

*A. Alleged False and Misleading Statements*

The Fund identifies ninety-three allegedly false and misleading statements by the defendants related to these issues. It states the speaker, date, and medium (*e.g.*, SEC filing, press release, or conference call) for each statement. The allegedly false statements cover several categories. First, the Fund claims that Hanger reported false financial metrics and falsely depicted

Hanger as having strong same-store sales. This resulted in reporting inflated financial results for 2011, 2012, and 2013, and for all quarters from the second quarter of 2011 to the second quarter of 2014. Second, the Fund claims that Hanger falsely stated that its Medicare audits and appeals were more successful than they actually were; that its reserves estimates were adequate; and that the Janus implementation caused minimal disruption. Third, the Fund claims that Hanger falsely assured investors that its internal controls were adequate. Finally, the Fund claims that even after Hanger began disclosing a series of problems—most prominently announcing in February 2015 that it would reissue financial statements for 2012 through the second quarter of 2014—Hanger continued to falsely understate "the size and scope of the restatement."

*B. Alleged Corrective Disclosures*

Since the initial restatement announcement in February 2015, Hanger has issued at least five updates.[3] It has also continued to announce material weaknesses, ultimately acknowledging at least eleven. Hanger eventually admitted to overstating its pre-tax income by $87 million.

On November 12, 2015, Hanger announced that its Audit Committee would investigate the circumstances which led to the restatement. On February 26, 2016, Hanger disclosed preliminary findings of the investigation in a Form 8-K ("February 8-K") filed with the SEC, stating that "certain former officers and employees . . . may have engaged in inappropriate activities," although it did not identify those individuals. The February 8-K revealed that Hanger had overstated its accounts receivable and understated its reserves by approximately $40 million. In June 2016, Hanger released a summary of the

---

[3] The full financial restatements had not been issued as of the time the district court ruled.

final investigation results in another Form 8-K ("June 8-K"). Both Forms 8-K stated that a former employee had fabricated inventory records. The June 8-K also stated that (1) Kirk and McHenry had "set an inappropriate 'tone at the top'" by emphasizing "achieving certain financial targets," which "may have" contributed to inappropriate accounting decisions, and (2) McHenry and others had "engaged in inappropriate historical accounting practices" and that "particular adjustments . . . were undertaken for the purpose of enhancing [Hanger's] reported financial results."

*C. Proceedings*

In February 2015, after the initial complaint was filed in November 2014 (before the first restatement announcement), the district court appointed the Fund as lead plaintiff.[4] The Fund has since amended the complaint three times. The current version, the Third Amended Complaint ("TAC"), was filed in July 2016 and is the first complaint to name Kirk as a defendant and to incorporate allegations based on the Audit Committee's June 8-K findings.

The TAC alleges (1) violations of § 10(b) of the Securities and Exchange Act[5] and SEC Rule 10b-5[6] by all defendants and (2) violations of § 20(a) of the Securities and Exchange Act[7] by the individual defendants ("control person claims") on behalf of every purchaser of Hanger stock between July 27, 2011 and February 26, 2016 (the "Class Period"). Each defendant filed a motion to dismiss in September 2016. The district court granted the motions with prejudice, and the Fund appeals.

---

[4] Plaintiffs City of Pontiac General Employees' Retirement System, City of Pontiac Policy and Fire Retirement System, and Lackawanna County Employees' Retirement Fund had all withdrawn their motions for appointment as lead plaintiff.

[5] 15 U.S.C. § 78j(b).

[6] 17 C.F.R. § 240.10b-5.

[7] 15 U.S.C. § 78t(a).

## II. Legal Standards

To state a claim under § 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance . . . [,] (5) economic loss[,] and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss."[8] "Under Section 20(a), a person who exerts control over a person who violates any provision of the Securities Exchange Act can be held jointly and severally liable with the primary actor of the underlying securities law violation."[9] "Control person liability is secondary only and cannot exist in the absence of a primary violation."[10]

We review a district court's analysis of a motion to dismiss de novo.[11] A claim under § 10(b) is subject to the heightened pleading standard of Rule 9(b), requiring a plaintiff to "state with particularity the circumstances constituting fraud."[12] The Private Securities Litigation Reform Act (PSLRA) adds two additional pleading requirements. First, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading," and must "state with particularity all facts on which" allegations made on information and belief are based.[13] Second, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[14]

---

[8] *Owens v. Jastrow*, 789 F.3d 529, 535 (5th Cir. 2015) (quoting *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 238–39 (5th Cir. 2009)).

[9] *Neiman v. Bulmahn*, 854 F.3d 741, 746 (5th Cir. 2017) (quoting *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 206 n.4 (5th Cir. 2009)).

[10] *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 383 (5th Cir. 2004).

[11] *Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014).

[12] Fed. R. Civ. P. 9(b); *see Owens,* 789 F.3d at 535.

[13] 15 U.S.C. § 78u-4(b)(1).

[14] *Id.* § 78u-4(b)(2)(A).

## III. Analysis

The district court dismissed the complaint for failing to allege scienter adequately. The Fund maintains that this was error; the defendants contend that the district court's dismissal was correct. The defendants also assert in the alternative that the complaint does not adequately plead loss causation.

### *A. Scienter*

In a securities fraud case, scienter connotes "an intent to deceive, manipulate, [or] defraud," or "severe recklessness."[15] "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standard of ordinary care[.]"[16] Severe recklessness is present when there is "a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."[17]

To determine whether the complaint states a strong inference of scienter, courts follow a three-step process. First, courts must take the complaint's allegations as true.[18] Second, "courts *must* consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."[19] In other words, courts evaluate scienter allegations holistically.[20] When doing so, "[a] district court may best make sense of scienter allegations by first looking to the contribution of each individual allegation to a strong

---

[15] *Owens*, 789 F.3d at 536 (quoting *Lormand*, 565 F.3d at 251).
[16] *Id.* (quoting *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002)).
[17] *Id.* (quoting *Abrams*, 292 F.3d at 430).
[18] *Tellabs*, 551 U.S. at 322.
[19] *Id.* (emphasis added).
[20] *Owens*, 789 F.3d at 536–37.

inference of scienter, especially in a complicated case[.]"[21] Third, "the court must take into account plausible opposing inferences."[22] To pass muster, "the inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."[23] "[A] reasonable person [must] deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged."[24]

We follow the approach taken in prior cases, examining the scienter allegations to determine whether and to what extent they contribute to an inference of scienter. We then examine those contributions holistically to determine whether that inference is strong. The Fund contends that the court can strongly infer scienter from allegations related to the following: (1) the magnitude of the restatement and the long period of time that it covers, (2) the individual defendants' stock transactions, (3) the Audit Committee's findings,[25] and (4) the defendants' certifications of Hanger's SEC filings under the Sarbanes-Oxley Act of 2002 ("SOX"), (5) in spite of the red flags they ignored.

---

[21] *Id.* The Fund complains that the district court only examined the allegations individually, but the district court explicitly stated that it considered the allegations holistically, and merely examined first the contribution of individual allegations to the overall scienter determination, a permissible approach.

[22] *Tellabs*, 551 U.S. at 323.

[23] *Id.* at 324.

[24] *Id.*

[25] These allegations quote and paraphrase liberally from the June 8-K, so the district court considered it incorporated into the complaint. This was appropriate, because "[w]hen deciding a motion to dismiss a claim for securities fraud on the pleadings, a court may consider the contents of relevant public disclosure documents which (1) are required to be filed with the SEC, and (2) are actually filed with the SEC," but "only for the purpose of determining what statements the documents contain." *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996). Further, a court *must* consider documents incorporated by reference into a securities fraud complaint. *Tellabs*, 551 U.S. at 322. The Fund has not contested that it implicitly incorporated the June 8-K into its complaint, and thus forfeited any objection on those grounds.

*1. Magnitude and Time Period of Restatement*

The most straightforward allegations of scienter point to the large size of the accounting restatement—$87 million—and the fact that it occurred over a significant period of time. These allegations provide some basis to infer scienter, but they cannot support a strong inference on their own.[26] "The significance of a large accounting error depends on the circumstances,"[27] so we must assess the extent of the support in the context of the other allegations.

*2. Stock Sales (Motive)*

The next set of allegations concerns motive. The Fund contends that the individual defendants intended to inflate the price of Hanger's stock so that they could sell their own stock at a high price. The TAC lists the individual defendants' stock transactions, and asserts that they sold much more of their stock during the Class Period than before.

"[A]ppropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter."[28] "However, this is true of insider trading 'only' when 'in suspicious amounts or at suspicious times.'"[29] "'Suspicious' in this context generally means that the 'sales are out of line with prior trading practices or at times calculated to maximize personal profit.'"[30]

---

[26] *See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007); *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990) ("[P]ublication of inaccurate accounting figures, or a failure to follow [Generally Accepted Accounting Principles], without more, does not establish scienter.").

[27] *Owens*, 789 F.3d at 541.

[28] *Southland*, 365 F.3d at 368 (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001)).

[29] *Id.* (quoting *Abrams*, 292 F.3d at 435); *see also Cent. Laborers*, 497 F.3d at 552–53 ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts.").

[30] *Cent. Laborers*, 497 F.3d at 553 (quoting *Abrams*, 292 F.3d at 435).

But, as with accounting restatements, "[i]nsider trading alone cannot create a strong inference of scienter."[31]

Defendants respond that these allegations do not support scienter because there is a "plausible, nonculpable explanation[]"[32] for the trades: The defendants sold the stock to cover tax expenses and pursuant to 10b5-1 trading plans. "A 10b5–1 plan is an agreement 'which allows corporate insiders to set a schedule by which to sell shares' over time, and which can 'raise an inference that the sales were pre-scheduled and not suspicious.'"[33] Defendants support this alternate explanation with SEC Forms 4, the disclosures required when particular corporate insiders trade corporate stock. The district court took judicial notice of these forms, explaining that they were the only possible source of the stock sales data in the TAC. The forms state that these transactions were made to cover taxes and pursuant to 10b5-1 trading plans. But the Fund argues that the court should not consider these forms because they require an inappropriate factual determination.

This court has never explicitly stated whether we may look to a Form 4 for plausible explanations of potentially suspicious trades at the pleading stage. Although district courts are divided on this issue,[34] we may look to

---

[31] *Id.*; *see Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) ("[M]otive and opportunity standing alone will not suffice [to allege scienter.]" (quoting *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 553 (5th Cir. 2008)).

[32] *Tellabs*, 551 U.S. at 324.

[33] *Cent. Laborers*, 497 F.3d at 554 n.4 (5th Cir. 2007) (quoting *Wietschner v. Monterey Pasta Co.*, 294 F. Supp. 2d 1102, 1117 (N.D. Cal. 2003)).

[34] *Compare In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("[W]hether or not the stocks in this case were sold pursuant to a 10b5–1 trading plan is irrelevant at this stage in the proceedings, as the existence of such a plan is an affirmative defense[.]"), *and Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 200 (S.D.N.Y. 2010) ("A Rule 10b5–l trading plan may give rise to an inference of scienter because a clever insider might maximize their gain from knowledge of an impending price drop over an extended amount of time, and seek to disguise their conduct with a 10b5–1 plan." (citation and internal quotation marks omitted)), *with Hopson v. MetroPCS Commc'ns, Inc.*, No. 3:09-CV-2392-G,

publically filed SEC documents implicitly incorporated into a complaint.[35] Looking to Forms 4 also seems congruent with the requirement that we consider plausible nonculpable explanations for the defendants' conduct.[36]

In *Central Laborers' Pension Fund v. Integrated Electrical Services Inc.*, the defendant offered a divorce decree and a 10b5-1 trading plan to explain suspicious trades.[37] The court explained that the decree was properly considered at the motion to dismiss stage because "the document's written terms themselves indicate the reason [the defendant] had for selling the shares."[38] But ultimately, neither document made another explanation more plausible because (1) it was "unclear whether the divorce decree actually created any financial obligations," and (2) "[the defendant] entered into the [10b5-1] Plan during the Class Period."[39] *Central Laborers* suggests that we may consider the Forms 4, but only in the course of weighing which explanation is more plausible. Selling shares to pay taxes weighs against a nefarious motive, but neither side has pointed to any information about *when* the defendants entered into the 10b5-1 trading plans. We therefore cannot say

---

2011 WL 1119727, at *14 n.14 (N.D. Tex. Mar. 25, 2011) ("[T]he court may properly consider [the 10b5-1 trading] plans, and the relevant Form 4s, when weighing the competing inferences regarding the insider sales."), *and In re Sec. Litig. BMC Software, Inc.*, 183 F. Supp. 2d 860, 884 (S.D. Tex. 2001) ("Because Plaintiffs relied on these documents and because they are integral to determining whether Plaintiffs allegations give rise to a strong inference of scienter, they are incorporated by reference even though they are not mentioned in the amended complaint.").

[35] *See Lovelace*, 78 F.3d at 1018.

[36] The Fund cites to *Rubinstein v. Collins*, in which this court declined to consider an argument that suspicious sales "were made in response to tax considerations," because such a contention had no place at the pleading stage. 20 F.3d 160, 169 n.38 (5th Cir. 1994). But *Rubenstein* was decided before the Supreme Court, in *Tellabs*, required weighing the plausibility of alternate explanations.

[37] 497 F.3d at 554.

[38] *Id.*

[39] *Id.*; *see also Ind. Elec.*, 537 F.3d at 543 (finding it "quite plausible" that a defendant would sell stock days after the expiration of a "lock-up" agreement to not sell shares for a period of time).

that the trading plans mitigate a suggestion of motive, even though that suggestion may be mitigated by a lengthy Class Period.[40] Thus, the trades contribute only slightly to an inference of scienter.[41] We emphasize that, even though we must weigh the plausibility of different explanations for the trades, we make no factual conclusions at this stage.

*3. Audit Committee Findings*

Perhaps the most important of the scienter allegations are those concerning the Audit Committee findings as reported in the June 8-K.[42] The TAC relies primarily on two of the Audit Committee's conclusions.[43] The first specifically identifies Kirk and McHenry:

> [T]he former Chief Executive Officer [Kirk], former Chief Financial Officer [McHenry], and former Chief Accounting Officer (but not any current executive officers) set an inappropriate "tone at the top." Specifically, emphasis placed by former executive management on meeting or beating consensus EPS and achieving certain financial targets, may have resulted in certain inappropriate accounting decisions and entries.

The second major conclusion also identifies McHenry: "[I]t is more likely than not that former employees and officers, including in some instances the former Chief Financial Officer [McHenry] and former Chief Accounting Officer,

---

[40] *ArthroCare*, 726 F. Supp. 2d at 723 (noting a Fourth Circuit case that "labeled a class period of 46 months 'exceedingly long' and declared 'such a lengthy class period weakens any inference of scienter that could be drawn from the timing of defendants' trades.'" (quoting *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 185 (4th Cir. 2007))).

[41] The parties also cite to several cases in which courts held that different percentages of the stock sold did or did not significantly contribute to a strong inference of scienter. But these percentages contribute to a strong inference of scienter only in a holistic context of the allegations in those cases, so particular percentages do not help us.

[42] The February 8-K contains some of the same conclusions as the June 8-K, but its conclusions are more general: It identifies only "former officers and employees," as opposed to the officers identified by title in the June 8-K. The June 8-K is essentially a more detailed version of the February 8-K, and this analysis is therefore confined to the June 8-K.

[43] As noted above, the Audit Committee also concluded that a former employee had intentionally fabricated records. There is no allegation, however, that any defendant knew about this fabrication.

engaged in inappropriate historical accounting practices relating to management estimates and certain accruals." The Form 8-K discusses these inappropriate accounting practices and concludes that whoever made particular accounting decisions did so for the purpose of achieving financial targets. But these findings are written in the passive voice and do not identify *who* made those adjustments with such intent: For example, "management's estimate of quarterly cost of materials *was inappropriately reduced with the objective of* attaining financial targets for those periods[.]" Also, the section describing the accounting practices concludes:

> The evidence of the actual purpose of these adjustments of management estimates and other accruals was neither direct nor conclusive. Nor did witnesses interviewed by the Investigative Team acknowledge having made these adjustments for an improper purpose. Nevertheless, based on the evidence uncovered in the Investigation, the Audit Committee has determined that it is more likely than not that in certain interim fiscal periods of 2011 particular adjustments to particular management estimates were undertaken *for the purpose of* enhancing the Company's reported financial results. Based on the evidence uncovered in the Investigation, the Audit Committee has also determined that it is more likely than not that in the years 2010 through 2012, the accrual and release of the "contingency reserve" was undertaken *for the purpose of* inappropriately enhancing the Company's reported financial results.

The question, then, is whether the June 8-K constitutes particular facts supporting a strong inference of scienter.

a. <u>Group Pleading</u>

As an initial matter, both major findings implicate more than one person. The defendants insist that these allegations are thus "group pleading." "[T]he 'group pleading' doctrine in its broadest form allows unattributed corporate statements [such as press releases] to be charged to one or more individual

defendants based solely on their corporate titles."[44] This court does not consider group pleading allegations.[45] Nor does this court allow group pleading allegations to establish scienter.[46] The Audit Committee-based allegations against Asar are that he must have known about the issues identified in the report and allowed them to continue. These allegations are based on his role as CEO, but the Audit Committee report specifically states that it makes no finding as to his role in the accounting problems. These allegations thus do not support Asar's scienter.

Kirk and McHenry are identified by title in the Audit Committee report. These allegations do not concern the allegedly false statements made *by* these two defendants, nor do they *attribute* Hanger's statements in the Audit Committee report to them.[47] In fact, the Fund describes Kirk's and McHenry's allegedly false statements individually in the complaint.[48]

As we understand it, the defendants contend that these allegations are group pleading because they are general allegations of scienter, and they are not linked to specific statements in the complaint. For reasons discussed below, we agree that some of the scienter allegations against McHenry are based on

---

[44] *Southland*, 365 F.3d at 363.

[45] *See id.* at 365.

[46] *See Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 957 (5th Cir. 2016) (citing *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 533 (5th Cir. 2008)).

[47] *Cf., e.g.*, *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (rejecting allegations as group pleading when "Plaintiffs fail . . . to allege which Individual Defendant made which *statement* at that meeting" (emphasis added)); *Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 261 (5th Cir.), *opinion modified on denial of reh'g*, 409 F.3d 653 (5th Cir. 2005) (upholding dismissal when plaintiff attributed *statements* to "management," but not individuals). McHenry cites various district court cases, but does not explain why our case law requires more of a connection than the June 8-K provides.

[48] To the extent that the Audit Committee report states that "officers" or "management" made certain statements, allegations based on those statements would indeed be group pleading. But we consider the Audit Committee report only in the context of whether the defendants have adequately pleaded scienter with respect to the specifically pleaded false statements elsewhere in the complaint.

group pleading. We have never required different sets of scienter allegations for each statement,[49] but a plaintiff must allege a connection between a defendant's scienter and the allegedly false statements.[50] The fact that these allegations pertain to more than one person does not make them group pleading.[51] The allegations against Kirk and McHenry are not categorically barred as group pleading.

b. <u>"Tone at the Top"</u>

The Fund contends that we may infer Kirk and McHenry's scienter from the Committee's conclusion that those two set an "inappropriate tone at the top" by emphasizing their desire to achieve financial targets. The only court of appeals to have addressed similar allegations concluded that they did not support an inference of scienter.[52] In that case, the Fourth Circuit explained that such admissions "fail to suggest that defendants intentionally created an environment conducive to accounting fraud; the company simply admits that such an environment existed."[53]

---

[49] *See, e.g.*, *Diodes*, 810 F.3d at 957–61; *Owens*, 789 F.3d at 538–46.

[50] *Southland*, 365 F.3d at 364 ("[S]cienter [must] be pleaded with regard to 'each act or omission' sufficient to give 'rise to a strong inference that the defendant acted with the required state of mind.'" (quoting 15 U.S.C. § 78u-4(b))); *cf. id.* at 365 ("[W]e do not construe allegations contained in the Complaint against the 'defendants' as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").

[51] *Cf. Owens*, 789 F.3d at 538 n.4 ("These allegations [common to more than one defendant] do not constitute group pleading because they are sufficiently particularized.").

[52] *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009).

[53] *Id.*; *see also In re Hertz Glob. Holdings, Inc. Sec. Litig.*, No. 13-7050, 2017 WL 1536223, at *16 (D.N.J. Apr. 27, 2017) (describing a company's restatement admitting there was an inappropriate tone at the top and concluding "although the Restatement admits to mismanagement and admits that the mismanagement impacted company accounting decisions, that by itself is not actionable"). *Matrix* also rejected the same argument that the Fund raises here, that "tone at the top" is a term of art critical to strong internal controls. *See Matrix*, 576 F.3d at 183. Even if that is true, it does not suggest that McHenry and Kirk *intended* to create that tone or were consciously doing so.

Some district courts have inferred scienter from a company's admissions of an inappropriate tone at the top. In *Luna v. Marvell Technology Group*, the plaintiff alleged that the inappropriate tone at the top "applied pressure to meet revenue targets not only on sales personnel (who, presumably, could work harder to generate more revenue), but also on *finance* personnel (who could only work with the transactions they were given)."[54] But the *Luna* court also relied on the fact that the company terminated its CEO shortly after commencing the internal investigation, without terminating any senior or lower-level employees, which further supported an inference of the CEO's misconduct in creating the "tone."[55] Another district court determined that a company's disclosure that it had "concerns about tone at the top," made it "more plausible . . . that the fraud flowed from the top[ ]down."[56]

We conclude that the instant allegations based on the Audit Committee's finding of an inappropriate tone at the top do not strongly support an inference of scienter. The allegation that Kirk and McHenry set an inappropriate tone at the top gives no information about *how* they did so. The Fund must plead the requisite scienter "with respect to each act or omission."[57] Without knowing what Kirk and McHenry said or did, it is equally credible that they realized that the tone at the top was inappropriate only with hindsight.[58] All we know about this tone is that Kirk and McHenry emphasized "meeting or beating consensus EPS and achieving certain financial targets." This court has

[54] No. C 15-05447 WHA, 2017 WL 2171273, at *4 (N.D. Cal. May 17, 2017).

[55] *See id.* at *5.

[56] *Fresno Cty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 551–52 (S.D.N.Y. 2017).

[57] 15 U.S.C. § 78u-4(b)(2)(A).

[58] Much like accounting errors and restatements "can easily arise from negligence, oversight or simple mismanagement," *Abrams*, 292 F.3d at 433, so too can "tones" become "inappropriate" through negligence.

declined to find a strong inference of scienter in goals that "virtually all corporate insiders share."[59]

These allegations also contrast with *Luna* in two key ways. First, there is no indication that Kirk and McHenry applied direct pressure to finance personnel. The Audit Committee concludes only that their emphasis on financial targets "may have" resulted in inappropriate accounting decisions. Second, it is undisputed in this case that a former lower-level employee orchestrated a large part of the fraud. This makes even more likely the alternative that the fraud flowed from the "bottom[ ]up" than from the "top[ ]down."[60] These details also make it less probable that the corporate officers directed the fraud or acted with severe recklessness. We emphasize, however, that we are not saying that allegations based on a company's finding of an "inappropriate tone at the top" can never support a strong inference of scienter. Rather, we conclude only that the instant allegations contribute minimally to that inference.

c. <u>"Inappropriate Historical Accounting Practices"</u>

The complaint also alleges, based on the June 8-K, that McHenry and at least one other person "engaged in inappropriate historical accounting practices relating to management estimates and certain accruals." This accounting related to (1) inventory valuation, (2) adjustments to estimates and accruals "without timely or appropriate analysis,"[61] and (3) accrual and release of a contingency reserve in a manner inconsistent with Generally Accepted Accounting Principles (GAAP). The Audit Committee also concluded that these

---

[59] *Owens*, 789 F.3d at 539.
[60] *Cf. comScore*, 268 F. Supp. 3d at 552.
[61] Specifically, recording adjustments before analysis was complete, or modifying analysis to obtain a desired result.

practices "were undertaken for the purpose of enhancing the Company's reported financial results."

The Audit Committee's report states that a group (including McHenry) engaged in the improper accounting, and that a subgroup (perhaps as large as the whole group) did so with the requisite scienter. Two aspects of these allegations dampen an inference of McHenry's scienter. First, the June 8-K does not identify McHenry's particular inappropriate practices, stating only that he engaged in inappropriate accounting "in some instances." Second, the report is replete with passive voice: It makes no reference to *McHenry's* objective, only that "particular adjustments to particular management estimates *were undertaken*" for improper purposes.

These allegations are group pleading of scienter and do not adequately address McHenry's individual state of mind.[62] The allegations say nothing about McHenry's individual intent. Moreover, McHenry's scienter cannot be inferred from a conclusion about the intent of a subgroup of Hanger employees that might not have included McHenry himself. Absent facts demonstrating that McHenry was part of the subgroup that acted with the requisite scienter, the allegations are group pleading.[63] The allegations in the Audit Committee's report contribute minimally to an inference of scienter.

*4. SOX Certifications*

Several of the false statements that form the basis of the Fund's claims are Hanger's SOX certifications. Such certifications require a corporate officer to certify that he or she (1) is "responsible for establishing and maintaining

---

[62] *See Indiana Elec. Workers'*, 537 F.3d at 533 (citing *Southland*, 365 F.3d at 366).

[63] McHenry's other arguments contesting this conclusion are unavailing: He notes that he is not the subject of a criminal investigation; that he was not terminated from Hanger; and that accounting affords a wide latitude for judgment. *Cf. Owens*, 789 F.3d at 544 (explaining that "it is improper to engage in detailed discussion of GAAP rules," including those involving subjective standards, at the motion to dismiss stage).

internal controls" and (2) has "evaluated the effectiveness of the issuer's internal controls."[64] According to the Fund, these certifications support scienter because the individual defendants signed them "[i]n spite of the[] massive accounting problems and falsity."

We have adopted the Eleventh Circuit's approach to SOX certifications: "'[A] Sarbanes–Oxley certification is only probative of scienter if' . . . . [there are] facts establishing that the officer who signed the certification had a 'reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions.'"[65] Although the Fund does not tie any specific red flags to the SOX certifications, it repeatedly points to the accounting problems and concludes that the individual defendants must have been aware of them. As explained above, the fact that there were accounting problems does not necessarily mean that the defendants were *aware* of these "red flags."

The only other allegations that any defendant was on notice of the accounting problems are those which state that Asar and McHenry "knew that Hanger's accounting department was overwhelmed and unreliable given the Company's history of accounting and internal control problems," and cite (1) prior instances when Hanger delayed financial results, (2) "material weaknesses in inventory," and (3) previously-announced misstatements. These might be the kind of issues that would give an officer concern, but they do not rise to the level of "glaring accounting irregularities"[66] such that it would be severely reckless to ignore them. These issues apparently were public

---

[64] 15 U.S.C. § 7241(a)(4).

[65] *Ind. Elec.*, 537 F.3d at 545 (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)).

[66] *Ind. Elec.*, 537 F.3d at 545.

knowledge. The Fund effectively alleges that the defendants should have known about the accounting irregularities because of their positions in Hanger, but that does not support the requisite inference.[67] The fact that accounting irregularities existed does not mean that the defendants were necessarily aware of them.

*5. Medicare Audits/Janus Implementation*

The only other potential red flags alleged are Hanger's problems with Medicare audits and its implementation of Janus. The Fund contends that Asar and, to a lesser extent, McHenry knew of the problems with Medicare audits, which were heightened by the Janus rollout. The Fund thus contends that we may infer that Asar and McHenry would have known that Hanger's Medicare claim reserve was inadequate and that they were severely reckless stating otherwise.

The Fund alleges that Asar and McHenry were on notice of the slowdown in Medicare audit success because (1) Asar and McHenry "paid close attention to Medicare reimbursements, as demonstrated by their regular discussions with investors about the Company's performance in Medicare audits;"[68] and (2) Medicare reimbursement was critically important to Hanger's business.

As explained above, "[a] pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."[69] But an exception to this rule exists in cases with "special circumstances":

---

[67] *Owens*, 789 F.3d at 546 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." (quoting *Abrams*, 292 F.3d at 432)).

[68] Specifically, McHenry told investors "we are watching [the audits] very closely," and Asar told investors "[w]e continue to monitor and adapt to the changing reimbursement environment driven by the volume of Medicare audits and delayed appeals process."

[69] *Owens*, 789 F.3d at 546 (quoting *Abrams*, 292 F.3d at 432).

> The "special circumstances" cases exhibit some combination of four considerations that might tip the scales in favor of an inference of scienter. First, the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations. Second, the transaction at issue may have been critical to the company's continued vitality. Third, the misrepresented or omitted information at issue would have been readily apparent to the speaker. Fourth, the defendant's statements were internally inconsistent with one another.[70]

Recently, in *Neiman v. Bulmahn*, this court held that a company with over 60 employees was too large to implicate the first consideration, and an oil well that was "projected to produce 22.5% of [the company's] total output" did not implicate the second consideration.[71] Hanger operated more than 740 clinics "with over 1,300 clinical practitioners." Although Medicare represented 29% of Hanger's sales, that is only slightly larger than the 22.5% in *Neiman*, and a far cry from *Nathenson v. Zonagen, Inc.*, in which "[s]ubstantially all" of the company's sales depended on one patented product.[72] Further, none of the officers' statements were internally inconsistent. This is not a special-circumstances case.

As for Asar's and McHenry's statements that they followed the Medicare audits closely, we have held that a CEO's puffery that "there is nothing in this company that I don't know" could not support a strong inference of scienter.[73] Such a boast was not sufficiently specific about what the CEO might have known.[74] Here, the allegations of what Asar and McHenry knew are more specific, but they used variations of the phrase "we are monitoring," not "I am monitoring." These statements could support knowledge of the Medicare

[70] *Diodes*, 810 F.3d at 959 (citations omitted).
[71] *Neiman*, 854 F.3d 741, 750 (5th Cir. 2017).
[72] *Nathenson*, 267 F.3d at 425 (alteration in original).
[73] *Ind. Elec.*, 537 F.3d at 535.
[74] *Id.*

problems, but it is equally possible that they merely mean that Hanger as a company monitored the audits. The Fund also notes that Asar and McHenry were likely to notice problems related to Medicare because they were aware of the other problems in the accounting department. But, as noted above, these problems were not so glaring as to make Asar and McHenry severely reckless. Knowing that the accounting department was having problems is different from knowing what each of those specific problems were. Asar's and McHenry's statements thus contribute only slightly to the inference of scienter.

*6. Summary*

As the allegations pertaining to McHenry, Kirk and Asar contribute only slightly to an inference of scienter, taking them holistically does not allow us to strongly infer scienter as to those three defendants. Thus, there is no strong inference of scienter that can be imputed to Hanger.[75]

*B. Control Person Claims*

The complaint does not state a claim against the individual defendants or Hanger with respect to any of the allegedly false statements.[76] Therefore, the individual defendants could not be subject to the § 20(a) claims, which make a "controlling person" jointly and severally liable with the corporation.[77]

## IV. CONCLUSION

For the reasons stated above, we AFFIRM the district court's judgment.

---

[75] *Southland*, 365 F.3d at 366. The defendants argue that we can affirm because the complaint does not adequately allege loss causation, *viz.*, the "causal connection between the material misrepresentation and the [economic] loss suffered by investors." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 808 (2011) (alteration in original) (citation and internal quotation marks omitted). Because we conclude that the complaint does not adequately allege scienter, we need not address this argument.

[76] *Cf. Southland*, 365 F.3d at 366.

[77] 15 U.S.C. § 78t(a); *Southland*, 365 F.3d at 383.

# *United States Court of Appeals*

**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

May 02, 2019

Ms. Jeannette Clack
Western District of Texas, Austin
United States District Court
501 W. 5th Street
Austin, TX 78701-0000

No. 17-50162 City of Pontiac Gen Empl Retmn v. Vinit Asar, et al
USDC No. 1:14-CV-1026

Dear Ms. Clack,

Enclosed is a copy of the judgment issued as the mandate and a copy of the court's opinion.

Sincerely,

LYLE W. CAYCE, Clerk

By: Deborah M. Graham
Debbie T. Graham, Deputy Clerk

cc:
- Ms. Susan Katina Alexander
- Mr. Paul R. Bessette
- Mr. Michael John Biles
- Mr. Douglas R. Britton
- Mr. Charles J. Clark
- Mr. Tyler Wayne Highful
- Mr. Robert Mark Loeb
- Mr. Andrew Love
- Mr. Richard Morvillo
- Ms. Ellen Marie Murphy
- Ms. Jennifer Barrett Poppe
- Mr. Howard Schiffman
- Mr. Peter Andrew Stokes
- Mr. Srimath Saliya Subasinghe